**No. 22-1516**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK TITUS,

Appellant.

On appeal from the United States District Court for
the District of Delaware at No. 1:18-CR-00045-001

**BRIEF FOR APPELLANT**

ELENI KOUSOULIS
Federal Public Defender

MARY KATE HEALY
Assistant Federal Public Defender

*Counsel for Appellant*
*Patrick Titus*

Office of the Federal Public Defender
for the District of Delaware
800 King Street, Suite 200
Wilmington, DE 19801
(302) 573-6010

# Table of Contents

TABLE OF AUTHORITIES ........................................................................ ii

STATEMENT OF JURISDICTION.............................................................1

STATEMENT OF RELATED CASES AND PROCEEDINGS ...........................2

STATEMENT OF THE ISSUES.................................................................3

STATEMENT OF THE CASE ....................................................................5

SUMMARY OF ARGUMENT ..................................................................20

ARGUMENT .........................................................................................22

I.  The district court erred by excluding Dr. Titus's proffered expert testimony................................................................................22

    A.  Standard of Review ..................................................................22

    B.  Discussion ...............................................................................22

II.  The district court violated Dr. Titus's Sixth Amendment right to a public trial by completely closing the courtroom during *voir dire*...........................31

    A.  Standard of Review ..................................................................31

    B.  Discussion ...............................................................................31

III.  The district court erred in framing its jury instructions on the *mens rea* element of the charged dispensing offenses. .................................36

    A.  Standard of Review ..................................................................36

    B.  Discussion ...............................................................................37

IV.  The government's pattern of misconduct requires reversal of Dr. Titus's convictions and remand for a new trial..........................................41

    A.  Standard of Review ..................................................................41

    B.  Discussion ...............................................................................41

V.  The district court erred in calculating the drug quantity attributable to Dr. Titus. ..............................................................................51

    A.  Standard of Review ..................................................................51

    B.  Discussion ...............................................................................52

CONCLUSION .....................................................................................56

CERTIFICATIONS OF COUNSEL ..........................................................57

# TABLE OF AUTHORITIES

*Cases*

*Berger v. United States*, 295 U.S. 79 (1935) ..................................................... 42, 51

*Bontempo v. Fenton*, 692 F.2d 954 (3d Cir. 1982) ...................................................48

*Brady v. Maryland*, 373 U.S. 83 (1963) ........................................................... passim

*Gomez v. United States*, 490 U.S. 858 (1989) ................................................... 32, 34

*Griffin v. California*, 380 U.S. 609 (1965) ...............................................................48

*Leka v. Portuondo*, 257 F.3d 89 (2d Cir. 2001)........................................................44

*Marshall v. Hendricks*, 307 F.3d 36 (3d Cir. 2002) .................................................42

*McDonnell v. United States*, 579 U.S. 550 (2016) ...................................................37

*Neder v. United States*, 527 U.S. 1 (1999)...............................................................34

*Presley v. Georgia*, 558 U.S. 209 (2010)........................................................... 31, 33

*Press-Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984)................................36

*Ruan v. United States*, --- U.S. ----, 142 S. Ct. 2370 (2022)........................... passim

*United States ex rel. Bennett v. Rundle*, 419 F.2d 599 (3d Cir. 1969) ....................36

*United States v. Alvin*, 30 F. Supp. 3d 323 (E.D. Pa. 2014) ....................................44

*United States v. Aviles-Colon*, 536 F.3d 1 (1st Cir. 2008)......................................49

*United States v. Bennett*, 161 F.3d 171 (3d Cir. 1998)............................................30

*United States v. Brennan*, 326 F.3d 176 (3d Cir. 2003) ..........................................48

*United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020) ..........................................54

*United States v. Burke*, 571 F.3d 1048 (10th Cir. 2009) ..........................................45

*United States v. Canty*, 37 F.4th 775 (1st Cir. 2022)................................... 49, 50, 51

*United States v. Chube*, 538 F.3d 693 (7th Cir. 2008)..........................................53

*United States v. Cobb*, 271 F. Supp. 159 (S.D.N.Y. 1967) ......................................44

*United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007)..........................................29

*United States v. Collado*, 975 F.2d 985 (3d Cir. 1992) ..........................................52

*United States v. Diaz*, 951 F.3d 148 (3d Cir. 2020).................................................51

*United States v. Fallon*, 50 F.4th 336 (3d Cir. 2022) ..............................................41

*United States v. Friedman*, 658 F.3d 342 (3d Cir. 2011) .........................................36

*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)...........................................34

*United States v. Gordon*, 290 F.3d 539 (3d Cir. 2002)............................................22

*United States v. Hakim*, 344 F.3d 324 (3d Cir. 2003) .............................................41

*United States v. Hayden*, 64 F.3d 126 (3d Cir. 1995)..............................................27

*United States v. Higgs*, 713 F.2d 39 (3d Cir. 1983).................................................44

*United States v. Houdersheldt*, 2020 WL 7646807 (S.D. W.Va. Dec. 23, 2020) ...53

*United States v. Johnson*, 302 F.3d 139 (3d Cir. 2002)............................................52

*United States v. Lee*, 612 F.3d 170 (3d Cir. 2010) ..................................................41

*United States v. Liburd*, 607 F.3d 339 (3d Cir. 2010) ............................................21

*United States v. Martinez-Medina*, 279 F.3d 105 (1st Cir. 2002) ..........................49

*United States v. Mister*, 553 F. Supp. 2d 377 (D.N.J. 2008) ...................................27

*United States v. Moore*, 423 U.S. 122 (1975)..........................................................23

*United States v. Morena*, 547 F.3d 191 (3d Cir. 2008) ...........................................42

*United States v. Negron-Sostre*, 790 F.3d 295 (5th Cir. 2015)......................... 34, 35

*United States v. Olano*, 507 U.S. 725 (1993) ...................................... 31, 33, 34, 35

*United States v. Phillips*, 959 F.2d 1187 (3d Cir. 1992)..........................................37

*United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) ......................... 22, 25, 26, 27

*United States v. Rand*, 835 F.3d 451 (4th Cir. 2016)...............................................22

*United States v. Rosenberg*, 585 F.3d 355 (7th Cir. 2009).............................. 53, 54

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978).........................................52

*United States v. Watson*, 260 F.3d 301 (3d Cir. 2001) ...........................................22

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020).................................. passim

*United States v. Wood*, 486 F.3d 781 (3d Cir. 2007)...............................................41

*United States v. Zayas*, 32 F.4th 211 (3d Cir. 2022) ...............................................44

*Waller v. Georgia*, 467 U.S. 39 (1984)............................................................ 32, 36

*Washington v. Texas*, 388 U.S. 14 (1967) ....................................................... 20, 22

*Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017) .............................. 20, 31, 32, 35

***Statutes***

18 U.S.C. § 17(a) ..................................................................................25

18 U.S.C. § 3231 .....................................................................................1

18 U.S.C. § 3742(a) .................................................................................1

18 U.S.C. § 922 .....................................................................................27

21 U.S.C. § 841 ................................................................ 5, 23, 24, 39

21 U.S.C. § 856 .......................................................................................5

28 U.S.C. § 1291 .....................................................................................1

***United States Sentencing Guidelines***

U.S.S.G. § 2D1.1..................................................................................16

***Rules***

Federal Rule of Appellate Procedure 4 ....................................................1

Federal Rule of Evidence 401 ..................................................................8

Federal Rule of Evidence 403 ..................................................................8

Federal Rule of Evidence 702 ..................................................................8

Federal Rule of Evidence 704 ..................................................... 8, 9, 30

***Constitutional Provisions***

U.S. Const. amend. V.............................................................................48

U.S. Const. amend. VI .................................................................. passim

## **STATEMENT OF JURISDICTION**

The United States District Court for the District of Delaware had jurisdiction over this federal criminal case under 18 U.S.C. § 3231. The district court entered the judgment of conviction and sentence under review on March 8, 2022. (Appx0002–9).[1] Appellant Patrick Titus timely filed a notice of appeal on March 21, 2022. (Appx0001); *see* Fed. R. App. P. 4(b). This Court has jurisdiction under 28 U.S.C. § 1291, as an appeal from a final decision of a district court, and under 18 U.S.C. § 3742(a), as an appeal of a sentence imposed under the Sentencing Reform Act of 1984.

---

[1] "Appx" refers to the appendix filed with this brief. "PSR" refers to the Presentence Investigation Report.

## **STATEMENT OF RELATED CASES AND PROCEEDINGS**

This case has not previously been before this Court.  Counsel is aware of no other case or proceeding – completed, pending or about to be presented to this Court or any other court or agency, state or federal – that is in any way related to this appeal.

## **STATEMENT OF THE ISSUES**

I.  Did the district court err by excluding wholesale Dr. Titus's expert testimony bearing on the critical issue of knowledge and intent?

- *Preservation of the issue*: Dr. Titus preserved the issue by filing a Notice of Expert Evidence of a Mental Condition, and by responding to the government's motion to exclude expert testimony. (Appx0037; Appx2476–94). Following oral argument, (Appx0038–172), the district court granted the government's motion to exclude expert testimony in a written memorandum order (Appx0178–87).

II.  Did the district court's *sua sponte* closure of the courtroom for the entirety of *voir dire* violate Dr. Titus's Sixth Amendment right to a public trial?

- *Preservation of the issue*: Dr. Titus did not preserve the issue.

III.  Did the district court err in framing its jury instructions on the *mens rea* element of the charged dispensing offenses and by refusing to give a key portion of the defense-requested jury instruction on good faith?

- *Preservation of the issue*: Dr. Titus raised the issue by requesting the Third Circuit Model Criminal Jury Instruction on good faith. (Appx1806–14). The district court ruled on the request orally after several discussions regarding the jury instructions. (Appx1806–14; Appx1825; Appx1967–71; Appx2144–46; Appx2152; Appx2287).

3

IV.   Did the prosecution commit misconduct by (1) withholding exculpatory material until the eve of trial, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); (2) eliciting prejudicial and improper opinion testimony from a witness; (3) commenting on Dr. Titus's right to remain silent; and (4) appealing to the passions and emotions of the jury during closing?

