No. 22-1516

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK TITUS,

Appellant.

———————————————

On Appeal from the United States District Court
for the District of Delaware
No. 1:18-CR-00045-001 (Andrews, J.)

———————————————

ANSWERING BRIEF FOR THE UNITED STATES

———————————————

ALEZA S. REMIS
JUSTIN M. WOODARD
 Assistant Chiefs

CLAIRE T. SOBCZAK
 Trial Attorney
 Criminal Division, Fraud Section

KENNETH A. POLITE
 Assistant Attorney General

LISA H. MILLER
 Deputy Assistant Attorney General

JOHN-ALEX ROMANO, Attorney
 U.S. Department of Justice
 Criminal Division, Appellate Section
 950 Pennsylvania Avenue, NW
 Washington, DC 20530
 Tel. 202-353-0249

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................i

TABLE OF AUTHORITIES ........................................................iv

STATEMENT OF JURISDICTION.............................................1

STATEMENT OF THE ISSUES ...................................................1

STATEMENT OF THE CASE .......................................................2

    I.     Procedural History.......................................................2

    II.    Relevant Facts ...........................................................2

         A.    Titus entered into a Consent Agreement with Delaware after the State suspended his authority to prescribe controlled substances...........................3

         B.    Titus engaged in the business of selling opioid prescriptions. .......................................................5

         C.    Titus's prescription of opioids harmed patients. ................ 11

         D.    Titus made false statements to the DEA, and the execution of search warrants yielded incriminating evidence. .......................................................... 13

    III.    Rulings Under Review ............................................... 15

STATEMENT OF RELATED CASES....................................... 15

SUMMARY OF ARGUMENT .................................................. 15

ARGUMENT................................................................................ 17

    I.     The District Court Properly Excluded Expert Testimony Concerning Titus's Mental Health............................... 17

         A.    Standard of Review ....................................... 17

i

B.     Background ...................................................................... 17

     1.     Legal standards ..................................................... 17

     2.     Proffered evidence ................................................ 19

     3.     Ruling ..................................................................... 21

C.     Discussion ...................................................................... 22

II.     The District Court Did Not Commit Reversible Plain Error by Directing Persons in the Courtroom to "Relocate" Before Voir Dire. .................................................................................. 29

A.     Standard of Review ......................................................... 29

B.     Background ...................................................................... 30

C.     Discussion ....................................................................... 31

     1.     Titus has not established that a closure occurred. .... 31

     2.     Titus cannot satisfy the third and fourth plain-error prongs ............................................................ 32

III.     The District Court Properly Denied Titus's Requested Jury Instruction on Good Faith. ......................................................... 38

A.     Standard of Review ......................................................... 38

B.     Background ...................................................................... 39

C.     Discussion ....................................................................... 40

IV.     The Government Did Not Engage in a Pattern of Misconduct ............................................................................. 42

A.     Standard of Review ......................................................... 42

B.     Discussion ....................................................................... 42

     1.     Undercover recordings ......................................... 43

   2. Doctor Raziano's testimony ................................... 46

   3. Cross-examination of defense expert ...................... 49

   4. Comments during jury arguments ........................... 51

   5. No cumulative error .............................................. 55

 V. The District Court's Drug-Quantity Finding Was Not Clearly Erroneous. ...................................................... 55

  A. Standard of Review .......................................... 55

  B. Background ...................................................... 56

  C. Discussion ....................................................... 57

CONCLUSION ..................................................................... 61

CERTIFICATE OF COMPLIANCE ........................................... 62

CERTIFICATE OF SERVICE ................................................... 63

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Fulminante,*
  499 U.S. 279 (1991) ................................................................... 32

*Brady v. Maryland,*
  373 U.S. 83 (1963) ..................................................................... 44

*Clark v. Arizona,*
  548 U.S. 735 (2006) ................................................................... 23

*Estes v. State of Texas,*
  381 U.S. 532 (1965) ................................................................... 38

*Greer v. Miller,*
  483 U.S. 756 (1997) .............................................................48, 49

*Greer v. United States,*
  141 S. Ct. 2090 (2021)............................................................... 32

*Griffin v. California,*
  380 U.S. 609 (1965) ................................................................... 50

*In re Oliver,*
  333 U.S. 257 (1948) ................................................................... 38

*Johnson v. United States,*
  520 U.S. 461 (1997) ................................................................... 35

*Presley v. Georgia,*
  558 U.S. 209 (2010) ................................................................... 31

*Puckett v. United States,*
  556 U.S. 129 (2009) ................................................................... 38

*Rosales-Mireles v. United States,*
  138 S. Ct. 1897 (2018)............................................................... 34

*Ruan v. United States*,
    142 S. Ct. 2370 (2022) .........................................................23, 41

*Strickland v. Washington*,
    466 U.S. 668 (1984) ................................................................ 33

*United States v. Andrews*,
    681 F.3d 509 (3d Cir. 2012) ..................................................... 42

*United States v. Antar*,
    38 F.3d 1348 (3d Cir. 1994) ..................................................... 36

*United States v. Azmat*,
    805 F.3d 1018 (11th Cir. 2015) ................................................. 60

*United States v. Bansal*,
    663 F.3d 634 (3d Cir. 2011) ..................................................... 36

*United States v. Bennett*,
    161 F.3d 171 (3d Cir. 1998) .................................................23, 25

*United States v. Berrios*,
    676 F.3d 118 (3d Cir. 2012) ..................................................... 55

*United States v. Brennan*,
    326 F.3d 176 (3d Cir. 2003) .........................................42, 50, 51

*United States v. Brown*,
    810 F. App'x 105 (3d Cir. 2020) ............................................... 22

*United States v. Byerley*,
    999 F.2d 231 (7th Cir. 1993) .................................................... 53

*United States v. Cameron*,
    907 F.2d 1051 (11th Cir. 1990) ................................................. 26

*United States v. Canty*,
    37 F.4th 775 (1st Cir. 2022) ..................................................... 53

*United States v. Cohen*,
    510 F.3d 1114 (9th Cir. 2007) .................................................. 27

*United States v. Diaz*,
   951 F.3d 148 (3d Cir. 2020)................................................................ 55, 57, 59

*United States v. DiPasquale*,
   740 F.2d 1282 (3d Cir. 1984)......................................................... 53

*United States v. Dominguez Benitez*,
   542 U.S. 74 (2004) ................................................................... 37

*United States v. Ellis*,
   595 F.2d 154 (3d Cir. 1979)......................................................... 52

*United States v. Freeman*,
   763 F.3d 322 (3d Cir. 2014)......................................................... 57

*United States v. Gallman*,
   __ F.4th __, No. 21-2294, 2023 WL 125972 (3d Cir. Jan. 9, 2023) ........... 35

*United States v. Gibbs*,
   190 F.3d 188 (3d Cir. 1999)......................................................... 57

*United States v. Granville*,
   716 F.2d 819 (11th Cir. 1983)....................................................... 49

*United States v. Green*,
   25 F.3d 206 (3d Cir. 1994) .......................................................... 52

*United States v. Gross*,
   961 F.2d 1097 (3d Cir. 1992).......................................................40, 41

*United States v. Hargrove*,
   911 F.3d 1306 (10th Cir. 2019)...................................................... 48

*United States v. Hayden*,
   64 F.3d 126 (3d Cir. 1995) .......................................................... 26

*United States v. Heinrich*,
   971 F.3d 160 (3d Cir. 2020)..........................................................17, 28

*United States v. Ifediba*,
　46 F.4th 1225 (11th Cir. 2022), *petition for cert. filed*, No. 22-6503
　(Nov. 23, 2022) ................................................................................ 60

*United States v. Jackson*,
　619 F. App'x 189 (3d Cir. 2015) ................................................... 52

*United States v. James*,
　712 F. App'x 154 (3d Cir. 2017) ...............................................40, 41

*United States v. Jimenez*,
　513 F.3d 62 (3d Cir. 2008) ........................................................38, 42

*United States v. Johnson*,
　816 F.2d 918 (3d Cir. 1987) ........................................................... 45

*United States v. Jones*,
　128 F. App'x 853 (3d Cir. 2005) ................................................... 28

*United States v. Leahy*,
　445 F.3d 634 (3d Cir. 2006), *abrogated on other grounds*,
　*Loughrin v. United States*, 573 U.S. 351 (2014) ......................40, 42

*United States v. Little*,
　753 F.2d 1420 (9th Cir. 1984) ....................................................... 53

*United States v. Litzky*,
　18 F.4th 1296 (11th Cir. 2021) ...................................................17, 23

*United States v. Lore,*
　430 F.3d 190 (3d Cir. 2005) ........................................................... 51

*United States v. Lynn,*
　515 F. App'x 79 (3d Cir. 2013) ..................................................... 51

*United States v. Mathis*,
　264 F.3d 321 (3d Cir. 2001) ........................................................28, 29

*United States v. McCutchen*,
　992 F.2d 22 (3d Cir. 1993) ............................................................. 59

vii

*United States v. McKoy,*
   129 F. App'x 815 (4th Cir. 2005) ............................................. 54

*United States v. Mister,*
   553 F. Supp. 2d 377 (D.N.J. 2008) ........................................ 26

*United States v. Moore,*
   423 U.S. 122 (1975) ................................................................ 58

*United States v. Moreno,*
   727 F.3d 255 (3d Cir. 2013) .................................................... 44

*United States v. Negrón-Sostre,*
   790 F.3d 295 (1st Cir. 2015) ................................................... 37

*United States v. Olano,*
   507 U.S. 725 (1993) ................................................................ 29

*United States v. Paulino,*
   996 F.2d 1541 (3d Cir. 1993) .................................................. 57

*United States v. Pohlot,*
   827 F.2d 889 (3d Cir. 1987)............................................. *passim*

*United States v. Powell,*
   444 F. App'x 517 (3d Cir. 2011) ............................................. 55

*United States v. Prosper,*
   375 F. App'x 190 (3d Cir. 2010) ............................................. 48

*United States v. Rosenberg,*
   585 F.3d 355 (7th Cir. 2009) .................................................. 60

*United States v. Scheffer,*
   523 U.S. 303 (1998) ........................................................22, 23

*United States v. Stevens,*
   935 F.2d 1380 (3d Cir. 1991).................................................. 48

*United States v. Thornton,*
   1 F.3d 149 (3d Cir. 1993) ....................................................... 48

*United States v. Urban*,
404 F.3d 754 (3d Cir. 2005) .................................................. 39, 42

*United States v. Wall*,
593 F. App'x 128 (3d Cir. 2014) ............................................... 28

*United States v. Weatherly*,
525 F.3d 265 (3d Cir. 2008) ..................................................... 54

*United States v. Welshans*,
892 F.3d 566 (3d Cir. 2018) ................................................. 43, 55

*United States v. Williams*,
974 F.3d 320 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 309-10 (2021) ...... *passim*

*United States v. Zayas*,
32 F.4th 211 (3d Cir. 2022), *petition for cert. filed*,
No. 22-6467 (Jan. 6, 2023) ...................................................... 45

*Waller v. Georgia*,
467 U.S. 39 (1984) ....................................................... 31, 32, 34

*Weaver v. Massachusetts*,
137 S. Ct. 1899 (2017) ........................................................ *passim*

## Statutes and Constitutional Provisions

U.S. Const. amend. VI ............................................................ 31

18 U.S.C. § 17 .................................................................. 17

18 U.S.C. § 3231 ................................................................. 1

18 U.S.C. § 3742 ................................................................. 1

21 U.S.C. § 841 .............................................................. 2, 23

21 U.S.C. § 856 ................................................................. 2

28 U.S.C. § 1291 ................................................................ 1

ix

## Rules and Sentencing Guidelines

3d Cir. I.O.P. 9.1 ........................................................................... 37

Fed. R. Evid. 704 .................................................................... 15, 18

Fed. R. Crim. P. 52 ..................................................................... 29

U.S.S.G. § 2D1.1 ..................................................................56, 57

## Other Authorities

Black's Law Dictionary (11th ed. 2019) ....................................... 41

Third Circuit Model Criminal Jury Instructions 5.07 ................................... 41

## STATEMENT OF JURISDICTION

Patrick Titus appeals from a final judgment of conviction entered by the district court on March 8, 2022. Appx0025.[1] The court had jurisdiction under 18 U.S.C. § 3231. Titus timely filed a notice of appeal on March 21, 2022. Appx0025. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## STATEMENT OF THE ISSUES

1. Whether the district court's exclusion of expert testimony concerning Titus's mental health violated his right to present a defense.

