**No. 22-1516**

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

UNITED STATES OF AMERICA,

Appellee,

v.

PATRICK TITUS,

Appellant.

_____

On appeal from the United States District Court for
the District of Delaware at No. 1:18-CR-00045-001

_____

**REPLY BRIEF**

_____

ELENI KOUSOULIS
Federal Public Defender

MARY KATE HEALY
Assistant Federal Public Defender

*Counsel for Appellant*
*Patrick Titus*

Office of the Federal Public Defender
for the District of Delaware
800 King Street, Suite 200
Wilmington, DE 19801
(302) 573-6010

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

ARGUMENT .........................................................................................1

  I.   The district court erred by excluding Dr. Titus's proffered expert testimony. .................................................................................1

  II.  The district court violated Dr. Titus's Sixth Amendment right to a public trial by completely closing the courtroom during *voir dire*.............................5

  III.  The district court erred in framing its jury instructions on the *mens rea* element of the charged dispensing offenses. ..................................................10

  IV.  The government's pattern of misconduct requires reversal of Dr. Titus's convictions and remand for a new trial..........................................................16

  V.  The district court erred in calculating the drug quantity attributable to Dr. Titus. ............................................................................21

CONCLUSION ......................................................................................26

CERTIFICATIONS OF COUNSEL ....................................................................27

# TABLE OF AUTHORITIES

## *Cases*

*Chapman v. California*, 386 U.S. 18 (1967)..................................................................4

*Gomez v. United States*, 490 U.S. 858 (1989) ..........................................................9

*Liparota v. United States*, 471 U.S. 419 (1985) ......................................................13

*Orie v. Sec'y Pa. Dep't of Corr.*, 940 F.3d 845 (3d Cir. 2019)................................2

*Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501 (1984)...........................10

*Ruan v. United States*, 142 S.Ct. 2370 (2022) .................................................. passim

*United States v. Brizuela*, 962 F.3d 784 (4th Cir. 2020) ........................................22

*United States v. Brown*, 810 F. App'x 105 (3d Cir. 2020) ......................................1

*United States v. Burke*, 571 F.3d 1048 (10th Cir. 2009) ........................................19

*United States v. Canty*, 37 F.4th 775 (1st Cir. 2022)..............................................20

*United States v. Cobb*, 271 F. Supp. 159 (S.D.N.Y. 1967) ....................................17

*United States v. Cohen*, 510 F.3d 1114 (9th Cir. 2007)............................................2

*United States v. Devin*, 918 F.2d 280 (1st Cir. 1990)..............................................19

*United States v. Diaz*, 951 F.3d 148 (3d Cir. 2020)................................................21

*United States v. Fabode*, 2022 WL 16825408 (6th Cir. Nov. 8, 2022)..................13

*United States v. Freeman*, 763 F.3d 322 (3d Cir. 2014)...........................................21

*United States v. Gallman*, 57 F.4th 122 (3d Cir. 2023)........................................6, 9

*United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999)...............................................21

*United States v. Ifediba*, 46 F.4th 1225 (11th Cir. 2022).........................................23

*United States v. Jannotti*, 729 F.2d 213 (3d Cir. 1984).............................................4

*United States v. Jones*, 128 F. App'x 853 (3d Cir. 2005)............................................3

*United States v. Kahn*, 58 F.4th 1308 (10th Cir. 2023) .................................. passim

*United States v. McCutchen*, 992 F.2d 22 (3d Cir. 1993).......................................21

*United States v. McIver*, 470 F.3d 550 (4th Cir. 2006) .............................................3

*United States v. Mister*, 553 F. Supp. 2d 377 (D.N.J. 2008) ...................................2

*United States v. Negron-Sostre*, 790 F.3d 295 (1st Cir. 2015) ................................7

*United States v. Olano*, 507 U.S. 725 (1993) ........................................................7, 9

*United States v. Pasha*, 797 F.3d 1122 (D.C. Cir. 2015).........................................18

*United States v. Paulino*, 996 F.2d 1541 (3d Cir. 1993) .........................................21

*United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) ...........................................1, 2

*United States v. Rosenberg*, 585 F.3d 355 (7th Cir. 2009).....................................22

*United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) ................................... passim

*United States v. Schneider*, 704 F.3d 1287 (10th Cir. 2013)....................................3

*United States v. U.S. Gypsum Co.*, 438 U.S. 422 (1978)....................................4, 22

*United States v. Wall*, 593 F. App'x 128 (3d Cir. 2014) ...........................................3

*United States v. Welshans*, 892 F.3d 566 (3d Cir. 2018)........................................17

*United States v. Williams*, 974 F.3d 320 (3d Cir. 2020)............................ 7, 8, 9, 10

*Waller v. Georgia*, 467 U.S. 39 (1984)...................................................................10

### ***Statutes***

21 U.S.C. § 841 ................................................................................... passim

21 U.S.C. § 856 ..................................................................................................22

### ***Rules***

Federal Rule of Evidence 403 ...................................................................................3

Federal Rule of Evidence 704(b) .........................................................................1, 3

### ***Constitutional Provisions***

U.S. CONST. amend. I. ...............................................................................................9

U.S. CONST. amend. VI. ...........................................................................................5

# **ARGUMENT**

I.   **The district court erred by excluding Dr. Titus's proffered expert testimony**.

Dr. Titus challenges the district court's wholesale exclusion of his proffered expert testimony on the critical issue of knowledge and intent. The district court failed to delineate the bounds of proper inquiry under Federal Rule of Evidence 704(b), instead relying on a misapplication of this Court's decision in *United States v. Pohlot*, 827 F.2d 889 (3d Cir. 1987) and Rule 704 to exclude entirely the evidence.