- *Preservation of the issue*: Dr. Titus objected to the *Brady* violation and requested a four-day continuance of the trial.  (Appx0295–311).  The district court denied the request.  (Appx0309–11).  Dr. Titus moved for a mistrial following the witness's prejudicial and impermissible opinion testimony.  (Appx0998–1007).  The district court denied the mistrial. (*Id.*).  Dr. Titus moved for a mistrial after the prosecution commented on Dr. Titus's decision to testify.  (Appx2100–1).  The district court denied the mistrial.  (Appx2101–4).  Dr. Titus did not preserve the challenge to the prosecution's appeal to the jury's emotion.

V.   Did the district court err in calculating the drug quantity attributable to Dr. Titus?

- *Preservation of the issue*: Dr. Titus preserved the issue by objection to the presentence report and through his sentencing memoranda. (Appx2503–6).   The district court overruled the objection. (Appx2335–7).

## STATEMENT OF THE CASE

I. **Dr. Titus's medical background**

In March 2001, the State of Delaware licensed Dr. Titus to practice medicine. *See* PSR ¶¶ 20–31.  In 2005, Dr. Titus established his medical practice, Lighthouse Internal Medicine.  *Id.*  On December 9, 2011, the Delaware Department of State's Office of Controlled Substances suspended Dr. Titus's controlled substances registration ("CSR").  *Id.*  On March 22, 2012, Dr. Titus entered into a Consent Agreement with the State of Delaware.  *Id.*  On May 23, 2012, Dr. Titus's CSR was reinstated.  *Id.*

II. **The charges**

On June 14, 2018, a federal grand jury in the District of Delaware returned a 15-count indictment charging Appellant, Dr. Patrick Titus, with fourteen counts of unlawful distribution and dispensing of controlled substances, in violation of 21 U.S.C. § 841(a)(1) & (b)(1)(C) ("Counts One through Fourteen") and one count of maintaining a drug involved premises, in violation of 21 U.S.C. § 856(a)(1) ("Count Fifteen").  (Appx0027–36).  Dr. Titus, then 55 years old, had no prior criminal history.  *See* PSR ¶¶ 113–18.

Counts One through Fourteen identified patients that received prescriptions for controlled substances from Dr. Titus between August 2013 and October 2014: (1) Brent Hood; (2) Scott Jones; (3) Delores Perry; (4) Maryjane Mench; (5) Dione Dickerson;  (6) Lisa  Parsons;  (7) Gregg  Smith;  (8) Donald  Meck;  (9) Loretta

Connelly; (10) Chasity Calhoun; (11) Tracie Owens; (12) Michael Adams; (13) Lucille Moody; and (14) Melissa Silbereisen. Count Fifteen identified the premises as "10-12 North Church Street, Milford, Delaware." Dr. Titus moved his medical practice to this location in November 2013 and his practice remained there until his office closed in late 2014.

III.    **Dr. Titus's proffered expert testimony**

Prior to trial, Dr. Titus filed notice of his intent to introduce expert evidence relating to his mental disease or defect or other mental condition bearing on the issue of guilt. (Appx0037). Dr. Titus's defense focused on his good faith attempt to treat his patients' chronic pain. "He made mistakes and used poor judgment at times." (Appx0549). Dr. Titus "was not the perfect doctor, but he was a caring doctor." (*Id.*).

The defense identified Dr. Jonathan H. Mack, Psy.D., ABN, FACPN, a board-certified neuropsychologist as an expert witness. (Appx2424). Dr. Mack conducted a neuropsychological and psychological evaluation of Dr. Titus over several days, performing a battery of tests and reviewing both Dr. Titus's medical records and the government's investigative reports.

Dr. Mack prepared a report outlining the results of his neuropsychological and psychological evaluation. (Appx2426–75). Dr. Mack observed that Dr. Titus's "thought process was often rigid and inflexible[.]" (Appx2444). Dr. Mack

6

administered the Halstead Category Test, "a measure of nonverbal concept formation and the ability to learn from trial and error which is one of the most individually sensitive tests to brain damage/dysfunction." (Appx2466). Dr. Titus scored in the "0.09-0.1 percentile rank, severely impaired range." (*Id.*). His score was so low, Dr. Mack re-administered the test. (*Id.*). While Dr. Titus made expected improvement given practice effects, he nonetheless scored in the "3rd percentile rank[,]" mildly to moderately impaired range. (*Id.*). Dr. Titus's performance "on the Halstead Category Test is suggestive of impaired adaptive reasoning to the point where even daily function is likely to be affected." (Appx2473). Dr. Mack assessed that Dr. Titus "attempt[s] to portray himself as exceptionally free of the common shortcomings to which most individuals will admit[]" and "present[s] himself in a very positive light by denying several minor faults and shortcomings that most people acknowledge[.]" (Appx2467). Dr. Mack opined that Dr. Titus's status as "an impaired physician" was "clear" as of the early 2000s. (Appx2473).

Dr. Mack diagnosed Dr. Titus with (1) mild neurocognitive disorder; (2) organic personality syndrome; and (3) schizotypal personality disorder. (Appx2473). Dr. Mack opined:

> [T]he totality of the evidence in Patrick Titus' case goes clearly towards the conclusion that Dr. Titus is, and essentially has been, an impaired and unfit physician from the start of his practice. Dr. Titus' impairments in reasoning and mental organization rendered him unable to assess his own performance realistically, and he lapsed into the arrogant and proselytizing view that his world view and his medical

opinions were correct without question, which is clearly based on severe lack of insight on his part.

It is the [unequivocal] opinion of this examiner that the predominant and underlying issue with Dr. Titus was that he was unqualified to practice medicine based on being unfit for duty due to substandard neurocognitive functioning, that in fact reach the level of chronic brain damage with clear evidence of an Organic Personality Syndrome and Mild Neurocognitive Disorder lateralizing predominantly to the right cerebral hemisphere. I should note that posterior right hemisphere deficits cause individuals to have greater difficulty reading social cues and navigating the social environment. Those same deficits are associated with lack of insight into one's own deficits, which defines the syndrome of anosognosia.

(Appx2474). After Dr. Titus disclosed Dr. Mack's report, the government provided notice of its intent to present expert testimony from Dr. Scott D. Bender. (Appx2398). After conducting a neuropsychological evaluation of Dr. Titus on April 26, 2021, Dr. Bender prepared an expert report. (Appx2553–63). Dr. Bender agreed with Dr. Mack that Dr. Titus has a mild neurocognitive disorder. (*Id.*).

## IV. Proceedings on the government's motion to exclude Dr. Titus's expert testimony

The government moved to exclude Dr. Titus's proposed expert testimony, arguing that the proffered testimony (1) violated the Insanity Defense Reform Act of 1984 ("IDRA") and did not negate the *mens rea* for the charged crimes; (2) was not relevant; (3) was unreliable under Federal Rule of Evidence 702; (4) contained hearsay; (5) was inadmissible under Federal Rule of Evidence 704(b); and (6) alternatively, should be excluded under Federal Rules of Evidence 401 and 403.

(Appx2395–2475).    Dr. Titus opposed the government's efforts to exclude Dr. Mack, arguing that his proposed testimony negates the requisite *mens rea* and demonstrates that Dr. Titus acted in good faith when prescribing to his patients, and was otherwise reliable, relevant, and non-prejudicial.  (Appx2476–94).  Dr. Titus's response to the government's motion included an addendum clarifying Dr. Mack's proposed testimony.  (Appx2491–4).  Dr. Mack explained:

> Dr. Titus had a defective thought process and significant neurocognitive impairments that resulted in his believing he was practicing medicine correctly; with the conclusion that he was acting in good faith within the usual course of medical practice. . .
>
> Dr. Titus processes information differently than others.  He is fixed and regimented in his own belief that his judgment and decision-making in his practice of medicine is correct.  Thus, his decision-making as a medical doctor is limited by his impairments.  His decision-making ability is impaired because of limitations in certain executive functions in the severe range of impairment, suggesting markedly impaired concept formation and adaptive problem solving, and other "significant, chronic cognitive impairment[.]"  It is his impairments that render Dr. Titus unfit to practice, but which also lead me to conclude that he was acting in good faith when prescribing to and treating his pain management patients.

(Appx2492–3).

On June 16, 2021, the district court heard oral argument.  (Appx0076-93). The government subsequently filed a supplemental brief in support of its motion to exclude and reiterated its arguments that Dr. Mack's proposed testimony violated the IDRA and Federal Rule of Evidence 704.  (Appx0173–7).  On July 2, 2021, the

district court granted the government's motion to exclude by memorandum order. (Appx0178–87).

## V.    Pretrial Status Conference

The district court held a status conference on June 30, 2021.  (Appx0188– 292).  After discussing jury selection and trial logistics, the district court considered various motions *in limine*.  As part of those discussions, the parties addressed the anticipated testimony of one government witness: Dr. Joseph Raziano.  (Appx0272– 91).  The defense flagged that Dr. Raziano's witness statement contained pejorative commentary about Dr. Titus.   (Appx0272; Appx0278).    After discussing Dr. Raziano's anticipated testimony, the district court "urge[d] the Government to be cautious here[.]"  (Appx0281).  The district court elaborated that Dr. Raziano should not "be testifying about [Dr. Titus's] reputation in the medical community[.]" (Appx0283).  The defense also noted that Dr. Raziano's witness statement offered inappropriate  expert  opinion  testimony  about  the  legitimacy  of  Dr.  Titus's prescribing.    (Appx0280).    The  district  court  agreed  such  testimony  was inappropriate, (*id.*), later clarifying that Dr. Raziano cannot "testify that it's his opinion that Dr. Titus was prescribing outside the usual course of medical practice" and that "the only people who could offer an opinion on that… are the two [pain management] experts" (Appx0290).

VI.    **The trial**

Dr. Titus's trial began on July 6, 2021.  (Appx0020).  On the eve of trial, the prosecution disclosed the existence of an unsuccessful undercover investigation into Dr. Titus's practice.  (Appx0295–311).  The defense requested that the parties proceed with jury selection but postpone opening statements by four days to allow the defense time to investigate the newly disclosed *Brady* evidence.  The district court denied the request.  *Id.*  The district court then ordered members of the public to exit the courtroom, and *voir dire* and jury selection occurred.  (Appx0311–498).