2. Whether the district court closed the courtroom for jury selection and, if so, whether the closure was reversible plain error.

3. Whether the district court abused its discretion by denying Titus's proposed jury instruction on good faith.

4. Whether the government engaged in a pattern of misconduct warranting a new trial.

5. Whether the district court's drug-quantity finding at sentencing was clearly erroneous.

---

[1] "Appx" and "SAppx" refer to the appendix and supplemental appendix, respectively; "Op.Br." refers to Titus's opening brief; and "Dkt." refers to district court docket entries.

1

## STATEMENT OF THE CASE

### I.    PROCEDURAL HISTORY

On June 14, 2018, a grand jury in the District of Delaware returned an indictment charging Titus with unlawfully distributing and dispensing Schedule II controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) (Counts 1-14), and one count of maintaining a drug-involved premises, in violation of 21 U.S.C. § 856(a)(1) (Count 15). Appx0027-0036. The distribution counts were based on Titus's prescription of opioids on 14 specific dates between August 2013 and October 2014; Count 15 was based on the clinic location where Titus issued opioid prescriptions from November 2013 until December 2014. Appx0034-0035, 1126. After a multi-week trial, the jury convicted Titus on all counts except Count 7, on which it acquitted. Appx2300-2304.

### II.    RELEVANT FACTS

Titus was a licensed physician who operated a solo medical practice, Lighthouse Internal Medicine, P.A. (Lighthouse), in Milford, Delaware. Appx0587, 1308; SAppx013. Although Titus specialized in internal medicine, over the years he purported to treat increasing numbers of patients for pain management, and those patients eventually made up more than 95% of his business. Appx0589-0591. Titus issued opioid prescriptions in the face of clear signs that patients were either abusing drugs or diverting the opioids he

2

prescribed them. And patients frequented Lighthouse to buy opioid prescriptions, sometimes driving long distances to get there. The evidence showed that Titus, in effect, ran his medical practice as an illegal drug business—a business that brought in more than $1,096,000 during its final 13 months in operation. Appx1133-1134; SAppx031.

### A.    Titus entered into a Consent Agreement with Delaware after the State suspended his authority to prescribe controlled substances.

Federal law classifies controlled substances according to schedules. Appx1552. As relevant here, Schedule I drugs, including heroin, have no legitimate medical use and are illegal. Appx0722, 1552. Schedule II drugs do have accepted medical use, but are potentially addictive, potent, and highly abusable; they include opioids such as morphine, oxycodone, fentanyl, and methadone. Appx1552-1554.[2]

Opioids work on the brain to provide relief from pain but do not treat the pain's underlying cause. Appx1556. Taking opioids can result in overdose or death, and taking them in combination with other medications, such as sedatives

---

[2] Oxycodone is one-and-a-half times stronger than morphine, can be crushed and snorted, and has a street value of $1 per milligram. Appx1047, 1540, 1553. Methadone is four-to-twelve times stronger than morphine and has a unique pharmacology that causes it to build up and last longer in the body. Appx1554-1555. Fentanyl is 70-to-100 times stronger than morphine, is dosed in micrograms per hour, and is usually administered through transdermal patches. Appx1555-1556, 1645.

or muscle relaxers, or with illegal drugs, magnifies their risks, including the risk of respiratory depression. Appx0723-0724, 1528, 1535-1536. Opioid treatment creates the potential for "diversion"—where the patient sells her prescribed pills instead of taking them. Appx0767, 1533-1534. Opioids are not a first-line treatment for chronic pain and should be used only when safer, reasonably effective options have failed. Appx1091-1092, 1522, 1556.

Under federal law, doctors who are authorized to prescribe controlled substances by the jurisdiction where they practice must possess a registration number from the Drug Enforcement Administration (DEA) to prescribe drugs. Appx0651, 0770. Doctors may prescribe controlled substances only if the prescriptions are written for a legitimate medical purpose and in the usual course of professional practice. Appx0771.

Titus obtained his medical license and controlled-substances registration from the state of Delaware in 2001. SAppx013. In December 2011, the State suspended Titus's registration based on his failure to establish adequate controls "to prevent diversion of controlled substances from his office into non-legitimate and illegal channels." SAppx014.

Titus's registration was reinstated as a result of his March 22, 2012, Consent Agreement with the State. SAppx013-017. Titus agreed to comply with a model policy for using controlled substances in pain treatment and with related

guidelines issued by medical professional organizations. SAppx014. The model policy required, among other things, that Titus conduct physical examinations of patients, maintain complete records of treatment for patients, discuss the risks and benefits of controlled substances with patients, and refer patients for additional evaluation, if needed, paying "[s]pecial attention … to those patients with pain who are at risk for medication misuse, abuse or diversion." SAppx010-011. The Consent Agreement also required, among other things, that Titus perform toxicology screens on patients. SAppx014-015.

### B.    Titus engaged in the business of selling opioid prescriptions.

Titus made changes to his practice after the Consent Agreement, Appx1305, 1717-1718, but only to mask the true nature of his business: selling unlawful opioid prescriptions.

Although Lighthouse was a small practice, Titus saw 35 to 40 patients per day; sometimes Titus saw more than that number, and occasionally he saw more than 80 patients per day. Appx0967-0968, 1299-1300, 1323-1326; Appx2595 (Gov't Ex. 801).[3] The office opened at 6 a.m., and the waiting room was usually crowded. Appx0592, 1309. People arrived early and waited in their cars. Appx0750-0751. By 2014, Titus charged patients $180 per monthly

---

[3] Exhibit 801 from trial appears in the appendix as part of a sentencing filing.

appointment. Appx0927-0928, 1027. Titus accepted copays from patients with medical insurance or Medicare but stopped accepting Medicaid in 2011. Appx0593-0594, 1311-1312. For the final 13 months that Lighthouse was in operation, it was located at 10-12 North Church Street in Milford, Delaware. Appx0904-0905, 1126-1127.

Although some patients had legitimate medical conditions, patients mostly went to Lighthouse to obtain opioid prescriptions, not medical treatment. Appx0559-0560, 1062, 1304. For example, Titus repeatedly prescribed patient T.O. oxycodone for migraines, even though opioids are contraindicated for migraines and toxicology screens showed that T.O. was not taking the prescribed oxycodone. Appx1674-1678. Patient D.M., to whom Titus prescribed 3,000 oxycodone pills over 18 months, had no "issue at all" with pain when he was temporarily cut off from oxycodone while admitted to a hospital for an overdose. Appx1651, 2596, 2613-2615. Patient L.M. had special ("back door") access to Titus, and neither she nor her husband required an appointment; over two years, Titus prescribed L.M. 4,070 oxycodone pills and 250 fentanyl patches, despite repeated, inconsistent drug-test results. Appx0888-0892, 1702-1707, 2596, 2626-2629.

A former patient (B.H.) described Lighthouse as "a revolving door, in and out.… You go, check in, you sit there and wait, you get called back, and then

6

you leave, get your prescription," undergoing (at most) a cursory physical examination. Appx0557-0560. Some patients complained about pain, but after being seen by Titus, "they'd run out healthy as an ox." Appx1179. In the waiting room, some patients talked about selling medications; others paced, shook, experienced hot and cold spells, and showed other signs of drug withdrawal. Appx1176-1178, 1304. Some patients traveled more than 50 miles to see Titus, including from New Jersey, Pennsylvania, and Maryland. Appx0748-0749, 2594. An HVAC repairman saw people exchanging cash for pills in the Lighthouse parking lot and was approached about buying drugs. Appx1273-1276.

Titus understood that patients frequented Lighthouse to buy prescriptions. The number of opioid prescriptions that he issued correlated directly with the number of patients seen and money brought in. Appx1424, 2589. When Titus discharged patients for aberrant drug use after initially ignoring warning signs, he sent them off with a prescription—despite not being in a position to monitor their use of the prescription—because, as Titus once explained, the patients had paid for the month and were entitled to 30 days of medication. Appx1377-1378.

Titus prescribed opioids in high quantities, strong doses, and potentially dangerous combinations. From November 2013 until December 2014, Titus issued more than 20,000 Schedule II prescriptions, for 1,228,722 pills and

fentanyl patches. Appx2591. Most (76.8%) patients receiving Schedule II prescriptions received oxycodone in 15mg doses, but 38.6% received 10-mg methadone doses—Titus's second most-prescribed drug. Appx1427, 2591-2593. And Titus often prescribed patients two opioids at a time, including oxycodone with fentanyl or methadone. Appx0564-0566, 0803, 0809, 0813, 0816. At times, Titus prescribed opioids along with muscle relaxers or sleep agents, creating a dangerous mix. Appx0755-0756, 1165-1167, 1658. Based on the pattern, quantities, and combinations of narcotics that he prescribed, several pharmacies, including the entire Rite Aid chain, refused to fill prescriptions issued by Titus in 2013 and 2014. Appx0732, 0753-0758, 1283-1285.

Although Lighthouse drug-tested patients after the Consent Agreement, Titus repeatedly ignored "inconsistent" test results—results showing either the presence of an illegal or non-prescribed drug in the patient (indicating drug abuse) or the absence of a prescribed medication (indicating diversion or drug abuse). Appx1532-1535. A random sample of Lighthouse patient files revealed that, between 2012 and 2014, 234 out of 282 patients (83%) had one or more inconsistent drug results, for a total of 874 inconsistent results out of 1577 tests (55.4%). Appx1449, 1455-1457; SAppx021. And Titus issued 7,241 prescriptions (mostly for opioids) to these sampled patients after they had produced inconsistent test results, Appx1456; SAppx021, even though staff

highlighted inconsistent results for Titus by placing them at the front of patient charts, Appx1307-08, and even though such patients were in violation of an agreement they had signed with Lighthouse, Appx799. Thus, for example, Titus prescribed patient M.M. both oxycodone and methadone after she tested positive for cocaine and methamphetamine. Appx1613-1617. Although Titus warned patients by letter about inconsistent drug-test results, he did not discuss those warnings with patients. Appx1051-1053, 1059, 1186.