The district court's decision denied Dr. Titus his constitutional right to present a defense. If, as Dr. Titus argues, *Pohlot* and Rule 704 did not require the district court's exclusion of his proffered expert testimony, then the ruling also violated Dr. Titus's fundamental right to present a defense. The government cites *United States v. Brown*, 810 F. App'x 105, 108 (3d Cir. 2020) (unpublished), to argue that the district court's application of *Pohlot* and the Federal Rules of Evidence must be arbitrary to implicate Dr. Titus's constitutional right to present a defense. Gov't Br. at 22–23. *Brown* did not analyze whether the district court's application of the Federal Rules of Evidence was arbitrary. The evidence was inadmissible and therefore "the only question [was] whether the Constitution required admitting the evidence." 810 F. App'x at 108. Dr. Titus's proffered expert testimony was admissible; because the district court's exclusion of the testimony was an evidentiary error, it was also a constitutional error. *See Orie v. Sec'y Pa. Dep't of Corr.*, 940

1

F.3d 845, 855 (3d Cir. 2019) (supporting the conclusion that erroneously excluding relevant defense testimony takes on a constitutional dimension in criminal cases).

The proffered expert testimony negated the requisite *mens rea*. *Pohlot*, 827 F.2d at 897–903. According to Dr. Mack's expert opinion, Dr. Titus has a "rigid and inflexible" thought process and he is "fixed and regimented in his own belief that his judgment and decision-making… is correct." (Appx2444; Appx2492–93). Dr. Titus scored in the "0.09–0.1 percentile" or "severely impaired range" on a test that measures "nonverbal concept formation and the ability to learn from trial and error." (Appx2466). Dr. Mack's opinion that Dr. Titus "processes information differently than others[,]" (Appx2466), supports a conclusion that he cannot "process contradictory information" and was relevant to whether Dr. Titus knew or intended to act in an unauthorized manner. *United States v. Cohen*, 510 F.3d 1114, 1124 (9th Cir. 2007). The government attempts to distinguish *United States v. Mister*, 553 F. Supp. 2d 377 (D.N.J. 2008), by emphasizing the district court's finding that Dr. Mack "did not contend that Dr. Titus could not understand the relevant medical standards." Gov't Br. at 26. But the correct inquiry is not whether Dr. Titus could understand the relevant medical standards – it is whether Dr. Titus subjectively knew he was acting, or intended to act, in a way that he believed was unauthorized.

Evidence of Dr. Titus's neurocognitive impairments was also admissible under Rule 704(b). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006). Although Rule 704(b) prohibits an expert witness from stating an opinion "about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged[,]" "the rules do not prevent an expert from drawing conclusions about intent, so long as the expert does not profess to know a defendant's intent." *United States v. Schneider*, 704 F.3d 1287, 1294 (10th Cir. 2013). Dr. Mack could not profess to know what Dr. Titus believed, but he should have been able to testify about Dr. Titus's defective thought process and neurocognitive impairments and draw conclusions about their effect on Dr. Titus's knowledge and intent.

Dr. Mack's proffered testimony was not misleading under Federal Rule of Evidence 403. The district court did not conclude that it was, but the government contends as much because "it lacked a nexus to the timeframe of the indictment." Gov't Br. at 27–28. The two unpublished cases cited by the government do not support its assertion because both involved diagnoses that were episodic in nature. *Id.* (citing *United States v. Wall*, 593 F. App'x 128, 131 (3d Cir. 2014) (unpublished) (involving psychotic episodes); *United States v. Jones*, 128 F. App'x 853, 855 (3d Cir. 2005) (unpublished) (involving schizophrenia)). In contrast, Dr. Titus's

impairments were not episodic. Dr. Mack opined that Dr. Titus was impaired at the start of his career, and those impairments persisted to the present. (Appx2473).

The district court's error was not harmless. To determine the harmlessness of constitutional error, "the reasonable doubt" or "reasonable possibility" standard of appellate review applies. *United States v. Jannotti*, 729 F.2d 213, 220 n.2 (3d Cir. 1984). This is a lesser standard than the "high probability" standard, which "requires that [the court] have a sure conviction that the error did not prejudice the defendant[]." *Id.* "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).

The erroneous exclusion of Dr. Titus's proffered expert testimony was not harmless beyond a reasonable doubt. There is a reasonable possibility that the error contributed to the judgment of conviction. Dr. Titus's knowledge and intent was the heart of his defense that he attempted to treat his patients' chronic pain in good faith. The distinction between prescribing legally and prescribing illegally is "often difficult to distinguish." *Ruan v. United States*, 142 S.Ct. 2370, 2378 (2022) (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 (1978)). Dr. Mack's testimony could have shaped the jury's verdict. The government relies "on the overall strength of the evidence," Gov't Br. at 28, but ignores that the jury acquitted Dr. Titus of Count Seven. Had the jurors learned about Dr. Titus's neurocognitive

4

impairments and severely impaired ability to learn from trial and error, the outcome of their deliberations could have been different on the remaining counts of conviction.