The prosecution presented its case-in-chief over five days.  (Appx0519–1793).  Three of the fourteen patients listed in the indictment testified about their struggles with addiction, their patient visits with Dr. Titus, and how the controlled substances prescribed by Dr. Titus alleviated their pain.  (*See* Appx0555–85 (Brent Hood); Appx1012–77 (Michael Adams); Appx1161–1214 (Chasity Calhoun)).  Two family members of patients listed in the indictment also testified about their loved ones' struggles with addiction.  (*See* Appx0986–93 (testimony of Henry Lankford, Lisa Parsons' stepfather); Appx1214–23 (testimony of Carla Haynes, Gregg Smith's sister)).  Several of Dr. Titus's former employees testified about his medical practice, detailing how the office staff assisted Dr. Titus with conducting pill counts, drug testing patients, and maintaining medical records.  (*See* Appx0585–649; (testimony

of Amanda Molesi);[2] Appx0684–703 (testimony of Marguerite Lenhardt); Appx1294–1408 (testimony of Jane Webb); Appx1223–71 (testimony of Shannon Holleger)).    Three area pharmacists testified that they decided to stop filling prescriptions written by Dr. Titus because of "red flags" they observed.    (*See* Appx0718–39 (testimony of Jeffrey Timmerman, CVS Pharmacy); Appx0740–62 (testimony of Percy Dhamodiwala, Rite Aid Pharmacy); Appx1279–91 (testimony of Ashley Webb (Wal-Mart pharmacy)).[3] Two emergency room physicians testified that they treated Dr. Titus's patients for overdoses and that they informed Dr. Titus or the State of Delaware about the patients' overdoses.    (*See* Appx1077–113 (testimony of Dr. Marisa Conti regarding Brent Hood); Appx0993–1012 (testimony of Dr. Raziano regarding Lisa Parsons).    During Dr. Raziano's direct examination, he opined that Dr. Titus was "infamous" and "the drug dealing doctor in the area." (Appx0998).

The government presented two expert witnesses: Michael Petron, a statistical expert, and Dr. Stephen Thomas, a pain management expert.    Mr. Petron reviewed

---

[2] Ms. Molesi was also a patient.  (Appx0621–25).  She suffered from addiction, which she hid from Dr. Titus, and sold some of the pills prescribed to her.  (*Id.*; Appx0629).

[3] Pharmacists have "corresponding responsibility" to ensure that the prescription they fill "is written for a legitimate health reason, that the patient and the doctor have an appropriate relationship with each other, and that the doctor is prescribing in the course of his or her practice."  (Appx1282; *see also* Appx0727).

282 patient files (randomly selected from a patient universe of over 1,100 patients) and prescription monitoring data to offer analysis, via summary charts, of Dr. Titus's prescribing habits. (Appx1408–89; Appx2585–2660). He did not make any medical conclusions, (Appx1415), or analyze the time spent by Dr. Titus with the patients or Dr. Titus's treatment of the patients (Appx1480).

Dr. Thomas reviewed the patient files for each of the patients named in Counts One through Fourteen. (Appx1561–1716). He testified that none of Dr. Titus's prescribing to those patients was for a legitimate medical purpose or in the usual course of professional practice. (*Id.*). Dr. Thomas also reviewed 24 additional, randomly selected patient files and concluded that Dr. Titus's prescribing was not for a legitimate medical purpose or in the usual course of professional practice for 18 of the 24 patients. (Appx1717–22).[4] Dr. Thomas emphasized that Dr. Titus's patients were failing drug tests (testing positive for illicit substances and testing negative for prescribed substances) and opined that there is no medically legitimate purpose for prescribing to such a patient. (Appx1541). Dr. Thomas also opined that once a doctor discharges a patient, ending "the doctor-patient relationship, no prescribing of controlled substances can be for a medically legitimate purpose in the

---

[4] Dr. Thomas's expert report and testimony conflict. In the expert report, Dr. Thomas opined that the prescribing was not for a medically legitimate purpose in the usual course of professional practice for 18 of the 24 patients. (Appx2324–27). In his testimony, Dr. Thomas testified that the ratio was 19 of the 24 patients. (Appx1721–22).

usual course of professional practice[.]" (Appx1547–8). Following Dr. Thomas's testimony, the prosecution rested.

The defense presented one expert witness, Dr. Carol Warfield. Dr. Warfield disagreed with Dr. Thomas, opining that Dr. Titus's prescriptions to all the patients named in Counts One through Fourteen were for a legitimate medical purpose and within the usual course of professional practice. (Appx1998–2000; Appx2029–49). She opined that Dr. Titus "was practicing medicine when he wrote those prescriptions." (Appx2000). Dr. Warfield disagreed with Dr. Thomas's opinion that "prescribing to patients who use illicit substances or did not take their drugs as prescribed is outside the usual course of professional practice." (Appx2005). She opined that a physician need not "do a physical exam on every visit[.]" (Appx2007). She "adamantly disagree[d] with Dr. Thomas" that providing a prescription after discharge is improper, opining that "prescribing a dose of a drug after [a physician discharges] a patient is very appropriate." (Appx2007–10). Dr. Warfield testified that, in reviewing Dr. Titus's files, she "saw a practice of medicine that wasn't always the best practice of medicine… but it was always practicing medicine." (Appx2025). She agreed that "Dr. Titus definitely made some mistakes in his treatment of these patients." (*Id.*). For example, Dr. Titus had poor medical record keeping, prescribed fentanyl incorrectly, performed incomplete exams, misinterpreted urine screens, and "in some instances, he was very naïve and gave

patients just too many chances." (Appx2025–28). During Dr. Warfield's cross-examination, the prosecution asked whether she believed Dr. Titus, should he testify, would qualify as an expert in pain medicine. (Appx2100).

The defense also called several former patients who testified about Dr. Titus's treatment of their chronic pain. (*See* Appx1851–73 (Lisa Cody); Appx1913–26 (Clifford Waples); Appx2122–38 (William Pucci)). The defense called Ms. Ryan, the task force officer who attempted an undercover operation at Dr. Titus's practice, (Appx1873–98), and Special Agent McDonald, the case agent (Appx1929–56). Following the defense's case, the government did not present rebuttal. (Appx2142).

Both parties filed proposed jury instructions. The defense requested the Third Circuit Model jury instruction on good faith. (Appx1806–14). The district court rejected the defense's proposal, choosing instead to modify the *mens rea* instruction, defining "knowingly or intentionally," for Counts One through Fourteen. (Appx1967–71; Appx2144–46).

The jury acquitted Dr. Titus of Count Seven and returned a verdict of guilty on Counts One through Six and Counts Eight through Fifteen. (Appx0022).

## VII.    Sentencing

The Probation Office prepared a PSR before sentencing. It calculated an adjusted offense level of 42, a criminal history category of I, and an advisory Guidelines range of 360 months to life. PSR ¶ 189.

The United States Sentencing Guidelines ("U.S.S.G.") contain a Drug Quantity Table that provides base offense levels that correspond to certain quantities of enumerated controlled substances.  U.S.S.G. § 2D1.1(c).  The Guidelines include Drug Conversion Tables "to determine the offense level for controlled substances that are not specifically referenced in the Drug Quantity Table or when combining differing controlled substances."  *Id.* § 2D.1, cmt. n. 8.  Section 2D1.1(c) provides the base offense level for various drug quantities:

- 38:    90,000 KG or more of Converted Drug Weight ("CDW").
- 36:    At least 30,000 KG but less than 90,000 KG of CDW.
- 34:    At least 10,000 KG but less than 30,000 KG of CDW.
- 32:    At least 3,000 KG but less than 10,000 KG of CDW.
  …
- 6:    Less than 1 KG of CDW.

U.S.S.G. § 2D1.1(c).

The government advanced a base offense level of 38, which the PSR adopted, based on an estimated CDW of 106,395.32 kilograms.  PSR ¶¶ 103; 104.  This quantity included all Schedule II controlled substances prescribed by Dr. Titus from November 4, 2013, through December 19, 2014 (the time frame when Dr. Titus leased the premises underlying Count Fifteen).  The government's statistical expert, Michael Petron, reviewed the Prescription Monitoring Program ("PMP") data from Delaware, Maryland, New Jersey, and Pennsylvania to determine that Dr. Titus issued 20,022 unique prescriptions for Schedule II controlled substances during this time.  (Appx1422; 2591).  Those unique prescriptions accounted for 1,228,772 pills

and patches. (*Id.*; *see also* PSR ¶ 91). Mr. Petron did not make any medical conclusions regarding the statistical data. (Appx1415).

The defense objected. *See* PSR at 41. The defense noted that the jury acquitted Dr. Titus of Count 7, prescribing to Gregg Smith. *Id.* The defense also argued that even the government's pain management expert, Dr. Thomas, did not conclude that all of Dr. Titus's prescriptions were outside the usual course of professional practice and not for a legitimate medical purpose. *Id.* at 41–2. Dr. Thomas reviewed the 14 patients identified in the indictment and concluded that Dr. Titus's prescriptions to those individuals were outside the usual course of professional practice and not for a legitimate medical purpose. (Appx1561–1678; 1681–1716). Dr. Thomas also reviewed 24 additional, randomly selected patient files, and concluded that Dr. Titus's prescribing was medically legitimate and within the usual course of professional practice for six of the 24 random patient files. (Appx1716–25; 1736–1769; *see also* PSR at 42). Finally, the defense contended that the government failed to present evidence about any of the other patients or prescriptions included in its quantity attribution. (*Id.*). Accordingly, the defense argued that the quantity should only include: (1) the prescriptions to the 13 patients underlying the counts of conviction and (2) the prescriptions to the 18 additional patients that Dr. Thomas concluded were illegitimately prescribed. *See* PSR at 41.