When Titus decided that he could no longer ignore signs of a patient's abuse, he discharged the patient rather than treating their disorder. But he usually gave discharged patients one or more opioid prescriptions for the road, sometimes days *after* discharging them.  For example:

- Titus discharged patient S.J. after S.J. tested positive for heroin and repeatedly tested negative for the oxycodone prescribed to him; three days later, Titus prescribed him 80 oxycodone pills, even though S.J. had no medical need for it and Titus was no longer his doctor. Appx1594-1598.

- After discharging patient M.S. for testing positive for Naloxone—a drug used to reverse the effects of opioids after an overdose—Titus prescribed M.S. a strong dose of fentanyl and a total of 148 oxycodone pills. Appx1714-1715.

- Nine days after discharging patient L.C., who had negative results for prescribed opioids and positive results for cocaine, amphetamines, and non-prescribed opioids, Titus prescribed L.C. oxycodone in 15mg doses. Appx1659-1663.

- Titus prescribed patient M.A. 160 oxycodone pills and 60 Oxycontin pills when he discharged M.A. following several warning letters. Appx1682-1692.

Prescribing opioids outside the doctor-patient relationship, including at the point of discharge, is not medically legitimate or in the usual course of professional practice. Appx1598, 1692-1693, 1787-1788.

Procedures at Lighthouse for mitigating the risks of drug abuse or diversion by patients were hollow or non-existent. Patients were subject to pill counts, but they received advance notice of the date, allowing them to set aside pills or bring substitute pills to the count. Appx1054-1055, 1191-1192, 1677. Titus did not counsel patients on the risks of opioids or refer many patients for drug rehabilitation. Appx0561, 1060, 1168, 1172, 1386. Any physical examination conducted by Titus was perfunctory. Appx0557-0558, 1030-1033, 1179-1180. Patient charts were not timely filled out and often contained stock language from a template. Appx1253-1255, 1327-1334.

Based on his review of patient files, the government's medical expert, Dr. Stephen Thomas, concluded that the prescriptions corresponding to the 14 distribution counts in the Indictment were not written for a legitimate medical purpose in the usual course of professional practice. Appx1494; *see* Appx1561-1716. Doctor Thomas reached the same conclusion about the opioid

10

prescriptions in 18 or 19 out of 24 randomly-selected patient files. Appx1494-1495, 1717-1722, 2325-2327.

### C.    Titus's prescription of opioids harmed patients.

Titus's patients were addicted to opioids and sometimes overdosed.

Patient C.C. began seeing Titus when she was 17 years old. Appx1163. During C.C.'s first visit, Titus prescribed her Tramadol (an opioid) and Soma (a muscle relaxer) for back pain; the Tramadol gave C.C. chest pains and the Soma made her feel "buzzed." Appx0817, 1164-1167. Titus later began prescribing C.C. oxycodone, without discussing the risks; she became addicted in a couple of months, with side effects that included chills, stomach aches, and nausea. Appx1172-1174. Titus prescribed oxycodone to C.C.'s mother and stepfather, who were also addicted. Appx1195. Titus eventually discharged C.C. based on repeated inconsistent drug-test results. Appx1183-1191. C.C. turned to heroin before becoming sober. Appx1196. When she stopped taking oxycodone, C.C. stopped experiencing pain and found that opioids had made her pain worse. Appx1197.

Another longtime patient, M.A., was prescribed oxycodone by Titus and became nervous and fidgety if he did not take it regularly. Appx1048-1049. When M.A. asked Titus if he was addicted, Titus said he had probably only formed a habit. Appx1059. Titus did not refer M.A. to drug rehabilitation or try

to wean him off opioids. Appx1061. M.A testified that he remains addicted to opioids and takes three methadone pills a day, which he gets from a friend. Appx1017-1019.

Some of Titus's patients suffered overdoses. For example, B.H. almost died from overdosing on oxycodone, heroin, cocaine, and Xanax. Appx0565. Two days later, Titus discharged B.H. for illegal drug use but, at the same time, gave him prescriptions for oxycodone and methadone—medications that B.H. ended up snorting. Appx0565-0567. The physician who treated B.H. for overdosing complained about Titus to the state medical board. Appx0676-0677, 1080, 1109-1110.

Patient L.P., who overdosed on opioids and sedatives, arrived at the emergency room semi-unconscious and covered in fentanyl patches of "varying degrees of aging." Appx1009-1010. The treating physician, Joseph Raziano, had "never seen … anything similar to this in 30 years of practice." Appx1009-1010. Doctor Raziano also filed a complaint about Titus. Appx1010-1011.

Titus prescribed L.P. oxycodone about ten days after she overdosed and discharged her a few days later. Appx1637-1638; SAppx002. Titus's discharge letter was more formal than other discharge letters he issued, likely reflecting knowledge of the complaint against him. *Compare* SAppx002 *with* SAppx001. It noted, for example, that Titus was going to wean L.P. off her prescribed

medications and refer her to a substance abuse program. SAppx002. Titus did neither. Appx1638-1639.

Emergency physicians were not the only persons registering concerns about Titus. Lighthouse received anonymous calls and calls from family members or friends expressing concern over patients; the details were often relayed to Titus. Appx1335-1338. For example, one caller reported that a patient (D.P.) was selling her medications to children. Appx1242-1244. A Lighthouse staff member expressed her own concern about a patient (D.D.) with failed drug tests who was passing on medications to the staff member's friend. Appx0618-0620. Titus dismissed these complaints. Appx0621, 1338.

Similarly, a probation officer once contacted Titus with concerns over the medication he was prescribing to a defendant under her supervision, who had a substance-abuse history and appeared lethargic and droopy in the officer's presence. Titus told the officer that she was not a doctor and that it was his (Titus's) "business," not hers. Appx0707-0708, 0713-0714.

### D.    Titus made false statements to the DEA, and the execution of search warrants yielded incriminating evidence.

In January 2015, the DEA executed search warrants for the homes of Titus and two Lighthouse employees, seizing documents, electronic equipment, and patient files. Appx0784-0787. Lighthouse had closed down by then. Appx0785.

The items seized from Titus's residence included notes with calculations in Titus's handwriting. Appx0934. Among other things, the notes stated, "retire with 4.3 million dollars by myself," "live off interest = retire with 4,950,000," "leave inheritance to grandchildren," and "leave legacy at Howard University." SAppx006-007; Appx0934-0938.

Agents also seized notebooks containing copies of receipts issued to Lighthouse patients. Appx0924. An analysis of those receipts and subpoenaed bank records revealed that, between November 3, 2013, and November 30, 2014—when Lighthouse was located at 10-12 North Church Street—Titus's business brought in $1,096,263.24 in total revenue. Appx1133-1134; SAppx031. It further revealed a discrepancy of $141,764.96 between cash received and cash deposited into a Lighthouse account for that period. Appx1132; SAppx029. Lighthouse bank records reflected repeated payments in 2013 to the Bellagio Hotel in Las Vegas and the Ritz Carlton in Key Biscayne, Naples (Florida), and Puerto Rico. Appx1129; *see* SAppx025 ($142,004.13 and $133,856.70 in travel and auto payments, respectively, during 2012-2014).

Titus agreed to be interviewed by the DEA. Appx0938. Titus acknowledged receiving warnings from pharmacists about patients. Gov't Ex.

14

304.[4] He falsely stated that he automatically discharged patients who tested positive for cocaine or heroin and that he believed a three-strikes policy for drug testing was too liberal. Gov't Exs. 301, 302; *see, e.g.*, Appx0961-0962 (Titus prescribed D.P. 525 oxycodone pills after she tested positive for cocaine). Titus also claimed that he saw an average of 27 patients per day, Gov't Ex. 303; *but see, e.g.*, Appx0964-0969 (examples of 45-50 patients seen per day); and that Lighthouse's gross revenue, in a "good" year, was probably $500,000, Gov't Ex. 305; *but see* SAppx023 (annual gross revenue exceeded $750,000 in 2013 and 2014). Titus was subsequently indicted and arrested. Appx0970.

## III.    RULINGS UNDER REVIEW

The rulings under review are summarized in the pertinent Argument sections.

## STATEMENT OF RELATED CASES

The government is not aware of related cases or proceedings.

## SUMMARY OF ARGUMENT

I.    The district court properly excluded expert testimony concerning Titus's mental health. The evidence was prohibited by *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987), and Fed. R. Evid. 704(b), and risked misleading the

---

[4] Flash drives with excerpts of Titus's audio-recorded interview (Gov't Exs. 301-305) are being filed with the supplemental appendix.

jury. Any error was harmless given all the evidence showing Titus's consciousness of wrongdoing.

II.    The district court did not commit reversible plain error by directing people sitting in the back of the courtroom to "relocate" before jury selection. Even if the comment is construed as an order closing jury selection to the public, Titus cannot satisfy the third or fourth plain-error prongs.

III.    The district court did not abuse its discretion by denying Titus's requested good-faith jury instruction. The court's charge correctly defined the mens rea element of a distribution offense and contained language approximating a good-faith instruction.

IV.    The government did not commit misconduct: it produced recordings of an undercover operation in time for the defense to use them effectively at trial; it did not elicit the challenged witness statement from Dr. Raziano or comment on Titus's right not to testify when questioning the defense's expert; and it did not make improper comments during opening, closing, or rebuttal. Any errors do not warrant a new trial.

V.    The district court did not clearly err in holding Titus responsible for at least 30,000 kilograms of converted drug weight. That quantity was based on the evidence at trial and substantially *understated* the opioids Titus prescribed while operating the drug-involved premises in Count 15.

# ARGUMENT

## I.   THE DISTRICT COURT PROPERLY EXCLUDED EXPERT TESTIMONY CONCERNING TITUS'S MENTAL HEALTH.

### A.   Standard of Review

This Court ordinarily reviews the exclusion of expert testimony under the abuse-of-discretion standard. *United States v. Heinrich*, 971 F.3d 160, 163 (3d Cir. 2020). Titus's assertion that the exclusion of evidence violated his constitutional rights, Op.Br.22, is reviewed de novo. *United States v. Litzky*, 18 F.4th 1296, 1302 n.2 (11th Cir. 2021).

### B.   Background

#### 1.   Legal standards

The Insanity Defense Reform Act of 1984 (IDRA) provides that "[i]t is an affirmative defense" to federal prosecution that "at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of his acts." 18 U.S.C. § 17(a). "Mental disease or defect does not otherwise constitute a defense." *Id.*

In *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987), this Court held that the IDRA prohibits diminished-responsibility and diminished-capacity defenses but does not prohibit using "evidence of mental abnormality to negate specific intent or any other mens rea" that is an "element[] of the offense." *Id.* at 890,

903-05. Evidence showing lack of capacity to form the mens rea is prohibited.