## II.   The district court violated Dr. Titus's Sixth Amendment right to a public trial by completely closing the courtroom during *voir dire*.

The district court plainly erred by completely closing the courtroom for the entirety of *voir dire* and jury selection.  The government concedes that "*if* the court closed jury selection, the court erred, and the error is plain, because it did not make findings to support closure."  Gov't Br. at 31.  The government contends, however, that no closure occurred.  *Id.*  The record establishes that one did.  In a pretrial status conference, the district court discussed its proposed plan for *voir dire* and the courtroom's capacity limitations:

> So here's what I'm thinking about in terms of jury selection.  So what I think is going to happen is I'm going to get the jury administrator here to take the 115 people… and to randomize them… And I'm going to… schedule essentially three waves.

> A wave for Tuesday morning which will … start at 9:30.  And I would imagine the number of people who might be in that wave would be probably in the low 40s.  *Basically the way we have the courtroom set up, we can only voir dire 32 jurors at a time*.  And so what I want to do is have enough people show up in the first wave so that there are 32 seats filled.  If there's extra people, because its random, *I am just going to excuse them because I don't have anything I can do with them*.

> Then I would like to have a second wave come in, and I think that may be in the neighborhood of like, I want to say, 12:30.  And then we'd have the same thing.  There would be, you know, whatever number we pick, low 40's.  They'd be summonsed to be in.  And you know, again,

if there's more than 32, whichever ones are left over, I would excuse or would be excused.

And then we'll have a third group who's ever left like the last 30, and they'll be scheduled to come in on Wednesday morning. But I don't think we'll need them. And essentially because they will have been randomized before we started this process, once we get up to 32 qualified and not excused peremptorily jurors, we've got enough to pick a jury.

(Appx0198–99) (emphasis added). The government's suggestion that the district court's comment "could have been a direction to move to another area of the courtroom" ignores the reality that there was no space to accommodate anyone other than the 32 jurors in each wave. Gov't Br. at 31. The district court excused "extra people" beyond the 32 in each wave because it did not "have anything [it could] do with them." (Appx0198–99). The court did not arrange a public video stream of the proceedings. *See e.g.*, *United States v. Gallman*, 57 F.4th 122, 124 (3d Cir. 2023). The government's hypothesis that the lack of clarifying questions from the public connotes uncertainty, Gov't Br. at 31, is illogical – uncertainty begets questions. And its position that the people sitting in the back of the courtroom simply relocated within the courtroom seems disingenuous, given that government counsel likely observed, as the defense did, the public exit.[1]

---

[1] Throughout trial, members of the government's trial team overflowed from counsel's table to the gallery. The district court's order would have excluded any members of the trial team seated in the gallery from *voir dire* and jury selection.

The plain error affects Dr. Titus's substantial rights.  The government argues that the United States Court of Appeals for the First Circuit's holding in *United States v. Negron-Sostre*, 790 F.3d 295, 306 (1st Cir. 2015), is "inconsistent with" this Court's decision in *United States v. Williams*, 974 F.3d 320 (3d Cir. 2020). Gov't Br. at 37.  It is not.  *Negron-Sostre* held that "structural error in the form of a denial of the public trial right prejudices a defendant notwithstanding that the prejudice may be difficult to detect."  790 F.3d at 305.    The Fifth Circuit thus concluded that the exclusion of the public for the entirety of *voir dire* necessarily affects substantial rights and thus satisfies the third prong of *United States v. Olano*, 507 U.S. 725 (1993).  *Id.* at 305–06.  *Williams* declined to resolve formally the possibility that an erroneous courtroom closure, as a structural error, fits within the "special category of forfeited errors that can be corrected regardless of their effect on outcome."  974 F.3d at 341 (quoting *Olano*, 507 U.S. at 734)).  But *Williams* explicitly repudiated any "suggestion that the present error, or any structural error, does not warrant a presumption of prejudice."  *Id.* at 341 n.9.  This Court should presume prejudice, as the *Williams* majority, Judge Restrepo in his *Williams* dissent, and *Negron-Sostre* all contemplate.  "It would be illogical to classify an error as structural because it affects substantial rights but then conclude that it did not affect defendants' substantial rights for purposes of *Olano*'s third prong."  *Williams*, 974 F.3d at 384 (Restrepo, J., dissenting).

7

Finally, this Court should exercise its discretion to correct the plain error because it seriously affects the fairness, integrity, and public reputation of judicial proceedings. The costs of inaction are significant. First, the district court itself, rather than courtroom staff, ordered the closure without considering "reasonable alternatives." *Williams*, 974 F.3d at 346. That is important regardless of whether the order was oral or written – the effect, a closure stamped with the imprimatur of the federal judiciary, is the same. Second, the closure extended across an entire phase of trial. *Id.* The government downplays the closure, noting jury selection lasted only a day in comparison to the public phases of trial and analogizing to *Williams*. Gov't Br. at 35. *Williams* involved a two-day closure during a longer than seven-week trial. 974 F.3d at 346. This involved a one-day closure during an eleven-day trial – nearly ten percent of Dr. Titus's trial was closed. Third, unlike in *Williams*, the closure excluded members of the public. *Id.* (characterizing as a mitigating factor the absence of "any evidence of an individual or news organization… being turned away after attempting to attend the proceedings[]").[2] Fourth, "[t]he availability of a transcript does little to mitigate the error because 'no transcript can recapture the atmosphere of the *voir dire*, which may persist throughout the trial.'" *Id.* at 385 (Restrepo, J., dissenting) (quoting *Gomez v. United*

---

[2] The government misreads *Williams* when it characterizes this discussion as "background information." Gov't Br. at 36. *Williams* discussed this factor when weighing the costs of inaction. 974 F.3d at 346.