At sentencing on March 1, 2022, the district court determined that the drug quantity attributable to Dr. Titus was somewhere between 30,000 and 90,000 kilograms CDW. (Appx2335–37). The district court did not calculate the attributable quantity but rather seemingly extrapolated from Dr. Thomas's report and testimony:

> I'm going to conclude here, based on the general trial evidence, but based in particular on the minimum that Dr. Thomas said… that, at a minimum, he opined 18 out of 24 were prescriptions that constituted crimes.
>
> And so, I reject the position of the defense that unless he personally analyzed and came to an opinion on a patient and the prescribing for that patient that you can't include it. I don't think that's right. It seems to me that I can extrapolate from the 18 out of 24, but I do have to take into account that its not a statistically valid number; and therefore, I have to be careful in the extrapolation.
>
> And in this regard, it's kind of helped by the fact that the next lower guideline is 30 kilograms to 90 kilograms. And I feel fairly confident in saying that it's reasonable to assume 18 out of 24, you know, as a statistically invalid sample, still the chances that the true ratio is, you know, seven or eight out of 24, is infitesimally small. And so, therefore, I think it's reasonable to extrapolate that the number is going to be somewhere between 30 and 90 kilograms, 30,000 and 90,000 kilograms of equivalent drug weight. And this is against the backdrop of a picture of widespread illegal prescribing, ignoring of positive drug tests.
>
> But I think even if you didn't have that, I would be confident in saying that I think it's reasonable to estimate that it's at least 30,000 kilograms, and it was well above that number. But I'm not so sure it's above 90,000, so I'm going to give, as I think I should, the Defendant the benefit of the doubt.

18

(*Id.*).  The district court then applied a base offense level of 36 and calculated a Guidelines range of 292 to 365 months.  (Appx2337).[5]  The district court varied downward and imposed a 240-month sentence. (Appx2387–94).

---

[5] Although the district court instructed probation to correct the PSR, the revised PSR incorrectly reflects a base offense level of 38 and a Guidelines range of 360 months to life imprisonment.  *See* PSR ¶¶ 98–104; 189.

## SUMMARY OF ARGUMENT

The right to present a defense "is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). The district court denied Dr. Titus this essential protection by excluding his proffered expert testimony before trial. The testimony supported a theory that Dr. Titus lacked the requisite *mens rea* for the dispensing offenses. The district court erred by excluding Dr. Titus's expert testimony entirely, rather than placing proper limits on it.

The Sixth Amendment right to a public trial includes *voir dire* proceedings. *Weaver v. Massachusetts*, 137 S. Ct. 1899 (2017). The district court's complete closure of the courtroom to the public for the entirety of *voir dire* denied Dr. Titus his right to a public trial. The closure was particularly egregious because the court *sua sponte* ordered it and the closure was complete, excluded members of the public, and lasted for all of jury selection.

The district court incorrectly instructed the jury on the *mens rea* element of the charged offenses and refused to include the defense's requested language regarding Dr. Titus's "good faith." The result is that the district court failed to instruct the jury that the government must prove the absence of Dr. Titus's genuine, honest belief that he was prescribing opioids legitimately beyond a reasonable doubt.

Prosecutorial misconduct violates due process when it has "so infected the trial with unfairness as to make the resulting conviction a denial of due process in

light of the entire proceeding." *United States v. Liburd*, 607 F.3d 339, 342 (3d Cir. 2010). The prosecution improperly failed to disclose *Brady* material until the eve of trial, elicited prejudicial opinion testimony from a witness, commented on Dr. Titus's decision to testify, and appealed to the jury's role as the conscience of the community. The misconduct was pervasive and denied Dr. Titus a fair trial.

The district court erred by attributing over 30,000 kilograms, but under 90,000 kilograms, of converted drug weight ("CDW") to Dr. Titus at sentencing. Unlike cases involving illicit substances, controlled substances may by legally prescribed. The district court's starting quantity included *all* prescriptions during Count Fifteen's indictment period. The government did not present any evidence that each of those prescriptions exceeded the bounds of medical practice in treating the particular recipient patient. The jury acquitted Dr. Titus of one of the prescribing counts, and the government's own expert agreed that not all of Dr. Titus's prescriptions were illegal. The district court should have only calculated the CDW of the prescriptions underlying the counts of conviction and the prescriptions to the additional 18 patients reviewed by Dr. Thomas. Provided Dr. Titus's convictions are not vacated, this Court should vacate his sentence and remand for resentencing.

# ARGUMENT

I.   **The district court erred by excluding Dr. Titus's proffered expert testimony**.

### A. Standard of Review

This Court reviews the district court's "ruling on the admissibility of expert testimony for abuse of discretion." *United States v. Watson*, 260 F.3d 301, 306 (3d Cir. 2001). This Court reviews "evidentiary rulings implicating constitutional claims" de novo. *United States v. Rand*, 835 F.3d 451, 460 (4th Cir. 2016); *see also United States v. Gordon*, 290 F.3d 539, 546 (3d Cir. 2002) ("claims of constitutional violations" reviewed de novo). The district court's exclusion of Dr. Titus's expert testimony violated his right to present a defense and should be reviewed de novo.

### B. Discussion

"[D]ue process requires that the government prove every element of a criminal offense beyond a reasonable doubt." *United States v. Pohlot*, 827 F.2d 889, 900 (3d Cir. 1987). "The defendant's right to present a defense to one of those elements generally includes the right to the admission of competent, reliable, exculpatory evidence, and the Supreme Court has struck down 'arbitrary rules that prevent whole categories of defense witnesses from testifying.'" *Id.* at 900–01 (quoting *Washington v. Texas*, 388 U.S. 14, 22 (1967)). An evidentiary rule "barring all evidence of mental abnormality on the issue of *mens rea*" requires "particular justification." *Id*. at 901. Indeed, this Court recognizes that "a rule barring evidence

on the issue of *mens rea* may be unconstitutional so long as we determine criminal liability in part through subjective status of mind." *Id.* at 905.

Counts One through Fourteen charged Dr. Titus with violations under 21 U.S.C. § 841. Section 841(a) provides:

> *Except as authorized by this subchapter*, it shall be unlawful for any person knowingly or intentionally. . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance[.]

*Id.* (emphasis added). The provisions referenced by the "except as authorized by this subchapter" clause are subchapter I of chapter 13 of title 21 (i.e., 21 U.S.C. §§ 801 – 904). Drug dispensing within the "bounds of professional practice" is what is "authorized by this subchapter," as the Supreme Court unanimously explained in *United States v. Moore*, 423 U.S. 122 (1975), after detailing the complex statutory scheme. *Id.* at 138–43; *see also Ruan v. United States*, --- U.S. ----, 142 S. Ct. 2370, 2375, 2377–78 (2022) ("'[T]o be effective,' a prescription 'must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.'") (quoting 21 C.F.R. § 1306.04(a)). Dr. Titus, as a licensed physician with a controlled substance registration, (Appx0671–2), was authorized to dispense controlled substances.

The Supreme Court recently explained what state of mind the government must prove to convict doctors of violating § 841(a). *Ruan v. United States*, --- U.S. ----, 142 S. Ct. 2370 (2022). "After a defendant produces evidence that he. . . was

authorized to dispense controlled substances, the government must prove beyond a reasonable doubt that the defendant knew that he. . . was acting in an unauthorized manner, or intended to do so." *Id.* at 2375. *Ruan* considered § 841's "knowingly or intentionally" *mens rea* and explained:

> Section 841 contains a general scienter provision – "knowingly or intentionally." And in § 841 prosecutions, a lack of authorization is often what separates wrongfulness from innocence. Defendants who produce evidence that they are "authorized" to dispense controlled substances are often doctors dispensing drugs via prescription. We normally would not view such dispensations as inherently illegitimate; we expect, and indeed, usually want, doctors to prescribe the medications that their patients need. In § 841 prosecutions, then, it is the fact that the doctor issued an *unauthorized* prescription that renders his or her conduct wrongful, not the fact of the dispensation itself. In other words, authorization plays a "crucial" role in separating innocent conduct – and, in the case of doctors, societally beneficial conduct – from wrongful conduct.

*Ruan*, 142 S. Ct. at 2377. In *Ruan*, the government proposed that the Supreme Court "should read the statute as implicitly containing an 'objectively reasonable good-faith effort' or 'objective honest-effort standard.'" *Id.* at 2381. The Supreme Court rejected the government's proposed *mens* rea standard:

> For one thing, § 841, like many criminal statutes, uses the familiar *mens rea* words "knowingly or intentionally." It nowhere uses words such as "good faith," "objectively," "reasonable," or "honest effort."
>
> For another, the [g]overnment's standard would turn a defendant's criminal liability on the mental state of a hypothetical "reasonable" doctor, not on the mental state of the defendant himself[.]

*Id.* at 2381. *Ruan* thus unanimously held that a defendant's genuine belief that his conduct was "authorized," even if unreasonable, requires acquittal because such a belief is inconsistent with the required "knowledge." *Id.* at 2382.

The defense's proposed expert testimony supported a legally acceptable theory that Dr. Titus lacked the requisite *mens rea* and did not objectionably opine on an ultimate issue. The district court erred by excluding Dr. Mack entirely.

### 1. The proffered expert testimony negated the requisite *mens rea*.

The proposed expert testimony did not violate the IDRA and was consistent with *United States v. Pohlot*, this Court's seminal opinion interpreting the IDRA. The IDRA states:

> It is an affirmative defense to a prosecution under any Federal statute that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts. Mental disease or defect does not otherwise constitute a defense.

18 U.S.C. § 17(a). *Pohlot* considered "what, if any, evidence of a criminal defendant's mental abnormality is admissible to prove the defendant's lack of specific intent to commit an offense following passage" of the IDRA and concluded that such evidence is admissible to negate *mens rea*. 827 F.2d at 897–903.

The district court characterized much of Dr. Mack's proposed testimony as centering on Dr. Titus's "lack of insight" or "inability to reflect on his own medical practice" before concluding that *Pohlot* prohibited such testimony. (Appx0180–5).

The district court read *Pohlot* too broadly. *Pohlot* was a murder for hire case in which the defendant, Mr. Pohlot, hired an individual to arrange the murder of his wife. 827 F.2d at 891–95. The applicable *mens rea* was intent to kill. The defense offered expert evidence that Mr. Pohlot "'did not really know' what hiring [the individual] meant" and that his "real hope was not to kill his wife but to live with her again." *Id.* at 906. Thus, "the testimony focused on what Pohlot 'really' knew[]" and not on his "conscious mind[.]" *Id.* This Court concluded that the proffered testimony did not negate intent:

> Pohlot acted with considerable awareness of what he was doing and with considerable purpose. Pohlot engaged in careful activity, over a lengthy period of time, sending first a deputy and then engaging in several phone calls and personal meetings all directed at one purpose: hiring someone to murder his wife. Pohlot came to a firm agreement, made payment, and expressed concern and took action to assure that the crime was not ultimately traceable to him.