*Id.* at 905. The Court directed lower courts to

> carefully scrutinize psychiatric defense theories bearing on mens rea. Psychiatrists are capable of supplying elastic descriptions of mental states that appear to but do not truly negate the legal requirements of mens rea. Presenting defense theories or psychiatric testimony to juries that do not truly negate mens rea may cause confusion about what the law requires.

*Id.* at 890. The Court emphasized that "a lack of self-reflection does not mean a lack of intent and does not negate mens rea." *Id.* at 906.

*Pohlot* involved a murder-for-hire plot. The defense psychiatrist testified that Pohlot "'did not really know'" what it "meant" to hire a hitman to kill his wife and that "Pohlot's real hope was not to kill his wife but to live with her again." 827 F.2d at 906. The district court properly instructed the jury not to consider this evidence in connection with mens rea, because, when "[p]laced in the context of the remaining evidence … that Pohlot acted with considerable awareness of what he was doing and with considerable purpose," the defense's theory focused "not on Pohlot's conscious mind but unconscious." *Id.* at 907. Pohlot's theory "amount[ed] covertly to a variation of the partially diminished capacity defense precluded by § 17(a)." *Id.*

Separately, Federal Rule of Evidence 704(b) bars an expert witness in a criminal case from "stat[ing] an opinion about whether the defendant did or did

not have a mental state or condition that constitutes an element of the crime charged or of a defense."

      2.   <u>Proffered evidence</u>

The defense noticed its intent to offer testimony by a neuropsychologist, Dr. Jonathan Mack, who would "opine that Dr. Titus suffers impairments in reasoning and mental organization, which rendered him unqualified to practice medicine based on being unfit for duty due to substandard neurocognitive functioning." Appx2424.

Doctor Mack evaluated Titus in November 2020, which was six years after the conduct charged in the indictment, Appx2426-2475, and reviewed neuropsychological evaluations performed on Titus in 2004, more than seven years before the charged conduct. Appx2428-2433. In his report, Dr. Mack concluded that Titus suffered from "Mild Neurocognitive Disorder," "Organic Personality Syndrome," and "Schizotypal Personality Disorder," and opined that:

> Dr. Titus is, and essentially has been, an impaired and unfit physician from the start of his practice. Dr. Titus' impairments in reasoning and mental organization rendered him unable to assess his own performance realistically, and he lapsed into the arrogant and proselytizing view that his world view and his medical opinions were correct without question, which is clearly based on severe lack of insight on his part.

Appx2473-2474. Dr. Mack stated that Titus "was unqualified to practice medicine" and that his mental disorders "lateraliz[ed] predominantly to the right

19

cerebral hemisphere," where "deficits cause individuals to have great difficulty reading social cues and navigating the social environment," adding: "[t]hese same deficits are associated with lack of insight into one's own deficits." Appx2474.

The government moved *in limine* to exclude Dr. Mack's testimony. Appx2395, 2406-2414.[5] The defense then filed a report "Addendum" purporting to clarify how Dr. Mack's findings related to mens rea. Appx2491-2494. Mack opined that Titus "had a defective thought process and significant neurocognitive impairments that resulted in his believing he was practicing medicine correctly; with the conclusion that he was acting in good faith within the usual course of medical practice." Appx2492. Mack again tied his opinion to Titus's alleged "lack of insight" into his alleged mental defects. Appx2493.

At a hearing, defense counsel explained that Titus's alleged mental defect "causes him to believe that he knows what he's doing. He can't reflect on that, and that his way is the right way." Appx0082. When pressed on what Dr. Mack properly could testify about, counsel reiterated that Dr. Mack could testify Titus "believed that he was practicing medicine and that he was prescribing [opioids]

---

[5] A government expert who evaluated Titus found that Titus had only a mild neurocognitive order, which did not significantly affect his reasoning, conceptualization, or judgment. Appx2398-2399.

… within the course of a medical practice." Appx0086-0087. Counsel insisted that "[Dr. Mack] should be able to say [Titus] believed he was practicing medicine correctly." Appx0088-0089.

### 3.    Ruling

The district court excluded Dr. Mack's testimony, Appx0178-0187, after observing that "[t]he description of the proposed testimony has varied over time," Appx0180.

Applying *Pohlot*, the court found that Dr. Mack's testimony "focus[es] primarily on whether Dr. Titus can retroactively assess his own medical decisions and whether Dr. Titus has insight into his own deficits rather than on psychological conditions that may be used to infer what his state of mind was during the charged conduct." Appx0185; *accord* Appx0183-0184. The court rejected the defense's analogy to evidence of "low intellectual function," noting that "Dr. Mack does not contend that Dr. Titus could not understand the relevant medical standards." Appx0184. "Insofar as Dr. Mack's testimony relie[d] on Dr. Titus' 'lack of insight' or [the notion] that Dr. Titus cannot reflect on his conduct," the court ruled that it was "prohibited by *Pohlot*" because it would "improperly focus on the Defendant's unconscious state of mind." Appx0184. Nor could Dr. Mack testify that Titus was "unfit to practice medicine." Appx0185.

The court determined that a variant of the testimony potentially relevant to mens rea—that Titus "'believed he was practicing medicine correctly' and was 'acting in good faith'"—was "clearly barred by Rule 704(b)." Appx0185 (quoting Appx2492). The court stressed that, at the hearing, "[d]efense counsel argued that Dr. Mack should be able to testify" to those points. Appx0185-0186. But "opining as to whether Dr. Titus believed he was practicing medicine correctly and/or in good faith strays into Rule 704(b) territory" by "drawing the ultimate inference regarding Dr. Titus's mental state, which is strictly in the purview of the jury." Appx0186.

### C.  Discussion

1.   Titus contends (Op.Br.22-23) that the exclusion of Dr. Mack's testimony violated his right to present a defense. It is well settled, however, that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," *United States v. Scheffer*, 523 U.S. 303, 308 (1998), "including the Federal Rules of Evidence," *United States v. Brown*, 810 F. App'x 105, 108 (3d Cir. 2020) (unpublished). "Evidentiary restrictions are unconstitutional only if their application is 'arbitrary' or 'disproportionate to the purposes that they are designed to serve.'" *Brown*, 810 F. App'x at 108 (quoting *Scheffer*, 523 U.S. at 308).

In *Clark v. Arizona*, 548 U.S. 735 (2006), the Court held that Arizona's restriction on using mental-disease evidence did not violate due process. *Id.* at 764, 769-70, 779. Because "[e]vidence of mental disease … can easily mislead" the jury, it was not "unreasonable to address that tendency by confining consideration of this kind of evidence to insanity, on which a defendant may be assigned the burden of persuasion." *Id.* at 776; *see Litzky*, 18 F.4th at 1302-06 (rejecting constitutional challenge to exclusion of mental-health testimony).

Titus does not explain how *Pohlot* and the rules governing expert testimony—or the district court's application of them—were "arbitrary" or "disproportionate to the purposes" those standards serve. *Scheffer*, 523 U.S. at 308 (quotations omitted).  Because the court's ruling was correct, not arbitrary, the Court should reject Titus's constitutional challenge.

2.    Doctor Mack's testimony was prohibited by *Pohlot* and Rule 704(b), and it risked confusing the jury. Excluding it was a proper exercise of the court's "broad" discretion. *United States v. Bennett*, 161 F.3d 171, 182 (3d Cir. 1998).

Counts 1 to 14 charged Titus with knowingly or intentionally distributing or dispensing a controlled substance without authorization. *See* 21 U.S.C. § 841(a). Consistent with *Ruan v. United States*, 142 S. Ct. 2370 (2022), the jury instructions required the government to prove that Titus knew he prescribed opioids not for a legitimate medical purpose and outside the usual course of

professional practice, or that he intended to do so. Appx2165, 2168-2169. Count 15 required proving that Titus knowingly maintained a drug-involved premises. Appx2171-2172.

The proffered testimony did not negate mens rea and was prohibited by *Pohlot*. First, testimony that Titus was "unfit" or "unqualified" to practice medicine (Appx2474, 2493) was not relevant to his state of mind. Titus does not appear to contend otherwise on appeal.

Second, the crux of Dr. Mack's opinion—that Titus's alleged mental defects made him believe that anything he did was medically legitimate, preventing the formation of criminal intent—was at best strained. *See Pohlot*, 827 F.2d at 903 ("Commentators have agreed … that only in the most extraordinary circumstances could a defendant actually lack the capacity to form mens rea as it is normally understood in American law."). And it relied on Titus's alleged inability to reflect on his conduct. Appx2474. Even in the report Addendum, Dr. Mack tied his opinion that Titus "processes information differently than others" to Titus's "lack of insight" into his alleged defects. Appx2493. But *Pohlot* prohibits this evidence, especially when other evidence shows that the defendant "acted with considerable awareness of what he was doing and with considerable purpose." 827 F.2d at 906.

24

That was the case here—Titus's conduct evidenced consciousness of wrongdoing. Testimony that he lacked self-awareness, if believed, would have spoken only to Titus's unconscious state of mind, in support of a diminished-capacity or diminished-responsibility defense that is "precluded by § 17(a)." *Pohlot*, 827 F.2d at 907.

Third, Dr. Mack's proffered testimony that Titus "believ[ed] he was practicing medicine correctly" and "was acting in good faith within the usual course of professional practice" was inadmissible. Appx2492. As the court concluded, it would have violated Rule 704(b)'s prohibition on testimony from which it "necessarily follows … that the defendant did or did not possess the requisite mens rea." *Bennett*, 161 F.3d at 182-83 (quotations omitted).

Titus concedes that testimony he "prescribed in good faith" was inadmissible, but maintains that testimony about his underlying "neurocognitive impairments" should have been admitted. Op.Br.30-31. Titus argued differently below. When the court pressed the defense on exactly what testimony was admissible, counsel steadfastly maintained that "at least [Dr. Mack] should be able to say [Titus] believed he was practicing medicine correctly." Appx0088; *accord* Appx0086-0087, 0089. That is another way of saying that Titus acted in good faith. Counsel referenced Titus's "impairments" and "neurocognitive deficits," but only as the basis for testimony that Titus

believed he was practicing medicine correctly, which, again, counsel insisted was admissible. Appx0089. The court found that the defense's "description of the proposed testimony ha[d] varied over time." Appx0180. Given those shifting descriptions, the court was entitled to hold the defense to its verbal proffer of the testimony it would elicit. *Cf. United States v. Cameron*, 907 F.2d 1051, 1067 (11th Cir. 1990) ("[A]ppellant failed to identify precisely the psychiatric evidence she wished to introduce.").

Regardless, general testimony about neurocognitive deficits did not tend to negate knowledge or intent, and it risked misleading the jury and "open[ing] up … theories of defense more akin to justification." *Pohlot*, 827 F.2d at 904-05; *Cameron*, 907 F.2d at 1067. Contrary to Titus's argument (Op.Br.27), the testimony was not probative of low-intellectual functioning; as the court found, Dr. Mack "d[id] not contend that Dr. Titus could not understand the relevant medical standards." Appx0184; *see also* Appx2471 (Titus scored average-to-superior marks on most academic testing). This case is therefore distinguishable from those cited by Titus. *See United States v. Hayden*, 64 F.3d 126, 134 (3d Cir. 1995) (low-intelligence evidence relevant to defendant's lack of knowledge that he was under indictment or information); *United States v. Mister*, 553 F. Supp. 2d 377, 378 (D.N.J. 2008) (low-intelligence evidence relevant to defendant's lack of knowledge that payments were bribes).