*States*, 490 U.S. 858, 874–75 (1989)).  Finally, prosecutorial misconduct permeated Dr. Titus's trial.   Just two months ago, this Court identified the absence of "misbehavior by the prosecutor, judge, or any other party" as the "most significant[]" factor in its analysis of *Olano*'s fourth prong.  *Gallman*, 57 F.4th at 129; *see also Williams*, 974 F.3d at 347 ("Finally, there has been 'no suggestion of misbehavior by the prosecutor, judge, or any other party[.]'").  The government tries to cabin the prosecutorial misconduct allegations, noting that they did not involve the erroneously closed portion of the trial.  Gov't Br. at 35; 38.  The cases do not make that distinction, and this Court should not either.

The costs of remedial action, while not negligible, should not prevent this Court from acting to correct the error.  *Williams* involved ten consolidated cases, "whose original trial occurred almost five years ago, spanned approximately two months, and involved well over one hundred witnesses."  974 F.3d at 347.  A retrial for Dr. Titus would involve a fraction of the *Williams* demands.  Nor would a retrial be a "windfall" to Dr. Titus.  Gov't Br. at 36.  The erroneous closure denied Dr. Titus the public trial that the Constitution guarantees him; he insists now on having it.

A retrial is also in the public interest, contrary to the government's position.  *Id.*  In fact, Dr. Titus's right to a public trial "is difficult to separate from the right of everyone in the community [under the First Amendment] to attend the *voir dire* which promotes fairness."  *Press-Enterprise Co. v. Super. Ct. of Cal.*, 464 U.S. 501,

508 (1984). "[P]ublic access to trial proceedings helps sustain public confidence that standards of fairness are being observed." *Williams*, 974 F.3d at 346. Moreover, during the *Williams* oral argument, the government agreed that having open trials is in the United States's interest.[3] Finally, the government omits necessary context when highlighting the *Williams* language that a new trial may, in some instances, be a "windfall" and "not in the public interest." Gov't Br. at 36. *Williams* quoted *Waller v. Georgia*, 467 U.S. 39, 50 (1984), which suggested "a new trial presumably would be a windfall for the defendant, and not in the public interest[,]" "[i]f, after a new suppression hearing, essentially the same evidence is suppressed[.]" The *Waller* possibility is inapplicable here.

## III.   The district court erred in framing its jury instructions on the *mens rea* element of the charged dispensing offenses.

The district court failed to instruct the jury that a finding that Dr. Titus subjectively believed he was prescribing legitimately, even if his belief was not reasonable, required acquittal because it creates reasonable doubt about knowledge and intent. A carefully framed "good faith" instruction was essential to explain that 21 U.S.C. § 841(a)'s *mens rea* standard is subjective and individual, not objective.

---

[3] Oral Argument at 35:45, *United States v. Williams*, 974 F.3d 320 (3d Cir. 2020) (No. 17-2111), https://www2.ca3.uscourts.gov/oralargument/audio/17-2111USAv.JabreeWilliams.mp3.

The jury instruction was inconsistent with the Supreme Court's guidance in *Ruan*. The government does not meaningfully address *Ruan*. Since the filing of the opening brief, both the Tenth and Eleventh Circuits issued their decisions on remand, concluded the jury instructions did not convey an adequate *mens rea* to the jury for convictions under § 841, vacated the defendants' convictions, and remanded for new trials. *See United States v. Ruan*, 56 F.4th 1291 (11th Cir. 2023) (*Ruan II*); *United States v. Kahn*, 58 F.4th 1308 (10th Cir. 2023). This Court should do the same.

In *Ruan II*, as here, the district court denied the defense's request for a good faith instruction and instead gave an alternative instruction. 56 F.4th at 1297. The alternate instruction stated:

> A controlled substance is prescribed by a physician in the usual course of a professional practice and, therefore, lawfully, if the substance is prescribed by him in good faith as part of his medical treatment of a patient in accordance with the standard of medical practice generally recognized and accepted in the United States.

*Id.* The Eleventh Circuit rejected the government's argument that the "instruction, read together with the whole charge, adequately instructed the jury that it had to find the defendants acted with knowledge or intent in order to convict them under § 841(a)." *Id.* The Eleventh Circuit concluded that "the passing reference to 'good faith'… is inadequate" on its own because the Supreme Court "explicitly rejected the government's proffered compromise instruction that objective good faith or 'honest effort' should govern the usual course of professional practice prong." *Id.*

The Eleventh Circuit emphasized that "the phrase 'good faith' encompasses both subjective and objective good faith" and "only the subjective version is appropriate." *Id.* Considering the phrase in the context of the entire charge, the Eleventh Circuit held that "the remaining jury instructions did not help convey that a subjective analysis was required for the 'except as authorized' exception." *Id.* The district court had enumerated § 841(a)'s elements: "(1) the defendant dispensed the controlled substance; (2) 'the defendant *did so* knowingly and intentionally;' and (3) the defendant did not have authorization." *Id.* The Eleventh Circuit explained that "[g]ramatically, the 'did so' phrase links the *mens rea* element to the preceding element describing the actus reus of dispensing the controlled substance, but not to the 'except as authorized' exception." *Id.* Finally, the Eleventh Circuit concluded that "the summary of the charge also did not help to convey the required *mens rea*[]" because the district court "essentially repeated the language from 21 C.F.R. § 1306.04(a) without linking it to any requirement that the jury find a lack of good faith or scienter for this exception." *Id.* at 1298.