> In the context of the facts, both Pohlot's own testimony and that of [his psychiatric expert] relate clearly not to Pohlot's intent in a legal sense but to Pohlot's meaningful understanding of his actions and their consequences. We often act intending to accomplish the immediate goal of our activity, while not fully appreciating the consequences of our acts. But purposeful activity is all the law requires.

*Id.* at 906–07. Here, the applicable *mens rea* requires more than mere purposeful activity; it requires proof that Dr. Titus knew he was "acting in an unauthorized manner, or intended to do so." *Ruan*, 142 S. Ct. at 2375.

Dr. Mack's proposed testimony regarding Dr. Titus's impairments is the type of evidence that negates that *mens rea*, by introducing reasonable doubt as to Dr.

Titus's knowledge or intent.   "Evidence of low intelligence and reading ability is generally relevant in determining knowledge and is usually a jury question." *United States v. Hayden*, 64 F.3d 126, 134 (3d Cir. 1995); *see also United States v. Mister*, 553 F. Supp. 2d 377, 382–90 (D.N.J. 2008) (finding that *Pohlot* does not bar evidence of intellectual impairment).   In *Hayden*, the defendant sought to admit expert testimony of his low intelligence and reading abilities to demonstrate that he did not know he was under a criminal information, thereby negating the knowledge element of his 18 U.S.C. § 922(n) charge for purchasing a gun while under criminal information.   64 F.3d at 132–34.   The district court "prevented Hayden from presenting evidence of his knowledge of the information." *Id.* at 134.   This Court reversed Hayden's conviction, finding that "Hayden's knowledge of whether he was under an indictment or information was central to his defense and indispensable to the factfinder in assessing whether he willfully violated § 922(n)[]" and concluding that the district court erred by preventing Hayden from offering evidence regarding his low intelligence and reading ability. *Id.*   Similarly, in *Mister*, the district court concluded that the IDRA did not bar evidence of a defendant's "poor perception and low intellectual functioning" because such evidence was relevant to whether the defendant knew that the money he accepted was a bribe or corrupt payment.   553 F. Supp. 2d at 378.

Dr. Mack's proposed testimony countered the conclusion that Dr. Titus knew he was "acting in an unauthorized manner, or intended to do so." *Ruan*, 142 S. Ct. at 2375. Dr. Mack opined that Dr. Titus has a "rigid and inflexible" thought process. (Appx2444). His adaptive reasoning is in the "severely impaired" range, affecting his daily functioning. Dr. Titus "processes information differently than others." (Appx2466). "He is fixed and regimented in his own belief that his judgment and decision-making in his practice of medicine is correct" without question. (Appx2492–3). Contrary to the district court's conclusion, this proposed testimony supports the conclusion that Dr. Titus was unable "to process contradictory information." (Appx0184). The jury could have inferred from Dr. Mack's proposed testimony that Dr. Titus continued to prescribe opioids to treat pain because he believed opioids were the best, most effective treatment modality despite their risks. The jury also could have inferred that Dr. Titus continued to prescribe opioids when patients reported debilitating pain and diagnostic imaging substantiated that pain, despite the patients' inconsistent drug screens. These inferences might have engendered within the jury a reasonable doubt as to whether Dr. Titus knowingly or intentionally issued unauthorized prescriptions to his patients.

The United States Court of Appeals for the Ninth Circuit considered similar proffered expert testimony that "suggested [the defendant] had a tendency to cling doggedly to [his] beliefs even in the face of overwhelming contradictions[]" and

concluded it countered the *mens rea* of knowledge.  *See United States v. Cohen*, 510 F.3d 1114, 1123–25 (9th Cir. 2007).  In *Cohen*, the proposed expert diagnosed the defendant "as suffering from a narcissistic personality disorder" and noted that his "beliefs are fixed and have led him to significant adverse consequences, he is irrational to the point of dysfunction, demonstrated by his stubborn adherence in the face of overwhelming contradictions and knowledge of substantial penalty[.]"  *Id.* at 1122–23.  The district court excluded the testimony but the Ninth Circuit reversed, finding that the expert testimony would have helped the defendant counter the applicable *mens rea* (that the defendant knew the tax returns were false).  *Id.* at 1124.

Dr. Mack's proposed testimony negated the *mens rea* of the charged offenses. Dr. Mack opined that Dr. Titus viewed his medical opinions as correct without question.  The proposed expert testimony would have allowed the jury to infer that Dr. Titus believed he was practicing medicine correctly, and therefore, that he did not know he was acting in an unauthorized manner and that he did not intend to act in an unauthorized manner.

### 2. Federal Rule of Evidence 704(b) did not warrant the wholesale exclusion of the proffered expert testimony.

The district court also held that portions of Dr. Mack's proffered testimony were inadmissible under Federal Rule of Evidence 704(b).  (Appx0185–6).  In particular, the district court excluded Dr. Mack's proposed testimony that Dr. Titus

believed "he was practicing medicine correctly, prescribing in good faith while within the usual course of medical practice." (*Id.*).

Rule 704 contemplates the admission of testimony embracing an ultimate issue. Indeed, Rule 704(a) states: "An opinion is not objectionable just because it embraces an ultimate issue." Rule 704(b) outlines an exception for criminal cases and prohibits an expert witness from "an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense[]" because "[t]hose matters are for the trier of fact alone." This Court explained the distinction between admissible and inadmissible expert testimony:

> Rule 704 prohibits "testimony from which it necessarily follows, if the testimony is credited, that the defendant did or did not possess the requisite mens rea. *United States v. Morales*, 108 F.3d 1031, 1037 (9th Cir. 1997). Therefore, expert testimony is admissible if it merely "supports an inference or conclusion that the defendant did or did not have the requisite mens rea, so long as the expert does not draw the ultimate inference or conclusion for the jury and the ultimate inference or conclusion does not necessarily follow from the testimony. *Id.* at 1038 (allowing expert testimony that a defendant charged with willfully making false entries in a union ledger had a weak grasp of bookkeeping principles, because to hold otherwise "would exclude an expert's opinion on any matter from which the factfinder might infer a defendant's mental state.").

*United States v. Bennett*, 161 F.3d 171, 182–83 (3d Cir. 1998). Dr. Mack's proposed testimony permitted, but did not require, the jury to infer that Dr. Titus did not possess the requisite *mens rea*. While Dr. Mack could not testify that Dr. Titus

prescribed in good faith, the district court should not have excluded Dr. Mack's proposed testimony regarding Dr. Titus's neurocognitive impairments.

## II. The district court violated Dr. Titus's Sixth Amendment right to a public trial by completely closing the courtroom during *voir dire*.

### A. Standard of Review

Review is for plain error. *See United States v. Williams*, 974 F.3d 320, 340 (3d Cir. 2020). There must be (1) an "error" that is (2) "plain" and (3) "affects substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993). "If these three conditions are satisfied, then it is 'within the sound discretion of the court of appeals' to correct the forfeited error – but only if (4) 'the error seriously affects the fairness, integrity or public reputation of judicial proceedings.'" *Williams*, 974 F.3d at 340 (quoting *Olano*, 507 U.S. at 732).

### B. Discussion

The Sixth Amendment right to a public trial encompasses jury selection. *Weaver*, 137 S. Ct. 1899. Indeed, "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials." *Presley v. Georgia*, 558 U.S. 209, 215 (2010) (*per curiam*). The district court violated Dr. Titus's right to a public trial by *sua sponte* ordering the complete closure of the courtroom during *voir dire* and jury selection. On the first day of trial, after addressing some preliminary matters, including the government's delayed disclosure

of *Brady* material and the defense's request to postpone opening statements by four days, the district court closed the courtroom, announcing:

> Let me just check and see how we're doing on the jury. All right. So the jury is ready to go. And so the people who are sitting in the back of the courtroom, other than the court security officers, you need to relocate.

(Appx0311). The people "sitting in the back of the courtroom" exited, the jury pool entered the courtroom, and *voir dire* and jury selection occurred. (Appx0311–Appx498). There is no indication that the district court permitted the evacuated members of the public to return to the courtroom or otherwise to observe any portion of this "critical stage of the criminal proceeding[.]" *Gomez v. United States*, 490 U.S. 858, 873 (1989).

The Supreme Court treats courtroom closures "as a structural error, *i.e.*, an error entitling the defendant to automatic reversal without any inquiry into prejudice." *Weaver*, 137 S. Ct. at 1905. In "rare" circumstances, a district court may order a closure but only "based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest." *Waller v. Georgia*, 467 U.S. 39, 45 (1984). "To justify a closure, there must be 'an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure.'" *Williams*, 974 F.3d at 343 (quoting *Waller*, 467 U.S. at 48). District courts must "consider

alternatives to closure even when they are not offered by the parties." *Presley*, 558 U.S. at 214.  The district court did not identify any overriding interest that was likely to be prejudiced, did not consider alternative options, and did not make any findings to support the closure.  (Appx0311).  The courtroom closure was structural error and violated Dr. Titus's constitutional right to a public trial.   Nonetheless, because neither the defense nor the government objected, review is for plain error.

This Court recently considered an unpreserved public trial violation on direct appeal in *United States v. Williams*, 974 F.3d 320 (3d Cir. 2020).  *Williams* guides the analysis and makes clear that the courtroom closure was an error that was plain, satisfying *Olano*'s first and second prongs.  In *Williams*, the panel majority declined to decide whether the error satisfied *Olano*'s third prong and instead concluded, after conducting a cost-benefit analysis, it would not exercise its discretion to correct the error under *Olano*'s fourth prong.  974 F.3d at 341–48.  In dissent, Judge Restrepo opined that the erroneous courtroom closure satisfied *Olano*'s third and fourth prongs.  *Id.* at 380–86 (Restrepo, J., dissenting).