The decision in *United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007), is inapposite. There, the Ninth Circuit held that the district court erroneously excluded testimony that the defendant's beliefs were "fixed and have led him to significant adverse consequences, [and that] he is irrational to the point of dysfunction," *id.* at 1123, which the Ninth Circuit found relevant to the defendant's "ability to form the intent to evade the tax laws," *id.* at 1125. But that portion of *Cohen* is inconsistent with *Pohlot*'s holding that the IDRA prohibits diminished-capacity defenses. 827 F.2d at 890. Although *Cohen* also found the excluded testimony relevant to whether the defendant "knew the zero [tax] returns were false," 510 F.3d at 1124, the court here correctly found that the proffered testimony, as "described at oral argument," was "only facially comparable" to that in *Cohen* and that Dr. Mack's opinions relied "primarily on Dr. Titus' inability to self-reflect rather than an inability to process contradictory information." Appx0184; *see* Appx2474.

Finally, testimony about Titus's alleged neurocognitive deficits was misleading because it lacked a nexus to the timeframe of the indictment (2012-2014). Doctor Mack evaluated Titus six years *after* that period and reviewed another doctor's evaluations performed over seven years *before* that period. Appx2426, 2428-2433. His conclusory assertions that Titus's alleged mental defects spanned the 16 years between evaluations, Appx2473-2474, 2492-2493,

did not adequately tie his diagnosis to the relevant period. *See United States v. Wall*, 593 F. App'x 128, 131 (3d Cir. 2014) (unpublished); *United States v. Jones*, 128 F. App'x 853, 855 (3d Cir. 2005) (unpublished). The lack of temporal nexus risked misleading the jury about the import of Dr. Mack's analysis. Under Rule 403, that risk substantially outweighed any slight probative value of the evidence.

The district court's ruling was not based on an erroneous view of the law or a clearly erroneous factual finding. *Heinrich*, 971 F.3d at 163.

3.    Even if this Court concludes that an error occurred, it was harmless given the conduct by Titus evidencing consciousness of wrongdoing and the overall strength of the evidence. *See United States v. Mathis*, 264 F.3d 321, 343-44 (3d Cir. 2001). Under the Consent Agreement, Titus agreed to abide by standards governing the treatment of pain with opioids, and he purported to make conforming changes to his practice. *See pp.3-5, supra*. He also attempted to minimize or conceal his deviation from medical standards, such as by falsely promising to refer patient L.P. to drug rehabilitation and wean her off opioids after a complaint was filed against him about L.P.'s overdose. *See pp.12-13, supra*. Titus made false or misleading statements to law enforcement about his drug-testing practices, Lighthouse's gross revenues, and Lighthouse's average patient count. *See pp.14-15, supra*. And Titus issued letters to patients about

28

inconsistent drug-test results, thereby papering his medical files, only to continue prescribing them opioids. *See* pp.8-10, *supra*.

Contrary to Dr. Mack's opinion, Titus knew (and was capable of knowing) that his conduct was not medically legitimate. Given "the record as a whole," the excluded testimony "was highly unlikely to have caused a different result." *Mathis*, 264 F.3d at 343.

## II. THE DISTRICT COURT DID NOT COMMIT REVERSIBLE PLAIN ERROR BY DIRECTING PERSONS IN THE COURTROOM TO "RELOCATE" BEFORE VOIR DIRE.

### A.    Standard of Review

Titus concedes that he failed to preserve his claim that the court closed jury selection to the public. Op.Br.3,31. The Court reviews unpreserved courtroom-closure claims for plain error. *United States v. Williams*, 974 F.3d 320, 340-41 (3d Cir. 2020), *cert. denied*, 142 S. Ct. 309-10 (2021); *see* Fed. R. Crim. P. 52(b). Under *United States v. Olano*, 507 U.S. 725 (1993), reversal requires (1) an "error" that (2) is "plain" and (3) "affects substantial rights." *Id.* at 732 (quotations and brackets omitted). If those requirements are met, the Court has discretion to correct the error if (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (quotations and brackets omitted).

### B.    Background

The district court conducted two waves of voir dire.  In each, it asked the group of prospective jurors general questions while the jurors were seated in the courtroom; the group then moved to an adjacent courtroom, and the court brought back individual jurors to follow up as necessary on their answers, striking some for cause. Appx0312-0491. After the parties exercised peremptory challenges, the court seated, swore in, and preliminarily instructed the jury. Appx0493-0515. The entire process, including two short breaks and one long break, took up almost one day. Appx0312, 0384, 0432, 0490-0493.

Before the first wave of prospective jurors entered the courtroom, the court stated:

> All right. So the jury is ready to go. And so the people who are sitting in the back of the courtroom, other than the court security officers, you need to relocate.

Appx0311. The record does not indicate whether the individuals seated at the back exited or moved to a different part of the courtroom. Appx0311. The court did not make any other comments related to closure, including when jury selection resumed each time a recess was taken. Appx0384, 0433-0434, 0493.

### C.    Discussion

1.    <u>Titus has not established that a closure occurred.</u>

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. The public-trial right applies to the voir dire of prospective jurors. *Presley v. Georgia*, 558 U.S. 209, 213 (2010) (per curiam). The right may give way when an overriding interest is likely to be prejudiced by a public proceeding. *See Waller v. Georgia*, 467 U.S. 39, 48 (1984). But any closure "must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." *Id.* Here, the government agrees that, *if* the court closed jury selection, the court erred, and the error was plain, because it did not make findings to support closure.

The record, however, does not establish that the court closed jury selection. The court did not refer to "closing" the courtroom. Nor did it direct people to "leave" or "exit." Rather, the court stated that people seated at the back "need[ed] to relocate." Appx0311. But that comment easily could have been a direction to move to another area of the courtroom so that jurors could use the seating in the courtroom gallery. That no one asked the court for clarification and the lack of any other comment pertaining to closure indicates that the comment did not have the clear meaning Titus alleges. And it is Titus

31

who bears responsibility for the present record: he neither objected to the court's comment nor moved for a new trial after verdict, which would have allowed the court to make a record of what happened. By not establishing that a closure occurred, Titus has not satisfied his "burden" of demonstrating an error, much less a plain one. *Greer v. United States*, 141 S. Ct. 2090, 2097 (2021).

2.    <u>Titus cannot satisfy the third and fourth plain-error prongs.</u>

Even if the court closed jury selection, this Court's decision in *Williams* precludes Titus from satisfying the fourth prong of the plain-error standard. He cannot satisfy the third prong either.

a.    Although public-trial violations are structural errors, *Waller*, 467 U.S. at 49-50, that characterization has "no talismanic significance," *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1910 (2017). It simply means that the error "def[ies] analysis by 'harmless-error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309-10 (1991). In other words, "where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to automatic reversal regardless of the error's actual effect on the outcome." *Weaver*, 137 S. Ct. at 1910 (quotations omitted). But Titus did not object, so his claim is reviewable for *plain* error, not harmless error. *See Williams*, 974 F.3d at 340-41.

b.    In *Williams*, this Court applied the plain-error standard to a forfeited claim that the district court violated the public-trial guarantee by closing jury

selection, an error the government conceded was "plain." 974 F.3d at 341. Without deciding whether the error affected the defendants' substantial rights, the Court held that the closure did not affect the fairness, integrity, or public reputation of judicial proceedings. *Id.*

The Court determined that, even if a structural error satisfies the third *Olano* prong, a court must still "evaluate the error in the context of the unique circumstances of the proceeding" to determine if it warrants correction under *Olano*'s fourth prong. *Williams*, 974 F.3d at 341-42. This "particularized inquiry" is supported by the Supreme Court's determination that, "[w]hile the Sixth Amendment public-trial right 'is important for fundamental reasons, … in some cases an unlawful closure might take place and yet the trial still will be fundamentally fair from the defendant's standpoint.'" *Id.* at 343-44 (quoting *Weaver*, 137 S. Ct. at 1910).[6]

---

[6] In *Weaver*, the defendant alleged that his lawyer provided ineffective assistance by not objecting to the closure of jury selection. 137 S. Ct. at 1906-07. Denying his new-trial motion, the trial court ruled that, even though the underlying closure error was structural, the defendant was still required to show prejudice under the standard in *Strickland v. Washington*, 466 U.S. 668 (1984). 137 S. Ct. at 1906-07. The Supreme Court affirmed, reiterating that structural errors permit automatic reversal *when* "there is an objection at trial and the issue is raised on direct appeal." *Id.* at 1910. In other cases, the ordinary requirement to show prejudice remains intact. *Id.*

On the facts of *Williams*, the Court found that "the costs of inaction, while not negligible, do not rise to the level recognized in other cases where a remedy has been provided." 974 F.3d at 346. Several "countervailing factors" mitigated the Sixth Amendment violation: (1) jury selection lasted only two days, while the public phases of trial lasted more than seven weeks; (2) a transcript of jury selection "was produced and later disclosed"; (3) "'there were many members of the venire who did not become jurors but who did observe the proceedings'"; and (4) there was "'no suggestion of misbehavior by the prosecutor, judge, or any other party'" during jury selection, and "no suggestion that any of the participants failed to approach their duties with the neutrality and serious purpose that our system demands.'" *Id.* at 346-47 & n.13 (quoting *Weaver*, 137 S. Ct. at 1913).

By contrast, the Court found that "the costs of remedial action," involving a lengthy retrial of ten defendants, "would be significant." 974 F.3d at 347. Even excluding case-specific burdens, "the prospect of retrial demands 'a high degree of caution' and implicates more fully the Supreme Court's admonition that [this Court] exercise [its] discretion under Rule 52(b) 'sparingly.'" *Id.* (quoting *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1909 (2018)). Indeed, "in some instances 'a new trial … would be a windfall for the defendant, and not in the public interest.'" *Id.* (quoting *Waller*, 467 U.S. at 50). After weighing "[t]he

34

practical costs of correcting the [d]istrict [c]ourt's error … with the mitigated costs of inaction," the Court held that the closure did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 347-48; *see also United States v. Gallman*, __ F.4th __, No. 21-2294, 2023 WL 125972, *5-*6 (3d Cir. Jan. 9, 2023) (declining, under *Olano*'s fourth prong, to correct alleged plain error in closure of courtroom for two proceedings).

*Williams* is controlling and dictates that Titus's claim be denied. The same mitigating factors are present here: (1) jury selection was short (less than a full day) in comparison to the public phases of trial (ten trial days spanning several weeks); (2) a transcript of jury selection is publicly available; (3) non-selected members of the venire observed portions of the proceeding; and (4) there is no allegation of misconduct by the district court, prosecutors, or venire members during jury selection. Moreover, the court's brief comment arguably "stamped" less of a judicial "imprimatur" on the alleged constitutional violation than the written order in *Williams*. 974 F.3d at 337, 346. And the alleged error did not undermine the trial's basic fairness: Titus was tried before an impartial judge and jury, represented by two lawyers, and convicted based on proof beyond a reasonable doubt. *See Johnson v. United States*, 520 U.S. 461, 470 (1997) ("Reversal for error, regardless of its effect on the judgment, encourages litigants

to abuse the judicial process and bestirs the public to ridicule it.") (quotations omitted).