Similarly, in *Kahn*, the defense argued that the district court improperly advised the jury regarding § 841(a)'s *mens rea* requirement. *Kahn* first discussed the Controlled Substances Act ("CSA") regulation outlining that a prescription "must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice[,]" in light of *Ruan*. 58 F.4th at 1313–

15 (quoting 21 C.F.R. § 1306.04)). Kahn explained that the terms "legitimate medical purpose" and "usual course of professional practice" are objective criteria. *Kahn*, 58 F.4th at 1314 (citing *United States v. Fabode*, No. 21-1491, 2022 WL 16825408, at *6 (6th Cir. Nov. 8, 2022)). "[T]he government's showing of objective criteria without proving that a defendant actually intended or knew that he or she was acting in an unauthorized way, is not enough to convict." *Id.* at 1315.[4]

*Kahn* next applied *Ruan* and concluded that the district court incorrectly instructed the jury on *mens rea* because the jury instructions did not "require the government to prove beyond a reasonable doubt that [the defendant] knowingly or intentionally acted in an unauthorized manner." 58 F.4th at 1315–17. The pertinent jury instructions stated:

> Jury Instruction No. 37… The [g]overnment must prove beyond a reasonable doubt … [that the defendant] knowingly or intentionally distributed or dispensed the controlled substance outside the usual course of professional medical practice or without a legitimate medical purpose.
>
> Jury Instruction No. 39… The good faith of [the defendant] is a complete defense to… knowingly and unlawfully dispensing and/or distributing Oxycodone outside the usual course of professional practice and without a legitimate medical purpose[], because good faith on the part of [the defendant] would be inconsistent with knowingly

---

[4] *Kahn* addressed *Ruan*'s discussion of *Liparota v. United States*, 471 U.S. 419 (1985), and explained: "The Supreme Court held that knowingly engaging in conduct that is, in fact, unauthorized is not sufficient, even if one is aware of all the factors that render it unauthorized. Instead, the government was required to prove that the defendant actually knew that his conduct was unauthorized under the law." 58 F.4th at 1315 n.3.

and intentionally distributing and/or dispensing controlled substances outside the usual course of professional practice and without a legitimate medical purpose, which is an essential part of the charges. "Good faith" connotes an attempt to act in accordance with what a reasonable physician should believe to be proper medical practice… The good faith defense requires the jury to determine whether [the defendant] acted in an honest effort to prescribe for patients' medical conditions in accordance with generally recognized and accepted standards of practice.

*Id.* at 1312–13. *Kahn* explained that repeatedly instructing the jury that it could convict the defendant "if it concluded that he acted outside the usual course of professional medical practice or without a legitimate medical purpose" was incorrect under *Ruan*. *Id.* at 1315–16. First, "*Ruan* expressly disallows conviction under § 841(a)(1) for behavior that is only objectively unauthorized." *Id.* at 1316. Second, "*Ruan* treats the two criteria in § 1306.04(a) not as distinct bases to support a conviction, but as 'reference to objective criteria' that may serve as circumstantial evidence of a defendant's subjective intent to act in an unauthorized manner." *Id.* *Kahn* also concluded that the district court's good faith instruction was "problematic" after *Ruan*. *Id.* at 1316–17. Instead of a good faith instruction, *Kahn* held that "[t]he question to be posed to a jury is whether a physician was subjectively intending to act in a way that he believed was unauthorized – not whether he was attempting to act in a way that a 'reasonable physician should believe' was authorized or unauthorized." *Id.* at 1317.

14

As in *Ruan II* and *Kahn*, the district court incorrectly instructed the jury on

*mens rea*.  The district court charged:

> The third element the Government must prove beyond a reasonable doubt is that Dr. Titus acted knowingly or intentionally.
>
> The phrase knowingly or intentionally requires the Government to prove beyond a reasonable doubt that Dr. Titus knew that what he distributed or dispensed was a controlled substance and that the distributing or dispensing was outside the usual course of professional practice and not for a legitimate medical purpose.
>
> To act knowingly means that Dr. Titus was conscious and aware that he was engaged in the acts charged and knew of the surrounding facts and circumstances that make up the offenses. Knowledge does not require that Dr. Titus knew the acts charged and the surrounding facts amounted to a crime.
>
> To act intentionally means to act deliberately and not by accident. Intentionally does not require that Dr. Titus intended to violate the law.
>
> If a person acts on the basis of an honestly held belief that is inconsistent with the charged conduct, but the belief turns out to be inaccurate or incorrect, then the person is not acting knowingly or intentionally. Thus, in this case, if Dr. Titus made an honest mistake about a patient's medical needs, then he did not act knowingly or intentionally.

(Appx2164–69).