The *Williams* majority left open the possibility that "a structural error ipso facto satisfies *Olano*'s third prong."  974 F.3d at 341.  *Olano* acknowledged that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on outcome."  507 U.S. at 735.  While the Supreme Court "has never held that *Olano*'s 'special category' includes or is the same as that of structural

error[,]" it "has consistently acknowledged but declined to address this possibility." *Williams*, 974 F.3d at 341 (collecting cases).  Judge Restrepo disagreed with the majority's approach, noting that he would resolve the question and hold that an erroneous courtroom closure "fits the special category of errors that must be corrected even without a particularized showing of prejudice and thus satisfies *Olano*'s third prong." *Id.* at 384.  He explained:

> The Supreme Court has made clear that structural errors generally result in the reversal of a conviction because they "are so intrinsically harmful as to require automatic reversal (i.e., 'affect substantial rights') without regard to their effect on the outcome." *Neder*[*v. United States*, 527 U.S. 1, 7 (1999)].  Requiring defendants to make a specific showing of prejudice when claiming a structural error on direct review would force them to engage in a "speculative inquiry into what might have occurred in an alternate universe." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148–50 (2006) (describing why it is "unnecessary to conduct an ineffectiveness or prejudice inquiry" to establish a violation to the "right to counsel of choice").

> The District Court's closure of the courtroom during *voir dire* is the prototypical constitutional error that is impossible to measure. "Jury selection is the primary means by which a court may enforce a defendant's right to be tried by a jury free from ethnic, racial, or political prejudice…, or predisposition about the defendant's culpability." *Gomez v. United States*, 490 U.S. 858, 873 (1989).  Public jury selection proceedings impact the way in which potential jurors respond to questions about their past experiences and the types of questions attorneys ask them. *See Negron-Sostre*, 790 F.3d at 305–06.

> The difficulty in determining the level of prejudice is precisely why structural errors are presumed to affect defendants' substantial rights. *See Neder*, 527 U.S. at 7…  It would be illogical to classify an error as structural because it affects substantial rights but then conclude that it did not affect defendants' substantial rights for purposes of *Olano*'s third prong.

*Id.* For the reasons outlined by Judge Restrepo, this Court should presume prejudice and hold that Dr. Titus satisfied *Olano*'s substantial rights prong.

This Court should exercise its discretion to correct the erroneous courtroom closure because it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 732.[6]  The closure is "particularly problematic" because the district court itself, rather than courtroom personnel, directed it. *See Williams*, 974 F.3d at 346; 385; *Weaver*, 137 S. Ct. at 1913 (emphasizing that there "court officers, rather than the judge[]" made the closure decision).  Moreover, the closure was complete and "extended across an entire phase of trial." *Williams*, 974 F.3d at 346.  And, unlike in *Williams*, the record indicates that the closure forced members of the public "to relocate." (*See* Appx0311; *Williams*, 974 F.3d at 346 ("There is no evidence. . . of an individual or news organization. . . being turned away after attempting to attend the proceedings.")).  The members of the public witnessed substantive preliminary matters but were thereafter forced to leave. (Appx0311).

---

[6] The United States Court of Appeals for the Fifth Circuit has held that "the closure of the courtroom during the entirety of voir dire was a plain and obvious error that, as a structural error, affected the defendants' substantial rights and seriously impaired the fairness, integrity, or public reputation of the proceedings." *United States v. Negron-Sostre*, 790 F.3d 295, 306 (5th Cir. 2015).  This Court should join its sister circuit.

The Sixth Amendment public trial guarantee exists "for the benefit of the accused[]" and "is a means of ensuring the fairness of the trial – 'that the presence of interested spectators may keep the defendant's triers keenly alive to a sense of their responsibility and to the importance of their functions.'" *Williams*, 974 F.3d at 346 (quoting *Waller*, 467 U.S. at 46). Open *voir dire* helps to ensure the selection of unprejudiced jurors and "maintains the public's confidence in the system by enhancing 'the appearance of fairness.'" *Id.* 384–85 (Restrepo, J., dissenting) (quoting *Press-Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984)). The "searchlight" of a public trial "serves as a restraint against the abuse of judicial power and also against possible perjury by witnesses who know that their testimony is exposed to public knowledge." *United States ex rel. Bennett v. Rundle*, 419 F.2d 599, 606 (3d Cir. 1969) (en banc). This Court should correct the structural error because it undermines the fairness, integrity, and public reputation of the criminal proceeding that resulted in Dr. Titus's conviction.

## III.    The district court erred in framing its jury instructions on the *mens rea* element of the charged dispensing offenses.

### A. Standard of Review

This Court reviews the district court's refusal to give a requested jury instruction for abuse of discretion but exercises plenary review over whether the instructions were a correct statement of law. *United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011). This Court "will reverse the district court's denial to charge

a specific jury instruction only when the requested instruction was correct, not substantially covered by the instructions given, and was so consequential that the refusal to give the instruction was prejudicial to the defendant." *United States v. Phillips*, 959 F.2d 1187, 1191 (3d Cir. 1992). When an erroneous jury instruction may have resulted in a conviction "for conduct that is not unlawful," the error cannot be harmless. *McDonnell v. United States*, 579 U.S. 550, 579–80 (2016).

## B. Discussion

Dr. Titus's defense focused on his good faith efforts to treat his patients' pain. He requested the Third Circuit's model jury instruction on good faith. The district court declined to instruct the jury on good faith, instead modifying the *mens rea* instruction defining "knowingly or intentionally." The district court thus charged the jury:

> Counts 1 through 14 of the indictment charge the Defendant, Patrick Titus, with distributing and dispensing a mixture or substances containing controlled substances. . .

> In order to find Dr. Titus guilty of the offense that we're talking about here, you must find that the Government proved each of the following four elements beyond a reasonable doubt[.] First, that Dr. Titus distributed or dispensed a mixture or substance containing a controlled substance.

> Second, that Dr. Titus distributed or dispensed the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose.

Third, that Dr. Titus distributed or dispensed the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose knowingly or intentionally.

And fourth, that the controlled substance was the particular controlled substance or substances alleged for each of Counts 1 through 14 of the indictment. . .

The third element the Government must prove beyond a reasonable doubt is that Dr. Titus acted knowingly or intentionally.

The phrase knowingly or intentionally requires the Government to prove beyond a reasonable doubt that Dr. Titus knew that what he distributed or dispensed was a controlled substance and that the distributing or dispensing was outside the usual course of professional practice and not for a legitimate medical purpose.

To act knowingly means that Dr. Titus was conscious and aware that he was engaged in the acts charged and knew of the surrounding facts and circumstances that make up the offenses. Knowledge does not require that Dr. Titus knew the acts charged and the surrounding facts amounted to a crime.

To act intentionally means to act deliberately and not by accident. Intentionally does not require that Dr. Titus intended to violate the law.

If a person acts on the basis of an honestly held belief that is inconsistent with the charged conduct, but the belief turns out to be inaccurate or incorrect, then the person is not acting knowingly or intentionally. Thus, in this case, if Dr. Titus made an honest mistake about a patient's medical needs, then he did not act knowingly or intentionally.

(Appx2164–9).

The district court's charge to the jury regarding Dr. Titus's *mens rea* is

incorrect and insufficient following *Ruan*. At best, the instruction is ambiguous as

to whether Dr. Titus's good faith belief is an affirmative defense or a way of raising reasonable doubt about Dr. Titus's knowledge or intent.

As discussed *supra*, *Ruan* considered § 841(a)'s "exception clause" and concluded that it establishes an element-like condition that the government must prove beyond a reasonable doubt "once a defendant meets the burden of producing evidence that his. . . conduct was 'authorized.'" 142 S. Ct. at 2376. The defendant's lack of authorization is subject to § 841(a)'s "knowingly or intentionally" *mens rea* element. *Id.* at 2376–82. The government bears the burden of proof on the defendant's lack of authorization both to establish that the dispensing was not authorized and to prove the defendant knew the dispensing was not authorized beyond a reasonable doubt. *Id.* The Court rejected the government's contention "that requiring it to prove that a doctor knowingly or intentionally acted not as authorized will allow bad-apple doctors to escape liability by claiming idiosyncratic views about their prescribing authority." *Id.* at 2382. The Court explained:

> The Government, of course, can prove knowledge of a lack of authorization through circumstantial evidence. And the regulation defining the scope of a doctor's prescribing authority does so by reference to objective criteria such as "legitimate medical purpose" and "usual course" of "professional practice." As we have said before, 'the more unreasonable' a defendant's 'asserted beliefs or misunderstandings are,' especially as measured against objective criteria, 'the more likely the jury. . . will find that the Government has carried its burden of proving knowledge.'" But the Government must still carry this burden. And for purposes of a criminal conviction under § 841, this requires proving that a defendant knew or intended that his. . . conduct was unauthorized.

*Id.* (citations omitted).

The district court's *mens rea* instruction fails to explain that Dr. Titus's good faith, honestly held belief that he was prescribing legitimately creates reasonable doubt about knowledge or intent. Put differently, the charge failed to instruct the jury that the government bears the burden of proving beyond a reasonable doubt that Dr. Titus lacked an honest, genuine belief that his prescribing was legitimate. The erroneous jury instruction likely prejudiced Dr. Titus. The jury acquitted Dr. Titus of Count Seven. (Appx2302). Several patients testified that they hid their addiction from Dr. Titus because they knew he would otherwise not prescribe to them. (*See* Appx0578 (Brent Hood); Appx0629 (Amanda Molesi); Appx1025, Appx1048, Appx1069 (Michael Adams); Appx1208 (Chasity Calhoun)). This testimony undercuts a conclusion that Dr. Titus dispensed prescriptions to "facilitat[e] addiction or recreational drug abuse." *Ruan*, 142 S. Ct. at 2389 (J., Alito, concurring). They also testified regarding their debilitating pain and affirmed that the pain medication prescribed by Dr. Titus alleviated it. (*See* Appx1017–19, Appx1036, Appx1069 (Michael Adams); Appx1208 (Chasity Calhoun)). And Dr. Warfield provided expert testimony that Dr. Titus's prescriptions were medically legitimate and within the usual course of professional practice for each of the patients identified in Counts One through Fourteen. (Appx2029–49). She testified that Dr. Titus was acting for a medical purpose – to alleviate and to treat pain. (*Id.*; *see also*

Appx2000–02; Appx2006).  She opined that doctors may continue to prescribe opioids to individuals suffering from addiction or substance abuse because "those patients have severe pain just like other people have severe pain. . . and sometimes the best treatment is. . . opioids."  (Appx2006).  The jury may have acquitted Dr. Titus of additional counts if it had been instructed that a reasonable doubt about whether Dr. Titus believed he was prescribing legitimately – to treat chronic pain – precluded a conclusion that he acted knowingly or intentionally.