Conversely, the costs of retrial would be "significant." *Williams*, 974 F.3d at 347. Although Titus's trial was shorter than that in *Williams*, it involved testimony from 28 witnesses and the presentation of voluminous documentary evidence. Ordering a new trial based on an ambiguous, unchallenged comment would be a "windfall" for Titus and "not in the public interest." *Id.* (quotations omitted). Because the costs of correcting the alleged error substantially outweigh the mitigated costs of inaction, it does not warrant correction under *Olano*'s fourth prong.

Titus does not meaningfully distinguish *Williams*. He alleges (Op.Br.35) that the closure here excluded members of the public who otherwise would have attended jury selection. But *Williams* discussed the absence of evidence that anyone was "turned away" as background information, not a "countervailing factor[]" that mitigated the public-trial violation. 974 F.3d at 346-47. And the record here similarly lacks evidence that anyone actually left the courtroom. In any event, "'[i]t is access to the content of the proceeding—whether in person, or via some form of documentation—that matters.'" *Id.* at 347 & n.13 (quoting *United States v. Antar*, 38 F.3d 1348, 1359-60 (3d Cir. 1994)); *see also United States v. Bansal*, 663 F.3d 634, 660-61 (3d Cir. 2011) (rejecting unpreserved jury-

selection-closure claim, in part because the "entire … process was transcribed and recorded; nothing was sealed or concealed from public view").

Titus mistakenly asks the Court to "join" the First Circuit's holding in *United States v. Negrón-Sostre*, 790 F.3d 295, 306 (2015), that closure of voir dire is reversible plain error. Op.Br. 35 n.6. That decision, which treated all unpreserved structural errors to require reversal, is inconsistent with the binding decision in *Williams*. *See* 3d Cir. I.O.P. 9.1. Titus's claim should be denied.

c.     Titus's claim also fails because he cannot show an effect on substantial rights. Under *Olano*'s third prong, a defendant ordinarily must establish "a reasonable probability that, but for the error claimed, the result of the proceeding would have been different." *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004) (quotations and brackets omitted). Titus does not purport to make that showing. Relying on the *Williams* dissent, he contends that prejudice should be presumed because courtroom closure is a structural error whose prejudice is impossible to measure. Op.Br.34-35. But that position is inconsistent with *Weaver*, where the Court applied *Strickland*'s prejudice standard to counsel's failure to object to the closure of voir dire, asking whether the defendant showed "either a reasonable probability of a different outcome" or "that the particular public-trial violation was so serious as to render his … trial fundamentally unfair," 137 S. Ct. at 1911, and concluding that he did not,

37

*id.* at 1912-13. *See also Puckett v. United States*, 556 U.S. 129, 140 (2009) (noting, before *Weaver*, that Court has "declined to resolve whether 'structural' errors … automatically satisfy the third prong of the plain-error test"). *Weaver* dispels Titus's argument that jury-selection closure is immune to prejudice analysis.

Here, the alleged closure did not affect the proceeding's outcome or infringe the fundamental purpose of the public-trial right—to insure that "the accused [is] fairly dealt with and not unjustly condemned." *Estes v. State of Texas*, 381 U.S. 532, 538-39 (1965); *see In re Oliver*, 333 U.S. 257, 270 (1948) (public-trial right "is an effective restraint on possible abuse of judicial power"). Jury selection was not secret, and the transcript shows that Titus was treated fairly and evenhandedly. *Weaver*, 137 S. Ct. at 1913. Nor is there any indication that a juror lied, anyone engaged in misbehavior during jury selection, or the public's presence would have led potential jurors to "behave[] differently." *Id.* at 1912-13. Titus's failure to show prejudice warrants rejection of his claim.

## III. THE DISTRICT COURT PROPERLY DENIED TITUS'S REQUESTED JURY INSTRUCTION ON GOOD FAITH.

### A.    Standard of Review

The Court reviews the denial of a jury-instruction request for abuse of discretion. *United States v. Jimenez*, 513 F.3d 62, 74-75 (3d Cir. 2008). Reversible error occurs "only if the omitted instruction is correct, is not substantially covered by other instructions, and is so important that its omission prejudiced

the defendant." *United States v. Urban*, 404 F.3d 754, 779 (3d Cir. 2005) (quotations omitted).

## B.    Background

Titus requested a jury instruction on good faith. Dkt. 64 at 56-57. The court denied that request because the proposed instruction "[wa]s just a mirror image of what the government has to prove in terms of knowledge." Appx1969; *see* Appx2145-2146. The court found that adding language about "good faith" would be "at best confusing," because it would "put[] in a whole bunch of different terminology" labeling good faith "a defense," only for the jury to be told that good faith is "not a defense that the defendant has to prove because [Titus] [does not] have the burden of proof." Appx1969. The court found the proposed instruction "confusing and unnecessary." Appx1970.

As relevant here, the court instructed the jury that the government had to prove beyond a reasonable doubt that Titus "distributed or dispensed the controlled substance outside the usual course of professional practice and not for a legitimate medical purpose knowingly or intentionally." Appx2164-2165. As the court further instructed, the government needed to prove "Titus *knew* … that the distributing or dispensing was outside the usual course of professional practice and not for a legitimate medical purpose." Appx2168 (emphasis added). The court added:

If a person acts on the basis of an honestly held belief that is inconsistent with the charged conduct, but the belief turns out to be inaccurate or incorrect, then the person is not acting knowingly or intentionally. Thus, in this case, if Dr. Titus made an honest mistake about a patient's medical needs, then he did not act knowingly or intentionally.

Appx2168-2169.

## C.    Discussion

Titus challenges the denial of his proposed instruction only as to "the charged dispensing offenses" (*i.e.*, Counts 1 to 14). Op.Br.3,36. That challenge is inconsistent with Circuit precedent holding "that a district court does not abuse its discretion in denying a good faith instruction where the instructions given already contain a specific statement of the government's burden to prove the elements of a 'knowledge' crime." *United States v. Leahy*, 445 F.3d 634, 651 (3d Cir. 2006) (citing *United States v. Gross*, 961 F.2d 1097, 1102-03 (3d Cir. 1992)), *abrogated on other grounds*, *Loughrin v. United States*, 573 U.S. 351 (2014); *see, e.g.*, *United States v. James*, 712 F. App'x 154, 157 (3d Cir. 2017) (unpublished).

The court's instructions on the mens rea element of a Section 841(a) offense were legally correct. They required the government to prove that Titus "knew" not only that he was distributing or dispensing a controlled substance, but that he was doing so "outside the usual course of professional practice and not for a legitimate medical purpose." Appx2168. That fully accords with the

Supreme Court's holding in *Ruan* that the statute's "knowingly or intentionally" requirement applies to the "except as authorized clause." 142 S. Ct. at 2375. The court's legally correct charge rendered a good-faith instruction unnecessary. *See Gross*, 961 F.2d at 1103.

In any event, the district court added an instruction "that, in context, approximated a good faith instruction," *James*, 712 F. App'x at 157-58, specifically, the instruction about acting based on "an honestly held belief" and making "an honest mistake." Appx2168-2169. This language appeared in Titus's own requested instruction. Dkt. 64 at 56. An "honestly held" belief is indistinguishable from a "good faith" belief. *See* Third Circuit Model Criminal Jury Instructions 5.07 ("A person acts in 'good faith' when he or she has an honestly held belief … ."); Black's Law Dictionary (11th ed. 2019) (defining good faith as "[a] state of mind consisting in … honesty in belief or purpose"). Adding "good faith" language was unnecessary and risked confusing the jury.

There is no merit to Titus's argument (Op.Br.40) that the charge failed to convey *the government's* burden to prove that Titus "lacked an honest, genuine belief that his prescribing was legitimate." The court instructed the jury that the government must prove knowledge or intent beyond a reasonable doubt, Appx2164-2165, 2168, and that Titus "did not act knowingly or intentionally" if he acted based on an honestly held, but inaccurate, belief, Appx2168-2169.

These instructions, which must be read together, *Jimenez*, 513 F.3d at 75-76; *Leahy*, 445 F.3d at 651, and which the jury is presumed to have followed, *United States v. Andrews*, 681 F.3d 509, 526 (3d Cir. 2012), kept the focus on the government's burden of proof.

Finally, Titus was not prejudiced by the denial of his instruction, *see Urban*, 404 F.3d at 779, given the "honestly held belief" language in the charge and counsel's repeated arguments to the jury that Titus was "acting and serving his patients in good faith." Appx2233; *see* Appx2227-2230. The jury simply found otherwise on 13 of the 14 dispensing counts in light of all the evidence. No reversible error occurred.

## IV.   THE GOVERNMENT DID NOT ENGAGE IN A PATTERN OF MISCONDUCT.

### A.   Standard of Review

The Court reviews a ruling on alleged prosecutorial misconduct for abuse of discretion if the defendant contemporaneously objected and reviews unpreserved claims for plain error. *United States v. Brennan*, 326 F.3d 176, 182 (3d Cir. 2003).

### B.   Discussion

Titus contends (Op.Br.41-51) that the government committed a pattern of misconduct based on its disclosure of six short recordings on the eve of trial, questioning of witnesses, and comments during jury arguments. The Court

analyzes claims of cumulative prosecutorial misconduct in "two steps," asking: (1) "whether there was misconduct," and (2) whether any misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process, taking into account the entire proceeding." *United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018) (quotations omitted). The government did not commit misconduct, but any errors did not render the trial unfair.

### 1.    Undercover recordings

The night before jury selection, the government produced in discovery six undercover recordings made by DEA Task Force Officer (TFO) Joelle Ryan in 2014. Appx0295-0298, 0301-0302, 0981. The recordings, which totaled 20 to 30 minutes, captured Ryan's unsuccessful attempts, in person and by phone, to be seen as a patient at Lighthouse. Appx0296-0297. Ryan spoke only to Lighthouse staff. Appx0297. The prosecutors found the recordings when doublechecking the DEA's case files to ensure the government had produced all discoverable materials, and they immediately turned them over. Appx0296, 0302. There were no reports documenting the undercover activities. Appx0302.[7]

The next morning, before jury selection, the defense requested a four-day continuance to evaluate and determine how to use the undercover evidence.

---

[7] The government's production included other material. Appx0306-0307. Titus's claim concerns only the six recordings. Op.Br.43.

Appx0295-0296, 0303-0305. The district court denied the request, noting that there would be only two days of trial that week after jury selection, followed by a three-day weekend, which would give the defense time to determine how the evidence fit into its overall strategy. Appx0302-0303. The court found that the defense would not be prejudiced by starting trial, Appx0309-0311, in part because the government was not calling TFO Ryan in its case, Appx0302-0303.