The instructions fail to convey that Dr. Titus's subjective belief that he was

prescribing within the standard of care creates reasonable doubt about knowledge or

intent.  The phrase "honestly held belief" similarly encompasses both the objective

and the subjective given the government's position that "[a]n 'honestly held' belief

is indistinguishable from a 'good faith' belief."  Gov't Br. at 41; *Ruan II*, 56 F.4th

at 1297 ("Without further qualification, the phrase 'good faith' encompasses both subjective and objective good faith.").  The jury could have concluded that Dr. Titus subjectively believed his conduct comported with the appropriate standard of care.  But under the erroneous instruction, the jury could have convicted Dr. Titus if it concluded that a reasonable doctor would not have held an honest belief that the conduct comported with the appropriate standard of care.  The repeated references to the objective criteria "legitimate medical purpose" and "usual course of professional practice" similarly emphasize the objective nature of the jury instructions and erroneously allowed the jury to convict if it found that Dr. Titus issued a prescription that did not meet the objective criteria.  *Kahn*, 58 F.4th at 1316.  Dr. Titus's subjective belief, even if unreasonable, that the prescriptions were issued for a legitimate medical purpose within his usual course of professional practice precludes conviction if Dr. Titus did not intend to act in an unauthorized way.  *Ruan*, 142 S.Ct at 2382; *see also Kahn*, 58 F.4th at 1315 n.3.

## IV.    The government's pattern of misconduct requires reversal of Dr. Titus's convictions and remand for a new trial.

The government impermissibly failed to disclose *Brady* material in a timely manner, elicited improper and prejudicial opinion testimony from a witness, remarked on Dr. Titus's right to remain silent, and appealed to the jury's emotions in its opening, closing, and rebuttal arguments.  Cumulatively, these errors "so

infected the trial with unfairness as to make the resulting conviction a denial of due process[.]" *United States v. Welshans*, 892 F.3d 566, 574 (3d Cir. 2018).

The government's delayed disclosure of the exculpatory undercover recordings until mere hours before jury selection prevented Dr. Titus from using it effectively in his defense. The government suggests that the defense had ample time to use the exculpatory evidence effectively because "there would be only two days of trial… after jury selection, followed by a three-day weekend," and the defense's case "began ten calendar days after the production." Gov't Br. at 44–45. The government ignores that the defense had less than a day to assess how the undercover recordings affected the entire defense strategy, including the defense's opening statement and planned cross-examinations of the government's witnesses. The district court's conclusion that Dr. Titus would not be prejudiced by starting trial without a four-day continuance because the government did not plan to call Ms. Ryan ignores that the evidence could impact the defense's cross-examination of the government's witnesses in the first two days of trial. The disclosure was "too late" to allow Dr. Titus to use it effectively. *United States v. Cobb*, 271 F. Supp. 159, 163 (S.D.N.Y. 1967). Indeed, the witnesses that Dr. Titus was able to call struggled to remember basic details about the investigation or entirely lacked firsthand knowledge. Ms. Ryan testified that she did not recall how many people were on the task force, did not recall who decided to conduct the undercover investigation

involving Dr. Titus, did not recall whether there was an operational plan, did not recall who directed her to attempt an in person visit with records after her telephone calls failed, did not recall whether she brought medical records to the visit, did not recall who accompanied her on the undercover attempts, and did not recall whether she took any notes or made any reports. (Appx1874–88). Although Agent McDonald performed surveillance of Dr. Titus's practice on other occasions, he had no contemporaneous knowledge of the undercover investigation. (Appx1936–37). Although the witnesses recognized the importance of documentation, there were allegedly no written notes or reports of this months-long undercover investigation. (Appx1874–88; Appx1930–32). Ms. Ryan could not identify her colleague on the recording with her, (Appx1884), forestalling Dr. Titus's ability to develop further the information. If the defense had been provided the evidence in a timely manner, it could have conducted investigation to determine who was on the recording with Ms. Ryan. That person may have the recollection of the undercover operation that Ms. Ryan lacked. The delayed disclosure prevented the defense from being able to develop facts and additional witnesses which could have proven useful to Dr. Titus's defense. *See United States v. Pasha*, 797 F.3d 1122, 1139 (D.C. Cir. 2015) ("It is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case,

whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on.") (quoting *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009)); *United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990) ("[I]n cases of delayed disclosure, a court's principal concern must be whether learning the information altered the subsequent defense strategy, and whether, given timeous disclosure, a more effective strategy would likely have resulted.").

The government improperly elicited Dr. Raziano's opinion that Dr. Titus "was the drug dealing doctor in the area." (Appx0998). Although the prosecutor represented that she "did not know [Dr. Raziano] was going to say anything," (Appx0998–99), she never represented that she instructed him not to testify as he did. The district court failed to inquire further, despite the extensive record that the government should have anticipated, as the defense did, that Dr. Raziano would share his opinion of Dr. Titus. (Appx0272–91; Appx0834–44). Dr. Raziano's testimony was entirely consistent with his witness interviews, which defense counsel repeatedly warned constituted prejudicial opinion testimony prior to the government calling him.

The government also improperly commented on Dr. Titus's decision to testify. The government characterizes its remark as "intended to impeach Dr. Warfield by pointing out that, in her view, not even [Dr.] Titus could make a judgment about whether an opioid prescription for pain was medically legitimate."