## IV.  The government's pattern of misconduct requires reversal of Dr. Titus's convictions and remand for a new trial.

### A. Standard of Review

"This Court reviews a violation of *Brady v. Maryland de novo* for conclusions of law, but applies a clearly erroneous standard to findings of fact."  *United States v. Fallon*, 50 F.4th 336, 363 (3d Cir. 2022) (footnotes omitted).  This Court reviews a district court's denial of a mistrial for abuse of discretion.  *United States v. Wood*, 486 F.3d 781, 786 (3d Cir. 2007); *see also United States v. Hakim*, 344 F.3d 324, 328 (3d Cir. 2003).  This Court reviews preserved claims of prosecutorial misconduct for an abuse of discretion and unpreserved claims for plain error.  *United States v. Lee*, 612 F.3d 170, 193–94 (3d Cir. 2010).

### B. Discussion

"Federal prosecutors have a special and solemn duty to refrain from improper methods of obtaining a conviction."  *United States v. Morena*, 547 F.3d 191, 193 (3d

Cir. 2008).  "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 79, 88 (1935).  Federal prosecutors "may prosecute with earnestness and vigor – indeed, [they] should do so.  But, while [they] may strike hard blows, [they] are not at liberty to strike foul ones." *Id.*  "Improper prosecutorial conduct rises to the level of constitutional error 'when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial.'" *Morena*, 547 F.3d at 193–94 (quoting *Marshall v. Hendricks*, 307 F.3d 36, 67 (3d Cir. 2002)).  "The test for prosecutorial misconduct is whether the conduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding.'" *Id.*

The government's pattern of misconduct requires reversal of Dr. Titus's convictions and remand for a new trial.  The government impermissibly: (1) failed to disclose exculpatory evidence in a timely manner; (2) elicited pejorative and improper opinion evidence from one of its witnesses despite repeated remonstrations from the defense and warnings from the district court; (3) remarked on Dr. Titus's right to remain silent; and (4) appealed to the jury's emotions.  These four instances of prosecutorial misconduct cumulatively warrant relief.

First, the government failed to comply with its *Brady* obligations.  On the eve of trial (mere hours before jury selection), the government disclosed that its investigation included an unsuccessful undercover operation.  (Appx0294–95).  The government explained:

> I will tell you that the way that this came about is that we were going through the case files one last time out of an abundance of caution to ensure that everything that was in there had been properly disclosed. And as soon as we saw it, we. . . provided it to defense counsel.

(Appx0296).[7]  The undercover attempts occurred in August and September of 2014 and the undercover officer, Joelle Ryan, generated six recordings (three phone calls with office staff and three visits to the office).  The defense requested that the parties proceed with jury selection but postpone openings by four days to review and to weigh the delayed discovery.  (Appx0296).  The district court denied the request. (Appx0309–11).

---

[7] The exculpatory evidence was thus exactly where one, with diligence, might expect to find it – "the case files."  (Appx0296).  The defense nonetheless accepted the prosecutor's representation that she discovered the exculpatory evidence the night before trial.  (Appx0309).  Still, the abject failure by all the law enforcement agents working on the case either to document the undercover investigation or to inform the prosecutors of its existence over the seven years spent building the case together is, to say the least, troubling.  (Appx0309).  Just a month prior, at the hearing on the motions *in limine*, the parties discussed the lack of an undercover attempt. (Appx0059–70).  The government addressed the lack of an undercover in its supplemental brief in support of its motion to exclude Dr. Titus's experts. (Appx0173–5).

"A *Brady* violation occurs if the government does not disclose evidence that is favorable to the defendant that is material to either guilt or innocence, and this failure prejudices the defendant." *United States v. Zayas*, 32 F.4th 211, 230 (3d Cir. 2022). "The critical question in delayed disclosure cases is whether the evidence was disclosed 'in time for its effective use at trial.'" *United States v. Alvin*, 30 F. Supp. 3d 323, 334 (E.D. Pa. 2014) (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983)). When, as here, the government discloses *Brady* material "on the eve of trial… the opportunity to use it may be impaired." *Leka v. Portuondo*, 257 F.3d 89, 101 (2d Cir. 2001). "The defense may be unable to divert resources from other initiatives and obligations that are or may seem more pressing." *Id.* Indeed, "there may be instances where disclosure of exculpatory evidence for the first time during trial would be too late to enable the defendant to use it effectively in his own defense, particularly if it were to open the door to witnesses or documents requiring time to be marshalled and presented." *United States v. Cobb*, 271 F. Supp. 159, 163 (S.D.N.Y. 1967).

The delayed disclosure of the undercover investigation, and the district court's related refusal to postpone trial by four days, did prejudice Dr. Titus. The delayed disclosure and denial of a postponement forced defense counsel to decide, within hours and without full information, whether and how to incorporate the *Brady* material into the opening statement and Dr. Titus's defense. The strategic pretrial

decisions about how to apportion time and resources, whether Dr. Titus should testify, and where to focus the jury's attention had likely already been made. Over the course of the next four days representing the requested postponement, the parties made their opening statements and the government called 13 witnesses. (Appx0020–21). The defense had insufficient time to consider how to incorporate the undercover investigation into its cross-examination, and insufficient information about the undercover investigation itself. Although the defense ultimately did decide to call both the undercover officer, Joelle Ryan, and the case agent, Special Agent William McDonald, neither had prepared reports documenting the undercover investigation and their memories were limited. (Appx1873–98 (Ms. Ryan's testimony); Appx1929–56 (Agent McDonald's testimony)). Allowing "the government to postpone disclosures to the last minute, during trial[]" "eviscerate[s] the purpose of the *Brady* rule and encourage[s] gamesmanship[.]" *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).

Second, the government elicited prejudicial and improper opinion testimony from its witness, Dr. Raziano. Throughout pretrial and trial proceedings, the defense repeatedly raised concerns about Dr. Raziano's anticipated testimony. (Appx0272–91; Appx0834–44). After the prosecution called Dr. Raziano, and perhaps in light of the defense's concerns, the district court held a conference at sidebar to "make sure that… [Dr. Raziano] was counseled properly[,]" and to ask the prosecutors "if

they needed a recess or would they like a recess to make sure that the witness was on board about what the limits were." (Appx0993–4; Appx1003–4). The prosecutor "pretty much assured [the district court] she didn't need it, and so [the direct examination] went forward." (Appx1004–5). In short order, the following exchange occurred:

> Q:     Are you familiar, Dr. Raziano, with an individual named Patrick Titus?
>
> A:     Absolutely, yes.
>
> Q:     When did you first become familiar with Patrick Titus?
>
> A:     I can't give you an exact date, but he's – he was pretty infamous in the area.
>
> Q:     How did you become familiar with him?
>
> A:     He was the drug dealing doctor in the area.

(Appx0998). The defense immediately moved to strike and, at sidebar, moved for a mistrial. (Appx0998–1007). The district court struck Dr. Raziano's last answer and denied the mistrial motion. (*Id.*).

Dr. Raziano's description of Dr. Titus as "the drug dealing doctor in the area" constitutes both prejudicial name calling and inappropriate expert opinion on an ultimate issue. The district court abused its discretion by denying the mistrial. The prosecutor repeatedly represented that she had prepared Dr. Raziano and, just before calling him as a witness, rejected additional time to make certain he knew the limits

of his testimony. (Appx0844; Appx0993–94). Despite her earlier assurances that she adequately counseled the witness, the prosecutor subsequently represented to the court: "I did not know he was going to say anything." (Appx0999). The district court concluded that the government "was not trying to elicit the answers that they got." (Appx1006–7). That conclusion is bewildering on this record. Dr. Raziano's testimony was consistent with his witness statements, and not a surprise. Counseling the witness about the limits of his testimony, as she represented that she did, requires that she know how he will or will not testify. Moreover, Dr. Raziano's testimony was entirely consistent with the government's own language advancing its theory of the case. During opening and closing statements, the prosecution repeatedly argued that Dr. Titus's practice was "a drug-dealing operation dressed up as a doctor's office." (Appx0539; *see also* Appx0545; Appx2175; Appx2178; Appx2216). Dr. Raziano, an emergency room physician, stated the conclusion that the government was asking the jury to reach.

Third, the government improperly commented on Dr. Titus's right to remain silent. During his cross-examination of Dr. Warfield, the prosecutor asked her if she believed Dr. Titus would qualify as an expert witness should he testify:

Q:    Around 2012, did you write an editorial – and I guess it's a journal, Pain Medicine?

A:    Yes.

Q:    Okay.  Titled "The Importance of Qualified Expert Witnesses"; right?

A:    Right.

Q:    Okay.  And you wrote as follows: "In my opinion, no one else, not an addictionologist, not a DEA agent, not a judge, nor an attorney should be in a position to determine whether a pain physician was acting reasonably when he or she prescribed opioids for a particular pain condition."  Correct?

A:    Correct.  That was about pain physicians, yes.

…

Q:    Okay.  Your editorial was about who could be qualified to testify in such cases; correct?

A:    It was about who is an expert in pain medicine.

Q:    Okay.  And if Dr. Titus were to testify in this case, would he meet the criteria?

(Appx2099–2100).

The Fifth Amendment forbids a prosecutor from commenting on a defendant's exercise of his right to remain silent or failure to testify at trial.  *Griffin v. California*, 380 U.S. 609, 615 (1965).  A prosecutor impermissibly remarks on a defendant's silence "when 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.'"  *United States v. Brennan*, 326 F.3d 176, 187 (3d Cir. 2003) (quoting *Bontempo v. Fenton*, 692 F.2d 954, 959 (3d Cir. 1982)).  Here, the prosecutor explicitly mentioned Dr. Titus and directly commented on

48

whether he would testify. (Appx2099–2100). Notably, and inexplicably, the comment was deliberate. Two of the prosecutors offered explanations for their planned questioning at sidebar, (Appx2101 (Mr. Woodard); Appx2102–3 (Ms. Remis)), but of course, "the purpose of the question has no relevance or significance" (Appx2103). The district court expressed its bewilderment at the prosecution's decision. (*See* Appx2100 ("What are you possibly thinking of by asking a question about whether he's going to testify or would testify? We know he's not going to testify.")). Although the district court did strike the testimony and offer a curative instruction, (Appx2103–4), it also noted that the instruction "seems to emphasize the point" (Appx2101). The emphasis was unavoidable and compounded the prosecutor's impermissible remark. The jury was left wondering whether Dr. Titus would testify and, when he did not, why.