The government's production did not violate its obligation under *Brady v. Maryland*, 373 U.S. 83, 87 (1963), to disclose favorable evidence material to guilt or punishment. At most, Ryan's unsuccessful attempt to be seen by Titus was exculpatory as to the drug-involved premises charge in Count 15; it had no bearing on the specific opioid prescriptions charged in Counts 1-14. But the recordings were not suppressed—the government produced them before trial. In delayed-disclosure cases, establishing a *Brady* violation requires showing that the production prevented the defendant from making "effective[]" use of the evidence during trial. *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013) (quotations omitted). Titus cannot do so.

To the contrary, Titus used the undercover evidence to his maximum advantage. At the very start of her opening statement, defense counsel described and emphasized the failed undercover "attempt to get Dr. Titus to improperly prescribe opioids." Appx0546. On cross-examination, counsel elicited from the

44

then-lead case agent that the undercover attempt was unsuccessful and that he previously had been unaware of it. Appx0976-0981. As part of the defense case, which began ten calendar days after the government's production, Titus introduced the undercover recordings into evidence; examined (then-former) TFO Ryan about the undercover activities, eliciting that a staff member ultimately told her that Titus did not agree to see her as a patient; and examined another former Task Force member about the importance of documenting investigatory steps. Appx1821, 1873-1884, 1929-1937. During closing argument, Titus's counsel played a recording excerpt for the jury and, accusing the government of "hypocrisy," alleged that no reports had been written about the undercover attempt because the government had "tried to sweep it under the rug." Appx2251-2253.

In short, the defense fully presented the undercover evidence to the jury. *See United States v. Zayas*, 32 F.4th 211, 229-30 (3d Cir. 2022) (no *Brady* violation from mid-trial disclosure of defendant's statements where, *inter alia*, defense used evidence during witness cross-examinations), *petition for cert. filed*, No. 22-6467 (Jan. 6, 2023); *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987) (no *Brady* violation from production during trial of fingerprint reports where defendant had access before cross-examining witness, introduced reports into evidence, and argued reports showed he was not guilty). The jury's decision to

convict on 14 counts reflects the limited exculpatory value of this evidence, not prejudice to the defense: the undercover attempt said nothing about the illegitimate opioid prescriptions that Titus did issue, while evidence obtained from a search warrant also suggested that Lighthouse staff were suspicious of undercover officers coming into the clinic. Appx0779.

Titus did not allege in any new-trial motion that he was unable to use the undercover evidence effectively. Titus's vague arguments to the contrary, which speak more to the nature of the evidence than the timing of its disclosure, lack support. No *Brady* violation occurred.

### 2.    Doctor Raziano's testimony

The government called Dr. Raziano to testify about his emergency-room treatment of Titus's patients who had overdosed on drugs, including patient L.P. (Count 6). Titus objected that the jury would draw an improper inference about patients who had died from overdosing and that Raziano would provide an opinion about Titus's prescribing practices. Appx0272-0288, 0834-0844. The court ruled that Raziano could testify about the overdose deaths, and his related communications with Titus, but could not opine about Titus's prescribing practices. Appx0842-0844. The court directed the prosecutor to ensure that Raziano understood these boundaries, while recognizing that "doctors are sometimes difficult to control." Appx0844.

The following exchange occurred near the beginning of Raziano's direct examination:

Q:    When did you first become familiar with Patrick Titus?

A:    I can't give you an exact date, but … he was pretty infamous in the area.

Q:    How did you become familiar with him?

A:    He was the drug dealing doctor in the area.

Appx0998. Titus objected; the court struck Raziano's last answer and held a sidebar, where the prosecutor immediately stated, "Your Honor, I did not know he was going to say anything." Appx0998-0999. The defense made a motion for a mistrial, which the court denied on the grounds that it promptly struck Raziano's answer, the jury would follow its instructions, and it was "going to be a long trial." Appx1001-1005. The court later found: "based on what I've seen and the way the questions were asked, … the Government certainly was not trying to elicit the answers they got." Appx1006. Before Raziano's testimony resumed, the government substantially shortened its witness outline. Appx1007. During the brief remainder of Raziano's examination, the prosecutor did not ask about the overdose deaths previously ruled admissible. Appx1008-1011.

No misconduct occurred. The prosecutor's question, asking Dr. Raziano how he was familiar with Titus, was not itself improper. Nor is there merit to Titus's argument (Op.Br.46-47) that the prosecutor secretly sought to elicit

Raziano's answer by declining to take a brief recess, before Raziano testified, to ensure he understood the boundaries of his testimony. That the prosecutor immediately expressed surprise over Raziano's comment and mitigated the risk of another errant witness statement by truncating her examination—including by eliminating questions about patients who died from overdosing—belies any notion of bad faith. *See United States v. Hargrove*, 911 F.3d 1306, 1317-18 (10th Cir. 2019). The court did not clearly err in finding, based on first-hand observations, that the government did not deliberately elicit Raziano's comment. *See United States v. Stevens*, 935 F.2d 1380, 1387-88 (3d Cir. 1991) (clear-error standard applied to lack-of-bad-faith finding in *Brady* context).

Moreover, Titus has not carried his "burden" of showing that the "decision to strike the testimony was insufficient to cure any error that may have occurred." *United States v. Prosper*, 375 F. App'x 190, 196 (3d Cir. 2010) (unpublished) (citing *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)). The alleged error here consisted of a single question and answer on the third day of a multi-week trial. The court not only struck Raziano's answer, but directed the jury, at the end of the case, to disregard any evidence stricken from the record, Appx2156-2157, an instruction the jury presumably followed, *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1997). The court did not abuse its discretion in finding that any minimal prejudice was cured by striking Raziano's testimony.

*See id.* at 766 (single improper question, followed by objection and two curative instructions, "clearly" did not violate due process); *United States v. Granville*, 716 F.2d 819, 821 (11th Cir. 1983) (per curiam) (denial of mistrial not an abuse of discretion where improper questions "were a brief, isolated part of a four-day trial").

### 3.   Cross-examination of defense expert

The prosecutor asked defense expert Dr. Carol Warfield about her opinion, expressed in a journal article, that no one other than a pain physician can opine on whether a physician acted reasonably "when he or she prescribed opioids for a particular pain condition." Appx2099-2100. When Warfield stated that her article concerned "who is an expert in pain medicine," the prosecutor asked: "And if Dr. Titus were to testify in this case, would he meet the criteria?" Appx2100. The defense objected and moved for a mistrial at sidebar. Appx2100. The government explained that the purpose of the question was to point out that, according to Dr. Warfield, not even Titus (an internal-medicine doctor) was "qualified to opine on whether anything was for a legitimate medical purpose" because he was "not a pain management specialist." Appx2102; *see* Appx2102-2103 ("[T]he whole question is whether Dr. Titus was able to make that judgment for himself.").

The court denied the mistrial motion, struck the prosecutor's question, and instructed the jury not to consider it. Appx2103-2104. The court further instructed that the government always bears the burden of proving guilt, a defendant has an "absolute constitutional right not to testify," and no negative inference may be drawn from a defendant's decision not to testify. Appx2104. The court repeated the substance of this instruction in its final charge. Appx2158.

The Fifth Amendment prohibits "comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." *Griffin v. California*, 380 U.S. 609, 615 (1965). "A remark is directed to a defendant's silence when the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Brennan*, 326 F.3d at 187 (quotations omitted).

No violation occurred. The prosecutor did not refer to Titus's decision not to testify. On its face, his question was intended to impeach Dr. Warfield by pointing out that, in her view, not even Titus could make a judgment about whether an opioid prescription for pain was medically legitimate. *See Brennan*, 326 F.3d at 188 ("context" of statement "reveal[ed] that it was directed toward the weight the jury should accord" defense-witness testimony); *United States v.*

50

*Lynn*, 515 F. App'x 79, 82 (3d Cir. 2013) (unpublished) (prosecutor's comment "if we had some factual basis, if [defendant] Lynn wants to testify" was intended to demonstrate lack of foundation for testimony defense counsel sought to elicit). Nor would the jury *naturally* and *necessarily* have understood the question as a reference to Titus not testifying; the defense had not yet rested its case, and context made clear that the question was aimed at Dr. Warfield's criteria for who is qualified to determine the medical legitimacy of an opioid prescription.

Finally, "[i]f any ambiguity as to the meaning or interpretation of the Government's remark existed, the District court's curative instruction"—before any questioning resumed—"was sufficient to neutralize any error." *Lynn*, 515 F. App'x at 83; *see also United States v. Lore,* 430 F.3d 190, 207 (3d Cir. 2005) (finding no Fifth Amendment violation from witness's comment, "You'd have to ask [the defendant]. She handled the checkbook," given specific curative instruction).

### 4.    Comments during jury arguments

Titus contends (Op.Br.49-51) that the government "appealed to the jury's emotions" during opening, closing and rebuttal, but concedes that he failed to preserve his claim. Titus cannot show the "egregious error" or "manifest miscarriage of justice" required for reversal. *Brennan*, 326 F.3d at 182 (quotations omitted).

The challenged remarks from opening and closing briefly touched on the vulnerability of Titus's patients, the harmful effects of his prescriptions on patients, and Titus's financial motivation to prescribe opioids. Appx0545-0546, 2175. Those remarks were "proper comments on the evidence or proper argument as to inferences which could be drawn therefrom." *United States v. Ellis*, 595 F.2d 154, 161 (3d Cir. 1979). The condition of Titus's patients was squarely relevant: as the government argued, one reason Titus knew he was dispensing opioids unlawfully was because he ignored obvious signs that his patients were either abusing drugs or diverting the medications he prescribed. *See, e.g.*, Appx2197-2199, 2203-2204, 2207-2212. Despite "red flags that were waving in" his face, Titus prescribed these patients opioids because he was selling prescriptions for money, not treating them based on medical necessity within the usual course of professional practice. Appx2216. Titus's operation of a business for "personal gain" (Appx0545) also spoke to his maintenance of the drug-involved premises charged in Count 15.

In short, the comments were within the "considerable latitude" afforded prosecutors when arguing the evidence, *United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994) (quotations omitted), especially on plain-error review. *See United States v. Jackson*, 619 F. App'x 189, 194-95 (3d Cir. 2015) (unpublished) (no obvious error in prosecutor referring to defendant as a "drug dealer"); *United*

*States v. Byerley*, 999 F.2d 231, 236 (7th Cir. 1993) (no error in prosecutor describing cocaine business as one "run totally by greed and … whose product is one of the most dangerous items in any marketplace anywhere on the planet"); *United States v. Little*, 753 F.2d 1420, 1441 (9th Cir. 1984) (references to money and greed as defendant's motivation did not amount to misconduct).