Gov't Br. at 50.  But the government explicitly asked: "And if Dr. Titus were to testify, would he meet the criteria?"  (Appx2099–2100).  The implication to the jury was that Dr. Titus could not testify because his own expert witness views him as unqualified "to determine the medical legitimacy of an opioid prescription."  *Id.* at 51.  The district court's curative instruction only emphasized the point, as the court itself acknowledged.  (Appx2101).

Finally, the prosecution impermissibly appealed to the jury's emotions during opening, closing, and rebuttal.  Appealing "to the jury's emotions and role as the conscience of the community" is improper, as is stressing "harm to a particular community caused by drug dealing."  *United States v. Canty*, 37 F.4th 775, 787 (1st Cir. 2022).  Here the prosecution repeatedly did just that.  The prosecution explicitly asked the jury to "[t]hink about all these patients.  Think about the Lisa Parsons of the world.  Think about the Chasity Calhouns, and the Michael Adams, and the Dione Dickersons, and the Melissa Silbereisens.   And find him guilty…" (Appx2280–81).  The government suggests this is a simple "turn of phrase" and that "of the world" really means Dr. Titus's own patients.  Gov't Br. at 54.  This Court should not accord the prosecution's plain language the government's preferred reading.  The prosecution asked the jury to convict Dr. Titus for all the patients in the world struggling with opioid addiction.  The prosecutors' comments across their opening, closing, and rebuttal arguments were improper.

Cumulatively, these four instances of misconduct infected Dr. Titus's trial with unfairness and denied him due process.

## V.    The district court erred in calculating the drug quantity attributable to Dr. Titus.

The government admits that the district court relied on "general trial evidence" and "the backdrop… of widespread illegal prescribing" when attributing at least 30,000, but less than 90,000, kilograms of converted drug weight to Dr. Titus. Gov't Br. at 56–59. The "general evidence" fails to support the attribution. The district court needed to determine whether Dr. Titus's prescriptions to each patient included in the drug quantity calculation were illegal. This approach is not "at odds with controlling precedent." Gov't Br. at 60. Notably, *all* of the cases cited by the government as "controlling precedent… which authorize sentencing courts to make reasonable estimates of drug quantity[]" involved *illicit* substances. *See id.* at 57–60 (discussing *United States v. Diaz*, 951 F.3d 148, 159–60 (3d Cir. 2020) (cocaine and heroin); *United States v. Freeman*, 763 F.3d 322, 329, 338 (3d Cir. 2014) (cocaine); *United States v. Gibbs*, 190 F.3d 188, 203–04 (3d Cir. 1999) (cocaine and crack); *United States v. Paulino*, 996 F.2d 1541, 1545 (3d Cir. 1993) (cocaine); *United States v. McCutchen*, 992 F.2d 22, 25–26 (3d Cir. 1993) (cocaine and crack)). Unlike those cases, estimation is not necessary here because precise measurement of the prescribed controlled substances is possible via Prescription Monitoring Program ("PMP") data. Moreover, determining the quantity of prescribed controlled

substances is insufficient.   The district court needed to determine whether prescriptions within that quantity were legal or illegal.

Requiring patient-specific findings regarding the legality of Dr. Titus's prescriptions comports with *Ruan*'s emphasis that "[prohibited conduct] (issuing invalid prescriptions) is difficult to distinguish from the gray zone of socially acceptable conduct (issuing valid prescriptions)." *Ruan*, 142 S.Ct. at 2378 (quoting *U.S. Gypsum Co.*, 438 U.S. at 441).   Indeed, "a doctor's violation of § 841 is prescription specific, and writing a prescription only violates § 841 if, in doing so, the doctor strays from bounds of professional medical practices *in treating that specific patient*." *United States v. Brizuela*, 962 F.3d 784, 797 (4th Cir. 2020).   The analysis for a doctor's violation of 21 U.S.C. § 856 is the same.   The only prescriptions that should be included in the drug quantity are those that the doctor knowingly prescribed outside the usual course of professional practice and not for a legitimate medical purpose.

The government must, at sentencing, "address every patient to whom a medical defendant has written an allegedly unlawful prescription." *United States v. Rosenberg*, 585 F.3d 355, 357 (7th Cir. 2009).   The district court "may not… only discuss some of the patient files and extrapolate[.]" *Id.*   The government distinguishes *Rosenberg* on procedural grounds; Ms. Rosenberg pleaded guilty and *Rosenberg* therefore did not "involve a jury finding." Gov't Br. at 60.   Nonetheless,

*Rosenberg* involved a two-day sentencing hearing with expert testimony. 585 F.3d at 357–58. The Seventh Circuit described Ms. Rosenberg as "not [a] typical nurse practitioner" with a "rather unusual medical practice." *Id.* at 356. She did not maintain an office (conducting house calls or meeting patients "in a variety of unusual settings[,]" including parking lots), prescribed patients pain medication (sometimes without physical examinations and "often with no more than scant knowledge of their medical history"), and she sold prescriptions to an undercover officer and a confidential informant. *Id.* at 356–57. Still, the Seventh Circuit required patient-specific findings. *Id.* at 357–58. The government highlights *United States v. Ifediba*, 46 F.4th 1225 (11th Cir. 2022), a recent decision from the United States Court of Appeals for the Eleventh Circuit. Gov't Br. at 60. *Ifediba* affirmed the district court's conclusion "that the broader pill mill conspiracy to distribute controlled substances supported an inference that most of the prescriptions were unlawful." 46 F.4th at 1246–47. Unlike *Ifediba*, there is no conspiracy here. *Ifediba* also fails entirely to address *Ruan*. *Rosenberg* is a more persuasive analysis.