Finally, the prosecution impermissibly appealed to the jury's emotions during opening, closing, and on rebuttal. "[I]t is improper to appeal to the 'jury's emotions and role as the conscience of the community.'" *United States v. Aviles-Colon*, 536 F.3d 1, 24 (1st Cir. 2008) (quoting *United States v. Martinez-Medina*, 279 F.3d 105, 119 (1st Cir. 2002)). "It is also improper to stress harm to a particular community caused by drug dealing." *United States v. Canty*, 37 F.4th 775, 787 (1st Cir. 2022).

During the opening statement, the prosecution argued that Dr. Titus "took advantage of vulnerable people for his own personal gain" and asked that the jury

hold him responsible for "the devastation and pain he caused[.]" (Appx0545–6). During the closing, the prosecution reiterated this theme and argued that Dr. Titus left "people who were clearly suffering from addiction, who were obviously abusing drugs, and who weren't even taking the drugs at all… in even more pain." (Appx2175). In rebuttal, the prosecution described the prescriptions as "poison" and expressly asked the jury to think about the impact of drugs on their broader community:

> Here's what you need to do when you go back there. Think about all these patients. Think about the Lisa Parsons of the world. Think about the Chasity Calhouns, and the Michael Adams, and the Dione Dickersons, and the Melissa Silbereisens. And find him guilty of Count 1. Find him guilty of Count 2. Find him guilty of Count 3, Count 4, Count 5. Find him guilty of Count 6. Find him guilty of Count 7. Find him guilty of Count 8, 9, 10, 11, 12, 13, and 14. And find him guilty for all of the other behavior that we talked about that has nothing to do with these 14 counts. Find him guilty of Count 15.

(Appx2278; 2281).

This is a direct appeal to "the jury's role as the conscience of the community" and an invitation to "the jury to abandon its role as rational factfinder and to judge the case based on negative feelings toward" Dr. Titus. *Canty*, 37 F.4th at 796.

*Canty* is instructive. *See* 37 F.4th at 786–88; 790–96. As here, the *Canty* prosecution cast the defendants as "greedy" individuals seeking to profit off "vulnerable" victims struggling with addiction. *Id.* at 786–87. The *Canty* prosecution emphasized "the themes of exploitation and of causing suffering[.]" *Id.*

at 787.  The *Canty* prosecution similarly "began with improper themes in the opening statement, built upon and exacerbated them at closing, and then repeated and added to them in the rebuttal."  *Id.* at 792.  The First Circuit concluded, on plain error review, that "the improper arguments by the prosecutor 'so poisoned the well that the trial's outcome was likely affected, thus warranting a new trial.'"  *Id.* at 796.  This Court should do the same.

The prosecution's pattern of misconduct infected Dr. Titus's trial with unfairness.  The misconduct was not "slight or confined to a single instance, but… pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."  *Berger*, 295 U.S. at 89.  Federal prosecutors "ought to be mindful of the harm done when those in power ignore the rules governing their own conduct while demanding strict compliance from others."  *Canty*, 37 F. 4th at 796.  Dr. Titus was denied due process by the unfairness of his trial and this Court should vacate his convictions and remand for a new trial.

## V.   The district court erred in calculating the drug quantity attributable to Dr. Titus.

### A. Standard of Review

This Court reviews the district court's drug quantity determination for clear error.  *United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020).  The district court "must determine by a preponderance of the evidence that a defendant was responsible for a particular weight of substance before attributing that amount to the

defendant." *Id.* (citing *United States v. Collado*, 975 F.2d 985, 998 (3d Cir. 1992)). "District courts may not calculate quantity based on 'mere speculation.'" *Id.* This Court finds "a sentencing court's factual findings clearly erroneous if they are 'unsupported by substantial evidence, lack adequate evidentiary support in the record, are against the clear weight of the evidence or where the district court has misapprehended the weight of the evidence.'" *Id.* at 160–61 (citing *United States v. Johnson*, 302 F.3d 139, 153 (3d Cir. 2002)).

### B. Discussion

To include a prescription as relevant conduct for the drug quantity calculation, the prescription must be illegal. Issuing invalid prescriptions is "often difficult to distinguish from" issuing valid prescriptions. *Ruan*, 142 S. Ct. at 2378 (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 (1978)). The government needed to prove that each of the 20,022 unique prescriptions included in its proposed drug quantity calculation was outside the usual course of professional practice and not for a legitimate medical purpose. It failed to do so, and the district court erred by purporting to discount the quantity attributable to Dr. Titus and using the government's erroneous proposed quantity as a starting point.

The difficulty of distinguishing illegal conduct "from the gray zone of socially acceptable conduct" is acute in physician prescribing cases. *Ruan*, 142 S. Ct. at 2378 (quoting *U.S. Gypsum Co.*, 438 U.S. at 441). There is little case law within the Third

Circuit addressing the relevant conduct analysis for drug quantity attributions in such cases. In *United States v. Rosenberg*, the Seventh Circuit considered "the proposition that judges must specifically address every prescription included in their relevant conduct determination." 585 F.3d 355, 357 (7th Cir. 2009). The Seventh Circuit discussed an earlier case, *United States v. Chube*, 538 F.3d 693 (7th Cir. 2008), that concluded that a district court "must explain its findings with respect to each patient and make a reasoned determination whether or not the government has carried its burden of establishing that each prescription was dispensed outside the scope of medical practice and without a legitimate medical purpose." *Id.* (quoting *Chube*, 538 F.3d 693, 705–06 (7th Cir. 2008)). *Rosenberg* clarified *Chube*, explaining that a sentencing judge need not address every prescription but must address every patient:

> *Chube* requires the government to at least address every patient to whom a medical professional defendant has written an allegedly unlawful prescription. It is not necessary, however, for the government [to discuss systematically] every single prescription that every single patient received. That would be a duplicitous and meaningless procedural requirement. A district court may not, however, as it did in *Chube*, only discuss some of the patient files and extrapolate that, because some of the patients received prescriptions that had no legitimate medical purpose and were outside the usual course of medical practice, all of the prescriptions written to all of the patients had no legitimate medical purpose and were outside the usual course of medical practice.

*Rosenberg*, 585 F.3d at 357–58; *see also United States v. Houdersheldt*, 2020 WL 7646807 (S.D. W.Va. Dec. 23, 2020) (not precedential) ("Before uncharged conduct

53

can be considered relevant conduct, the United States must establish… that the uncharged conduct constitutes a crime.  In other words, the specific prescriptions listed in the PSR must exceed the 'bounds of professional medical practices in treating that patient.'  To determine whether this standard is met, the Court must look at each specific prescription and compare it to the evidence presented at trial and at the sentencing hearing.") (quoting *United States v. Brizuela*, 962 F.3d 784, 797 (4th Cir. 2020) (internal citation omitted)).

The district court here did exactly what *Rosenberg* cautions against for a drug quantity calculation.  The district court set Dr. Titus's base offense level at 36 but did not calculate the drug quantity attributable to him.  Instead, the district court conjectured that the drug quantity was over 30,000 kilograms but under 90,000 kilograms of CDW.  (Appx2335–37).  The district court characterized its approach as an extrapolation, (Appx2336), but there is no indication as to how it reached the range it did.  Ostensibly, the range approximates a discount, based on Dr. Thomas's testimony that Dr. Titus's prescribing was illegal for 18 out of 24 randomly selected patients.  But the district court failed to discuss any of those patients, any of the prescriptions issued to them, the course of the patients' treatments, or the options available to Dr. Titus to treat the patients.  This omission becomes more glaring when applying Dr. Thomas's conclusions regarding the randomly selected, statistically insufficient sample to all the prescriptions issued during Count Fifteen's

indictment period. The government presented no evidence, and the district court made no findings at all, about the patients underlying the 20,022 prescriptions comprising the 1,228,722 patches and pills prescribed.

If this Court does not vacate Dr. Titus's conviction, it should vacate his sentence and remand for resentencing.

## **CONCLUSION**

Appellant Patrick Titus's convictions should be vacated and the case remanded for a new trial.  Alternatively, Dr. Titus's sentence should be vacated and remanded for resentencing.

Respectfully submitted,

Eleni Kousoulis
Federal Public Defender

*/s/ Mary Kate Healy*
MARY KATE HEALY
Assistant Federal Public Defender

Office of the Federal Public Defender
for the District of Delaware
800 North King Street, Suite 200
Wilmington, DE 19801
(302) 573-6010
de_ecf@fd.org

Counsel for Appellant Patrick Titus

Date: <u>November 14, 2022</u>

## CERTIFICATIONS OF COUNSEL

I, Mary Kate Healy, Assistant Federal Defender, of the Office of the Federal Public Defender for the District of Delaware, hereby certify:

1. I have been appointed to represent Patrick Titus in this appeal, although I am not a member of the bar of the Court of Appeals for the Third Circuit.

2. This brief complies with the type-volume requirements of Fed. R. App. P. 32(a)(7)(B) because it contains 12,972 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 word count software in font size 14, type style Times New Roman.

3. The text in the electronic copy of this brief is identical to the text in the paper copies of the brief filed with the Court.

4. The electronic version of this brief was scanned by Trend Micro Apex One, Version 14.0.11110, and found to contain no known viruses.

5. I have electronically filed the *Brief for Appellant and Appendix* and served copies upon Filing User John-Alex Romano, Esq., U.S. Department of Justice, through the Third Circuit Court of Appeals' Electronic Case Filing (NextGen CM/ECF) system.

6. I mailed a hard copy of this brief to Patrick Titus, Register No. 09227-015, Danbury, FCI, Federal Correctional Institution, Route 37, Danbury, CT 06811.


Date:  November 14, 2022                          / s / *Mary Kate Healy*
                                                  Mary Kate Healy