The comments were also justified by Titus's trial defense. Counsel maintained that Titus had prescribed opioids in good faith, Appx0547-0549, 2227-2231, making at most an "honest mistake" about patients' medical needs, Appx0551-0552, 2227-2228, and that, according to Dr. Warfield, there was a "wide" range of reasonable options for treating chronic pain, Appx0550, 2226. Pointing out that Titus prescribed opioids to patients who were "clearly suffering from addiction" or "obviously abusing drugs"—sometimes leaving them "in even more pain"— or to patients "[not] even taking the drugs at all," Appx2175, was a fair response to Titus's defense. *See United States v. DiPasquale*, 740 F.2d 1282, 1296 (3d Cir. 1984).[8]

Titus's challenge to comments from rebuttal also fails. The prosecutor described opioids as "poison" when responding to counsel's argument that Titus

---

[8] Titus's reliance on *United States v. Canty*, 37 F.4th 775 (1st Cir. 2022), is misplaced. Op.Br.50-51. The improper comments there were pervasive, involving four different types of error, and the government conceded that, unlike here, the comments were not proper argument. 37 F.4th at 781, 786-92.

was "compassion[ate]" and "kind" toward his patients. Appx2277-2278; *see* Appx2233, 2269-2270. As the prosecutor argued, what Titus did was "not kind," because he discharged patients without following up on the "dangerous drugs he was prescribing them on their way out the door[,] … the same poison that they were struggling with …" Appx2277-2278. In context, the comment was "a brief and appropriate response" to defense argument about Titus's alleged compassion. *United States v. Weatherly*, 525 F.3d 265, 272 (3d Cir. 2008); *see United States v. McKoy*, 129 F. App'x 815, 827-28 (4th Cir. 2005) (per curiam) (unpublished) (reference to defendant "spread[ing] poison of cocaine and heroin" not improper).

Finally, the prosecutor did not ask the jury to consider "the impact of drugs on their broader community." Op.Br.50. She simply used a turn of phrase in asking the jury to "[t]hink about all these patients. Think about the [L.P.'s] of the world. Think about the [C.C.'s] …" when going through the verdict sheet. Appx2280-2281. The prosecutor made the comment immediately after discussing a note Titus had written about *his own* patients. Appx2280. It was not a clear or obvious exhortation to consider the broader community.

Even if the Court concludes that plain error occurred, a new trial is not warranted. The comments appeared on only six transcript pages, out of approximately 60 pages comprising the government's opening, closing, and

rebuttal. Appx0536-0546, 2175-2216, 2272-2281. The court instructed the jury to base its verdict only on the evidence, Appx2157, 2282, and not to be influenced by "sympathy, prejudice, fear, or public opinion," Appx2157. During rebuttal, the prosecutor asked the jury to scrutinize the evidence because "the evidence is what proves Dr. Titus is guilty." Appx2273. And the evidence supporting Titus's convictions was indeed strong. These factors show the absence of prejudice. *See United States v. Berrios*, 676 F.3d 118, 135-36 (3d Cir. 2012).

### 5.    No cumulative error

The absence of misconduct renders cumulative-error analysis unnecessary. *See United States v. Powell*, 444 F. App'x 517, 522 (3d Cir. 2011) (unpublished) ("zero plus zero equals zero"). If the Court concludes otherwise, any prosecutorial missteps were not severe, were neutralized by strong curative instructions, and were harmless given the strength of the evidence. *See Welshans*, 892 F.3d at 574.

## V.    THE DISTRICT COURT'S DRUG-QUANTITY FINDING WAS NOT CLEARLY ERRONEOUS.

### A.    Standard of Review

The Court reviews a sentencing court's drug-quantity determination for clear error. *United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020).

### B.    Background

The Presentence Report (PSR) recommended a base offense level of 38 based on 106,395.32 kilograms of converted drug weight (CDW), which corresponded to the total Schedule II controlled substances Titus prescribed between November 4, 2013, and December 19, 2014, when his clinic was located at the premises charged in Count 15. PSR ¶¶ 91, 103-104; *see* U.S.S.G. § 2D1.1(c)(1). Titus objected on the ground that the government had not shown that each underlying prescription was unlawful. Appx2503-2506.

The court applied a base offense level of 36, finding that Titus unlawfully prescribed at least 30,000, but less than 90,000, kilograms of CDW. Appx2335-2337; *see* U.S.S.G. § 2D1.1(c)(2). The court relied on "general trial evidence" about Titus's conduct and the trial testimony of Dr. Thomas, who reviewed 24 random patient files (in addition to the files pertinent to Counts 1 to 14) and found that the prescriptions in 18 or 19 of the random files were not for a medically legitimate purpose in the usual course of professional practice. Appx2335-2337; *see* Appx1494-1495, 1717-1722. The court "extrapolate[d]" from that percentage of unlawful prescriptions. Appx2336. The court recognized that 24 files did not provide a statistically valid sample, but "against the backdrop … of widespread illegal prescribing, ignoring of positive drug tests," it was "confident" that "at least 30,000 kilograms" was a "reasonable" estimate of

drug quantity, noting that the actual quantity "was well above that number." Appx2336.

With a total offense level of 40 and category I criminal history, Titus's Guidelines range was 292 to 365 months. Appx2337. The court sentenced him to 240 months. Appx2391.

### C.    Discussion

The district court did not clearly err in holding Titus responsible for at least 30,000 kilograms of CDW.

A sentencing court determines drug quantity by a preponderance of the evidence. *Diaz*, 951 F.3d at 159. Where "no drug seizure" occurred, the Guidelines commentary directs the court to "approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt(n.5); *accord United States v. Gibbs*, 190 F.3d 188, 203 (3d Cir. 1999) (recognizing that "a degree of estimation is sometimes necessary"). Although "the need to estimate … is not a license to calculate drug amounts by guesswork," *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993), the court may rely on a wide range of evidence provided the evidence bears "sufficient indicia of reliability to support its probable accuracy," *Gibbs*, 190 F.3d at 203-04 (quotations omitted); *see, e.g., United States v. Freeman*, 763 F.3d 322, 329, 338 (3d Cir. 2014) (affirming drug-quantity

finding despite district court's heavy reliance on cooperating coconspirator's testimony).

The court reasonably estimated drug quantity based on the trial evidence. The starting point was the total quantity of Schedule II narcotics (106,395.32 kilograms CDW) Titus prescribed when occupying the drug-involved premises in Count 15. PSR ¶ 91. That quantity was underinclusive insofar as it did not account for prescriptions before November 4, 2013, including those in Counts 1 to 3. Appx0034. And even though the jury found that unlawful drug activity was "a significant or important reason" why Titus operated Lighthouse at 10-12 North Church Street, Appx2171, the finding of "at least 30,000" kilograms of CDW represented less than a third (28.2%) of the total opioids he prescribed when he occupied those premises.

The drug-quantity finding was not clearly erroneous. The evidence amply proved that Titus engaged in "widespread illegal prescribing." Appx2336. Titus routinely ignored drug screens by prescribing opioids to patients who had tested positive for illicit substances or non-prescribed opioids, or tested negative for the opioids prescribed to them. *See* pp.8-12, *supra*; *see United States v. Moore*, 423 U.S. 122, 142-43 (1975) (ignoring drug-test results is evidence of unlawful prescribing). He prescribed opioids in large quantities and similar patterns, prescribed opioids to patients who had recently overdosed, and prescribed

opioids to patients he was discharging for aberrant drug behavior. *See* pp.7-8, 12-13, *supra*. The pattern, quantities, and combinations of narcotics prescribed by Titus were so alarming that some pharmacies refused to fill his prescriptions. Appx0732-0733, 0753-58, 1283-1285. And patients came to Lighthouse to buy prescriptions, exhibiting signs of addiction or diversion in the waiting room and sometimes traveling long distances to get there. Appx1176-1178, 1304. An HVAC repairman observed people selling pills for cash in the parking lot. Appx1273-1276.

This and other trial evidence provided a backdrop to the court's extrapolation from Dr. Thomas's conclusion that prescriptions in at least 18 out of 24 randomly selected patient files were unlawful. Appx2335-2336. The court's finding was below the quantity warranted by Dr. Thomas's analysis and the evidence, even if 24 patients were not a statistically valid sample. *See United States v. McCutchen*, 992 F.2d 22, 25-26 (3d Cir. 1993) (rejecting requirement of expert statistical evidence on sampling when extrapolating quantity from a test sample; "reasonable reliability is the touchstone"). But it was certainly reasonable from Titus's standpoint, given the jury's finding on Count 15 and Titus's rampant practice of unlawful prescribing. *See Diaz*, 951 F.3d at 159-60.

Titus contends that quantity determinations require proof concerning each underlying prescription or at least each patient who received prescriptions.

Op.Br.53-55. That argument is at odds with controlling precedent (discussed *supra*), which authorize sentencing courts to make reasonable estimates of drug quantity. The Seventh Circuit decision relied on by Titus, *United States v. Rosenberg*, 585 F.3d 355, 356-58 (2009), is inapposite: it did not involve a jury finding that the defendant maintained a drug-involved premises, and the court had no occasion to consider whether drug quantity may be estimated based on a random sample of patient files and abundant trial evidence of rampant illegal prescribing.

The more apt out-of-circuit precedent is *United States v. Ifediba*, 46 F.4th 1225 (11th Cir. 2022), *petition for cert. filed*, No. 22-6503 (Nov. 23, 2022), which rejected a doctor-defendant's argument that a court must determine that each prescription was unlawful when determining drug quantity. *Id.* at 1246. The Eleventh Circuit found no clear error in holding the defendant responsible for the total opioids he prescribed during the conspiracy, even if some prescriptions could have been legitimate, based on trial evidence showing the defendant operated a "pill mill." *Id.* at 1247; *accord United States v. Azmat*, 805 F.3d 1018, 1047 (11th Cir. 2015). Here, the court's quantity determination was more conservative, corresponding to less than 30% of the opioids prescribed while Titus ran the drug-involved premises in Count 15. As in *Ifediba*, it was based on specific and reliable trial evidence and not clearly erroneous.

# CONCLUSION

For the foregoing reasons, the judgment of conviction should be affirmed.

Respectfully submitted,

KENNETH A. POLITE
 Assistant Attorney General

ALEZA S. REMIS                          LISA H. MILLER
JUSTIN M. WOODARD                        Deputy Assistant Attorney General
 Assistant Chiefs

                                        s/ John-Alex Romano
CLAIRE T. SOBCZAK                       _____
 Trial Attorney
                                        JOHN-ALEX ROMANO, Attorney
                                         U.S. Department of Justice
                                         Criminal Division, Appellate Section
                                         950 Pennsylvania Avenue, NW
                                         Washington, DC 20530
                                         Tel. 202-353-0249
                                         John-Alex.Romano@usdoj.gov

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,995 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in Calisto 14-point font.

3.    The digital version electronically filed with the Court on this day is an exact copy of the written document to be sent to the Clerk; and

4.    This brief has been scanned for viruses with the most recent version of a commercial virus scanning program, and according to that program, is free of viruses.

**Dated:  January 24, 2023**

s/John-Alex Romano

_____
John-Alex Romano, Attorney
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov

## CERTIFICATE OF SERVICE

Undersigned counsel of record certifies that all participants in this case are registered users of the Court's electronic case filing system and that the foregoing Brief for the United States was this day delivered by electronic case filing to the Clerk of the Court and to counsel for Appellant Titus.

**DATED:**    **JANUARY 24, 2023**

s/John-Alex Romano
_____
JOHN-ALEX ROMANO, Attorney
U.S. Department of Justice
Criminal Division, Appellate Section
950 Pennsylvania Avenue, NW
Washington, DC 20530
Tel. 202-353-0249
John-Alex.Romano@usdoj.gov