The district court's failure to analyze Dr. Titus's prescriptions on a patient-specific level ignores the spectrum between issuing invalid and valid prescriptions. *Ruan*, 142 S.Ct. at 2378 ("A strong scienter requirement helps to diminish the risk of 'overdeterrence,' *i.e.*, punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line."). The district court's analysis

lacks necessary nuance and contradicts both pain management experts' testimony that there is a range – from excellent practice to malpractice – that falls within the legal practice of medicine. (Appx1503; Appx2021–22). Both experts also testified that there is a range of appropriate treatment options for any particular patient and different approaches to pain management. (Appx1500–01 (Dr. Thomas discussing individualized patient treatment); Appx1996–97 (Dr. Warfield testifying that "[t]here are many, many different approaches to pain management…"); Appx1997 (Dr. Warfield explaining acupuncture, massage therapy, nerve blocks, opiates, steroid injections, and surgery are examples of the various ways of treating pain)).

Even if the district court could look to the "general trial evidence" for an extrapolation, it did not make sufficient findings to do so here. The government highlights evidence regarding inconsistent drug screen results, prescription patterns and quantities, prescriptions to patients with histories of substance abuse, prescriptions to patients after discharge, and pharmacy decisions to stop filling prescriptions. Gov't Br. at 58–59. But the experts disagreed about the import of such evidence.[5] Dr. Warfield disagreed with Dr. Thomas that prescribing to a patient

---

[5] The government incorrectly represented that the trial also included evidence that "*patients came to Lighthouse to buy prescriptions*, exhibiting signs of addiction or diversion in the waiting room and sometimes traveling long distances to get there." Gov't Br. at 59 (emphasis added). No patient testified that they came to Dr. Titus's practice "to buy" prescriptions. The government cites to Appx1176–78 and Appx1304 to support its assertion. *Id.* Chasity Calhoun's testimony on direct examination is Appx1176–78. That portion of Ms. Calhoun's direct examination

struggling with substance abuse always falls outside the usual course of professional practice. (Appx2005–06; Appx2018). She disagreed that a physician must perform physical examinations at every visit. (Appx2006–09; Appx2028). She disagreed that a physician may never prescribe opioids after discharge. (Appx2007–08). She disagreed that prescribing two short-acting opioids or that prescribing opioids with sedatives is outside the usual course of professional practice. (Appx2014–Appx2017). The district court did not weigh the experts' competing testimony or otherwise credit one expert opinion over the other. The district court's attribution of at least 30,000, but less than 90,000, kilograms of CDW to Dr. Titus was clear error.

---

focused on her observations of the patients. On cross-examination, Ms. Calhoun admitted that she hid her addiction from Dr. Titus because she wanted him to keep prescribing her medication. (Appx1208–09). Jane Webb's testimony on direct examination is Appx1304. That portion of Ms. Webb's testimony focused on her observations of the patients. On cross-examination, Ms. Webb testified that Dr. Titus's office did not post a sign indicating cash was the only form of payment and that she would not work in his office if such a sign was posted. (Appx1401). Patients testified, contrary to the government's characterization, that they did not buy prescriptions from Dr. Titus. *See e.g.*, Appx1026–27 (patient Michael Adams testifying that his payments to Dr. Titus were for office visits); Appx1865–66 (patient Lisa Cody testifying that her payments to Dr. Titus were for office visits, not for controlled substances).

## **CONCLUSION**

For the foregoing reasons, and those raised in his opening brief, Appellant

Patrick Titus respectfully submits that his convictions should be vacated and his case

remanded for a new trial.  He further contends that his sentence should be vacated

and his case remanded for reconsideration of the drug quantity attributable to him.


Respectfully submitted,

Eleni Kousoulis
Federal Public Defender


*/s/ Mary Kate Healy*
MARY KATE HEALY
Assistant Federal Public Defender


Date: <u>March 7, 2023</u>

## <u>CERTIFICATIONS OF COUNSEL</u>

I, Mary Kate Healy, Assistant Federal Defender, of the Office of the Federal Public Defender for the District of Delaware, hereby certify:

1.  I have been appointed to represent Patrick Titus in this appeal, although I am not a member of the bar of the Court of Appeals for the Third Circuit.

2.  This brief complies with the type-volume requirements of Fed. R. App. P. 32(a)(7)(B) because it contains 6,460 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office 365 word count software in font size 14, type style Times New Roman.

3.  The text in the electronic copy of this brief is identical to the text in the paper copies of the brief filed with the Court.

4.  The electronic version of this brief was scanned by Trend Micro Apex One, Version 14.0.11136, and found to contain no known viruses.

5.  I have electronically filed the *Reply Brief for Appellant* and served copies upon Filing User John-Alex Romano, Esq., U.S. Department of Justice, through the Third Circuit Court of Appeals' Electronic Case Filing (NextGen CM/ECF) system.

6.  I mailed a hard copy of this brief to Patrick Titus, Register No. 09227-015, Danbury, FCI, Federal Correctional Institution, Route 37, Danbury, CT 06811.

Date: <u>March 7, 2023</u>                    <u>/ s / *Mary Kate Healy*    </u>
                                        Mary Kate Healy
                                        Assistant Federal Public Defender